Michael Newdow, in pro per
PO Box 233345
Sacramento, CA  95823
916-427-6669

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

Civil Action No.

THE REV. DR. MICHAEL A. NEWDOW, IN PRO PER;

Plaintiff,

v.

THE CONGRESS OF THE UNITED STATES OF AMERICA;
PETER LEFEVRE, LAW REVISION COUNSEL;
THE UNITED STATES OF AMERICA;
JOHN WILLIAM SNOW, SECRETARY OF THE TREASURY;
HENRIETTA HOLSMAN FORE, DIRECTOR, UNITED STATES MINT;
THOMAS A. FERGUSON, DIRECTOR, BUREAU OF ENGRAVING AND PRINTING;

Defendants.

---

## ORIGINAL COMPLAINT

---

Plaintiff alleges as follows:

## TABLE OF CONTENTS

LIST OF APPENDICES ................................................................................................iii

TABLE OF AUTHORITIES.........................................................................................v

JURISDICTION AND VENUE....................................................................................1

PARTIES .......................................................................................................................1

HISTORICAL BACKGROUND ..................................................................................3

   A. HISTORY OF AMERICAN RELIGIOUS FREEDOM .........................................3

   B. HISTORY OF "IN GOD WE TRUST" ON THE COINS AND CURRENCY ...................10

   C. HISTORY OF "IN GOD WE TRUST" AS THE NATIONAL MOTTO ...........................22

   D. THE POLITICAL CLIMATE WAS PRO-MONOTHEISTIC AND ANTI-ATHEISTIC
      WHEN THE CHALLENGED ACTS WERE IMPLEMENTED .......................................25

   E. THE POLITICAL CLIMATE HAS REMAINED PRO-MONOTHEISTIC AND ANTI-
      ATHEISTIC SINCE THE CHALLENGED ACTS WERE IMPLEMENTED ...................26

CLAIM FOR RELIEF ..................................................................................................29

   A. PLAINTIFF NEWDOW DOES NOT TRUST IN GOD .....................................................29

   B. THE DEFENDANTS IN THIS CASE, INDIVIDUALLY AND COLLECTIVELY,
      HAVE ACTED AND CONTINUE TO ACT TO FURTHER THE PRO-
      MONOTHEISTIC AND ANTI-ATHEISTIC BIAS THAT STEMS FROM THE USE
      OF THE MOTTO ...................................................................................................30

   C. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE
      NATION'S MOTTO – TURNS NEWDOW INTO A "POLITICAL OUTSIDER,"
      THUS VIOLATING THE ESTABLISHMENT CLAUSE .................................................32

   D. NEWDOW IS FORCED TO PAY TAX DOLLARS TO SUPPORT THE PURELY
      RELIGIOUS NOTION – WHICH TURNS HIM, PERSONALLY, INTO A POLITICAL
      "OUTSIDER" – THAT "WE" TRUST IN GOD..................................................................35

E. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE NATION'S MOTTO – INFRINGES UPON NEWDOW'S RIGHT TO THE FREE EXERCISE OF HIS RELIGION .........................................................................37

F. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE NATION'S MOTTO – VIOLATES NEWDOW'S RIGHTS UNDER RFRA ...................42

G. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY, AND AS THE NATION'S MOTTO – VIOLATES NEWDOW'S FREE SPEECH AND EQUAL PROTECTION RIGHTS.........................................................................................44

H. DEFENDANT LEFEVRE HAS INJURED NEWDOW IN OTHER WAYS......................44

DEFENDANTS HAVE NO COMPELLING INTEREST ...........................................................47

A. "IN GOD WE TRUST" IS – AND WAS INTENDED TO BE – RELIGIOUS, AND ANY CLAIM TO THE CONTRARY IS PRETEXTUAL ....................................................48

B. CONSIDERATION OF ANALOGOUS INFRINGEMENTS OF CONSTITUTIONAL RIGHTS – IN WHICH DEFENDANTS WOULD NEVER ENGAGE – HIGHLIGHTS THE DEGREE TO WHICH THE ACTIVITIES BEING CHALLENGED HERE ARE IMPERMISSIBLE. ..........................................................................................................51

C. "IN GOD WE TRUST," CONSTITUTIONALLY, IS SECTARIAN..................................53

PRAYER FOR RELIEF..............................................................................................................57

## <u>LIST OF APPENDICES</u>

**APPENDIX A**        **Pertinent Constitutional Provisions and Code Sections**

**APPENDIX B**        **American Society was Overtly Partial to (Christian) Monotheism in the 1950s**

**APPENDIX C**        **American Society was Overtly Antagonistic to Atheism in the 1950s**

**APPENDIX D**        **The Contemporaneous Interlarding of the Pledge of Allegiance With "Under God" Corroborates Congress's Religious Intentions**

**APPENDIX E**        **Analysis of the Congressional Record (Circa 1955)**

**APPENDIX F**        **"In God We Trust" Continues to Foster a Particular Religious Ideology**

**APPENDIX G**        **"In God We Trust" is Not Merely "Ceremonial." Nor is its Religious Content or Effect *De Minimis***

**APPENDIX H**        **"In God We Trust" is Not an "Acknowledgement" of Religion, but Endorses the Particular Religious Belief that there Exists a (Christian) God**

**APPENDIX I**        **Declaration of Michael Newdow**

**APPENDIX J**        **Data on Religion in the United States**

**APPENDIX K**        **Constitutionally, Monotheism is Just as Sectarian as is Any Other Denomination**

**APPENDIX L**     **Twenty-Eight of Thirty Supreme Court Justices have Written Opinions Containing Principled Statements Inconsistent with the Current Governmental Use of "In God We Trust"**

**APPENDIX M**     **The Supreme Court has Issued an Overwhelming Number of Principled Statements that Demonstrate that "In God We Trust" as Currently Used by Government is Unconstitutional**

**APPENDIX N**     **Survey Results: American Views on the Motto, "In God We Trust"**

## **TABLE OF AUTHORITIES**

### Cases

Adarand Constructors, Inc. v. Mineta, 534 U.S. 103 (2001)....................................................44

Agostini v. Felton, 521 U.S. 203 (1997) .........................................................................32, 55

Board of Education of Kiryas Joel v. Grumet, 512 U.S. 687 (1994) .......................................55

Board of Education v. Allen, 392 U.S. 236 (1968) ..................................................................32

Board of Regents v. Southworth, 529 U.S. 217 (2000).......................................................51, 55

Bowen v. Kendrick, 487 U.S. 589 (1988) ...............................................................................36

Bradwell v. State, 83 U.S. 130 (1873)....................................................................................52

Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753 (1995)..............................53

City of Boerne v. Flores, 521 U.S. 507 (1997)...................................................................32, 42

Clark v. Jeter, 486 U.S. 456 (1988)........................................................................................47

Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756 (1973).........32

Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,
    483 U.S. 327 (1987) .........................................................................................................32

Edwards v. Aguillard, 482 U.S. 578 (1987) ...........................................................................32

Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004)..........................3, 32, 33, 54

Employment Div. v. Smith, 494 U.S. 872 (1990) .........................................................38, 49, 55

Engel v. Vitale, 370 U.S. 421 (1962) ........................................................................32, 34, 52

Everson v. Board of Education, 330 U.S. 1 (1947) .................................................................32

Flast v. Cohen, 392 U.S. 83 (1968) ........................................................................................32

Grand Rapids School District v. Ball, 473 U.S. 373 (1985) ..................................................56

Guam v. Guerrero, 290 F.3d 1210 (9th Cir. 2002)..................................................................42

Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. 203 (1948) ............................................32

Lee v. Weisman, 505 U.S. 577 (1992) .....................................................................................32

Lemon v. Kurtzman, 403 U.S. 602 (1971) ....................................................................25, 32, 33

Locke v. Davey, 540 U.S. 712 (2004) ......................................................................................32

Lynch v. Donnelly, 465 U.S. 668 (1984) ......................................................................34, 38, 47

Marsh v. Chambers, 463 U.S. 783 (1983)..........................................................................32, 49

McGowan v. Maryland, 366 U.S. 420 (1961) ..........................................................................32

Meek v. Pittenger, 421 U.S. 349 (1975)..................................................................................32

Mitchell v. Helms, 530 U.S. 793 (2000) .............................................................................32, 55

Murdock v. Pennsylvania, 319 U.S. 105 (1943) ......................................................................41

Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833 (1992) ...............................53

Reynolds v. United States, 98 U.S. 145 (1878)........................................................................32

Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995) .........................32

Rosenberger v. University of Virginia, 515 U.S. 819 (1995)....................................................55

School Dist. v. Schempp, 374 U.S. 203 (1963)........................................................................32

Tilton v. Richardson, 403 U.S. 672 (1971) .............................................................................32

Torcaso v. Watkins, 367 U.S. 488 (1961) ...............................................................................32

United States v. Virginia, 518 U.S. 515 (1996)........................................................................51

Valley Forge Christian College v. Americans United for Separation of Church & State, 454
    U.S. 464 (1982)................................................................................................................32

Van Orden v. Perry, 125 S. Ct. 2854 (2005) ......................................................................33, 38

Walz v. Tax Com. of New York, 397 U.S. 664 (1970)...............................................................32

Wisconsin v. Yoder, 406 U.S. 205 (1972) ..........................................................................32
Wooley v. Maynard, 430 U.S. 705 (1977) ..........................................................................44
Zelman v. Simmons-Harris, 536 U.S. 639 (2003)..........................................................32, 55

## Constitutional Provisions

Constitution of Georgia - 1777 ..........................................................................................4
Constitution of South Carolina - 1778................................................................................4
Constitution of the State of New Jersey (1776)..................................................................55
United States Constitution, Amendment I ......................................................................1, 8
United States Constitution, Amendment V ........................................................................1
United States Constitution, Article I, Section 1 .................................................................2
United States Constitution, Article I, Section 8 ...............................................................36
United States Constitution, Article II ...............................................................................4
United States Constitution, Article VI..........................................................................4, 8

## Statutes

1 Stat. 23 ...........................................................................................................................7
1 Stat. 246-51 ..................................................................................................................10
1 Stat. 65 .........................................................................................................................10
10 U.S.C. § 502 ...............................................................................................................46
10 U.S.C. § 6031 .............................................................................................................45
13 Stat. 517 .....................................................................................................................13
13 Stat. 518 .....................................................................................................................13
13 Stat. 54-55 ..................................................................................................................13
17 Stat. 427 .....................................................................................................................14
18 Stat 3517 ....................................................................................................................14
2 U.S.C. § 285 .................................................................................................................31
2 U.S.C. § 285b .................................................................................................................2
28 U.S.C. § 1331 ...............................................................................................................1
28 U.S.C. § 1346 ...............................................................................................................1
28 U.S.C. § 1361 ...............................................................................................................1
28 U.S.C. § 1391 ...............................................................................................................1
31 U.S.C. § 301 .................................................................................................................2
31 U.S.C. § 303 ...........................................................................................................2, 31
31 U.S.C. § 304 ...........................................................................................................2, 30
31 U.S.C. § 321 .................................................................................................................2
31 U.S.C. § 5103 .............................................................................................................30
31 U.S.C. § 5111 .............................................................................................................30
31 U.S.C. § 5112 .......................................................................................22, 30, 31, 57
31 U.S.C. § 5114 .......................................................................................22, 30, 31, 57

31 U.S.C. § 5115 ....................................................................................................30
32 U.S.C. § 304 .....................................................................................................46
32 U.S.C. § 312 .....................................................................................................46
35 Stat. 164 ...........................................................................................................16
36 U.S.C. § 22903 .................................................................................................45
36 U.S.C. § 306 .....................................................................................................31
42 U.S.C. § 2000bb et seq .......................................................................................1
5 Stat. 136-42 ........................................................................................................11
5 U.S.C. § 3331 .....................................................................................................46
70 Stat. 732 ......................................................................................................26, 49
8 Stat. 154 ...............................................................................................................8

## Congressional Record

1 Annals of Cong. 102 (1789) ...................................................................................6
100 Cong. Rec. 2, 1700 .........................................................................................23
100 Cong. Rec. 5915 .............................................................................................27
100 Cong. Rec. 6085 .............................................................................................24
100 Cong. Rec. 6348 .............................................................................................23
100 Cong. Rec. 7758 .............................................................................................27
100 Cong. Rec. 7764 .............................................................................................24
100 Cong. Rec. 7765 .............................................................................................24
100 Cong. Rec. 7833 .............................................................................................23
100 Cong. Rec. 8618 .............................................................................................27
100 Cong. Rec. A2515 ...........................................................................................27
101 Cong. Rec. 11193 ...........................................................................................24
101 Cong. Rec. 4384 .............................................................................................17
101 Cong. Rec. 8156 .............................................................................................23
101 Cong. Rec. 9448 .............................................................................................18
98 Cong. Rec. 771 .................................................................................................54
99 Cong. Rec. A1428 .............................................................................................27
99 Cong. Rec. A2658 .............................................................................................22
99 Cong. Rec. A4130 .............................................................................................27
H.J. Res. 396 .........................................................................................................25
H.R. Rep No. 143, 43rd Cong., 1st Sess. 1 (1874)..................................................10
H.R. Rep. No. 1106, 60th Cong., 1st Sess. 1 (1908).................................................16
H.R. Rep. No. 1959, 84th Cong., 2nd Sess. 1 (1956)................................................24
H.R. Rep. No. 271, 21st Cong., 1st Sess. 1 (1830) .....................................................8
H.R. Rep. No. 662, 84th Cong., 1st Sess. 2 (1955) .................................12, 13, 18, 21
H.Rep. 532, 89th Cong., 1st Sess. (June 21, 1965) ..................................................26
*Hearing on H.R. 619 and related bills, before the Committee on Banking and Currency*, 84th
    Cong., 1st Sess. 47 (Tuesday, May 17, 1955)..................................18, 19, 20, 39
S. Rep. No. 1287, 83rd Cong., 2nd Sess. 2 (1954) ...................................................17
S. Rep. No. 637, 84th Cong., 1st Sess. 2 (June 27, 1955) ........................................21

## Treatises

Cornell S. *The Other Founders*: Anti-Federalism and the Dissenting Tradition in America, 1788-1828 (University of North Carolina Press: Chapel Hill, NC; 1999)............................ 6

*Detached Memoranda, W. & M. Q., 3d ser., 3:554--60 (1946)* ................................................ 44

Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology*. (Garden City, NY: Doubleday & Co., 1955) ...................................................................... 55

James Madison, *Memorial and Remonstrance against Religious Assessments*, II Writings of Madison.................................................................................................................................... 36

Schwarz T. *A History of United States Coinage*. (A.S. Barnes & Co., New York; 1980) 14, 15, 43

Stokes AP. *Church and State in the United States*. (Harper & Brothers: New York, 1950) .... 6, 12, 13, 14

*The Complete Anti-Federalist*, Strong HJ, ed. (Chicago: University of Chicago Press, 1981) . 5

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*. Elliot, Jonathan, ed. 2d ed., 1888. ................................................................................................................................... 5

*The Papers of James Madison*. Edited by William T. Hutchinson et al. (Chicago and London: University of Chicago Press, 1962) ................................................................... 4, 7, 32, 47

*The Writings of James Madison*. Edited by Gaillard Hunt (New York: G. P. Putnam's Sons, 1900--1910).............................................................................................................................. 8

## Newspapers and Periodicals

Antiques & Collecting, July, 1987 .......................................................................................... 17

Arkansas Gazette, December 6, 1953....................................................................................... 17

Arkansas Gazette, March 4, 1955............................................................................................. 17

Current Literature, New York, Vol. XLIV, No. 1 (January, 1908).......................................... 15

New York Times, December 18, 1865 ...................................................................................... 14

New York Times, November 15, 1907 ...................................................................................... 15

The Gideon, May, 1954.............................................................................................................. 22

The Independent, New York, Vol. LXIII, No. 3077 (November 21, 1907)............................. 15

The Outlook, New York, Vol. 87, No. 13 (November 30, 1907)............................................. 15

**Polls & Surveys**

American Religious Identification Survey, 2001 ("ARIS 2001"), from The Graduate Center of the City University of New York .........................................................................................56
Harris Poll #59, October 15, 2003.......................................................................................56
Louis Harris and Associates, August 12, 1998.....................................................................56
Opinion Dynamics, December 5, 1997 .................................................................................56
Pew Research Center for the People and the Press, May 31 through June 9, 1996 ................56
Pew Research Center, March 20, 2002 .................................................................................34
The Gallup Organizaion, July 30-August 4, 1958................................................................35
The Gallup Organization, February 19-21, 1999 .................................................................35
Zogby International, 2000 .....................................................................................................35

1

## JURISDICTION AND VENUE

2

3    1.   This is a civil action claiming violations of the First and Fifth Amendments of the

4         Constitution of the United States of America. As such, this Court has jurisdiction under 28

5         U.S.C. § 1331.

6    2.   This is a civil action claiming violations of 42 U.S.C. § 2000bb et seq. (Religious

7         Freedom Restoration Act (RFRA)). As such, this Court has jurisdiction under 42 U.S.C. §

8         2000bb-1(c) and 28 U.S.C. § 1331.

9    3.   This action is founded in part upon the Constitution of the Unites States of America. As

10        such, this Court has jurisdiction over Defendant United States of America under 28 U.S.C.

11        § 1346(a)(2).

12   4.   This action is in the nature of mandamus, and seeks to compel the Congress of the United

13        States of America, the United States of America, its agents and its officers to perform their

14        duties owed Plaintiff under the terms of the First and Fifth Amendments of the

15        Constitution of the United States and under 42 U.S.C. § 2000bb et seq. As such, this Court

16        has jurisdiction under 28 U.S.C. § 1361.

17   5.   Defendants are each an officer or employee of the United States, an agency of the United

18        States, or the United States. Plaintiff resides in this judicial district. Venue is therefore

19        proper under 28 U.S.C. § 1391(e)(3).

20   6.   A substantial part of the events or omissions giving rise to this claim occurred, occur or

21        will occur in the Eastern District of California. Venue is therefore proper under 28 U.S.C.

22        § 1391(b)(2) and § 1391(e)(2).

23

24

25

26

## PARTIES

27

28   7.   Plaintiff Michael A. Newdow is a resident and citizen of the United States, of the State of

29        California, and of Sacramento County. He pays federal income taxes that are used to fund

30        the activities of the Defendants. He is an ordained minister, and the founder of the

31        Atheistic church, the First Amendmist Church of True Science (FACTS). He owns real

1    estate in Elk Grove, California, on which he has attempted to raise funds for FACTS.

2    Lastly, he is a numismatist, who has been collecting coins since his early childhood.

3  8.  Defendant the Congress of the United States of America is the branch of government in

4    which all legislative powers are granted under Article I, Section 1 of the United States

5    Constitution.

6  9.  Defendant Peter LeFevre is the Law Revision Counsel. As such – pursuant to 2 U.S.C. §

7    285b – he is responsible for the preparation and publication of the United States Code,

8    wherein Defendants United States Congress and the United States of America make the

9    purely religious assertion that "In God We Trust."

10  10.  Defendant the United States of America is the constitutionally established government of

11    the United States of America.

12  11.  Defendant John William Snow is Secretary of the Treasury of the United States. Pursuant

13    to 31 U.S.C. § 301(b), Defendant Snow is "head of the Department [of the Treasury]."

14    Pursuant to 31 U.S.C. § 321(a)(4), Defendant Snow "shall … mint coins, [and] engrave

15    and print currency."

16  12.  Defendant Henrietta Holsman Fore is the Director of the Mint. According to the Mint's

17    website, "The primary mission of the United States Mint is to produce an adequate

18    volume of circulating coinage for the nation to conduct its trade and commerce."[1]

19    Defendant Fore – pursuant to 31 U.S.C. § 304(b)(2) – "shall carry out duties and powers

20    prescribed by the Secretary of the Treasury."

21  13.  Defendant Thomas A. Ferguson is the Director of the Bureau of Engraving and Printing

22    (BEP). According to the BEP website, the Bureau "prints billions of Federal Reserve

23    Notes for delivery to the Federal Reserve System each year."[2] Defendant Ferguson –

24    pursuant to 31 U.S.C. § 303(b)(1) – "shall carry out duties and powers prescribed by the

25    Secretary [of the Treasury]."

26

27

28

---

[1] Accessed at http://www.usmint.gov/about_the_mint/ on May 8, 2005.
[2] Accessed at http://www.moneyfactory.com/section.cfm/2 on May 8, 2005.

1                          **HISTORICAL BACKGROUND**

2

3    **A.  HISTORY OF AMERICAN RELIGIOUS FREEDOM**

4    14. In striking contrast to the Declaration of Independence,[3] to the state constitutions in

5        existence at the time,[4] to the Articles of Confederation it replaced,[5] and even to the

6        Virginia Bill for Religious Freedom,[6] the Constitution of the United States is a completely

7        secular document.

8    15. Thus, for instance, there is no reference to God in the Preamble to the United States

9        Constitution.[7] This may be contrasted with the preambles that not only were incorporated

10       into the constitutions of each of the thirteen original colonies, but that have since been

11       incorporated into the constitutions of every one of the fifty states.[8]

---

[3] The Declaration of Independence has four references to a supernatural power: "Nature's God," "their Creator," ""the Supreme Judge of the World," and "Divine Providence." Accessed on May 26, 2005, at http://memory.loc.gov/cgi-bin/query/r?ammem/bdsdcc:@field(DOCID+@lit(bdsdcc02101))

[4] See at note 11, infra.

[5] The Articles of Confederation referenced "the Great Governor of the world." Accessed on May 26, 2005, at http://www.yale.edu/lawweb/avalon/artconf.htm.

[6] The Bill for Religious Freedom began, "Whereas Almighty God hath created the mind free," and speaks of "the Holy author of our religion." The Founders' Constitution, Volume 5, Amendment I (Religion), Document 44, The University of Chicago Press (citing *The Papers of John Marshall*. Edited by Herbert A. Johnson et al. Chapel Hill: University of North Carolina Press, in association with the Institute of Early American History and Culture, Williamsburg, Virginia, 1974--.) Accessed on May 26, 2005, at http://press-pubs.uchicago.edu/founders/documents/amendI_religions44.html.

[7] "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." Preamble to the United States Constitution, accessed at http://www.house.gov/Constitution/Constitution.html on May 26, 2005. This absence was by no means unintentional.

[8] Seven state constitutional preambles reference "God" (Alaska, Connecticut, Minnesota, Montana, New Hampshire, South Carolina, Wyoming); thirty-three reference "Almighty God" (Alabama, Arizona, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Wisconsin); three reference something "Divine" (Deleware ("Divine Goodness"), Hawaii ("Divine Guidance"), and West Virginia ("Divine Providence")); three reference the "Supreme Ruler of the Universe" (Colorado, Missouri, Washington); one (Maine) references the "Sovereign Ruler of the Universe;" one (Massachusetts) references the "great Legislator of the universe;" one (Virginia) references "our Creator;" and one (Iowa) references the "Supreme Being." Brief of United States as Respondent Supporting Petitioners, Appendix B, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).

1    16. Additionally, unlike the specified oaths of office in the state constitutions (see, e.g., the

2        1777 Constitution of Georgia (Articles XIV, XV, XXIV and XXX) and the 1778

3        Constitution of South Carolina (Article XXXVI)), there is no "so help me God" in the

4        only oath of office given in the federal Constitution – i.e., that of the President.[9]

5    17. Among the original thirteen colonies, eleven had constitutions in place when the federal

6        constitution was being created in 1787.[10] Of these, nine had religious tests as

7        qualifications for public office.[11] The Constitution of the United States specifically states

8        that "no religious test shall ever be required as a qualification to any office or public trust

9        under the United States."[12]

10   18. So intent were the Framers to keep the federal government religion-neutral, that James

11       Madison – the "Father of the Constitution"[13] – reported to the Virginia State Ratifying

12       Committee that "There is not a shadow of right in the general government to intermeddle

13       with religion. Its least interference with it would be a most flagrant usurpation."[14]

---

[9] "Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:--'I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States.'" United States Constitution, Article II, Section 1, cl. 8.

[10] Connecticut (1662) (http://www.yale.edu/lawweb/avalon/states/ct03.htm) and Rhode Island (1663) (http://www.yale.edu/lawweb/avalon/states/ri04.htm) were still governed by distinctly Christian charters.

[11] In four states, governmental officials were required to be Protestant (New Jersey, Georgia, North Carolina and South Carolina). Delaware – in Article 22 of its Constitution of 1776 – required its legislators to state, "I … do profess faith in God the Father, and in Jesus Christ His only Son, and in the Holy Ghost, one God, blessed for evermore; and I do acknowledge the holy scriptures of the Old and New Testament to be given by divine inspiration." Article 22. Three other states – Massachusetts, New Hampshire and Maryland – required adherence to Christianity, and Pennsylvania mandated, "I do believe in one God, creator and governor of the universe, the rewarder of the good and the punisher of the wicked. And I do acknowledge the Scriptures of the Old and New Testament to be given by Divine inspiration." 1776 Constitution of Pennsylvania, Section 10. All provisions accessed at http://www.yale.edu/lawweb/avalon/states/statech.htm on May 26, 2005.

[12] United States Constitution, Article VI, cl. 3.

[13] As reported at the White House website, at http://www.whitehouse.gov/history/presidents/jm4.html (accessed on May 26, 2005).

[14] The Founders' Constitution, Volume 5, Amendment I (Religion), Document 49, The University of Chicago Press (citing *The Papers of James Madison*. Edited by William T. Hutchinson et al. Chicago and London: University of Chicago Press, 1962--77 (vols. 1--10); Charlottesville: University Press of Virginia, 1977--(vols. 11--). Accessed on May 26, 2005 at http://press-pubs.uchicago.edu/founders/documents/amendI_religions49.html.

19. Similarly, Alexander Hamilton, explaining the difference between the King of England and the United States President, noted that whereas the former was "the supreme head and governor of the national church," the President "has no particle of spiritual jurisdiction."[15]

20. Richard Dobbs Spaight, who would later become Governor of North Carolina (as well as a member of the U.S. House of Representatives) stated, "As to the subject of religion … No power is given to the general government to interfere with it at all. Any act of Congress on this subject would be a usurpation."[16]

21. Likewise, James Iredell – who was to be nominated by George Washington and confirmed by the Senate as one of the first justices of the Supreme Court – noted, "If any future Congress should pass an act concerning the religion of the country, it would be an act which they are not authorized to pass, by the Constitution."[17]

22. This constitutional secularity, of course, did not go unnoticed by those who wished for a (Christian) Monotheism-based government. For instance, published on January 10, 1788, the anti-Federalist, "Samuel,"[18] wrote:

> [A]ll religion is expressly rejected, from the Constitution. Was there ever any State or kingdom, that could subsist, without adopting some system of religion? Not so much as to own the being, and government of a Deity; or any acknowledgment of him! or having any revelation from him! Should we adopt such a rejection of religion as this, the words of Samuel to Saul, will literally apply to *us, – Because thou hast rejected the word of the Lord, he hath also rejected thee from being king.* We may justly expect, that God will reject us, from that self government, we have obtained thro' his divine interposition.[19]

23. Similarly, Luther Martin – who, in addition to being Maryland's longtime attorney was an active participant in the Constitutional Convention – hoped to have the United States

---

[15] Federalist #69. Accessed at http://www.yale.edu/lawweb/avalon/federal/fed69.htm on October 22, 2005.

[16] The Founders' Constitution, Volume 5, Amendment I (Religion), Document 52, The University of Chicago Press (citing Elliot, Jonathan, ed. *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787. . . .* 5 vols. 2d ed. 1888. Reprint. New York: Burt Franklin, n.d. Accessed on October 23, 2005, at http://press-pubs.uchicago.edu/founders/documents/amendI_religions52.html.

[17] Id.

[18] As was the case with "Publius" in *The Federalist Papers*, pseudonyms were frequently used in published political discourses at the time of the debates on the Constitution.

[19] *The Complete Anti-Federalist*, Strong HJ, ed. (Chicago: University of Chicago Press, 1981), Vol. 4 (4.14.7), at 195-96.

1   deemed "a Christian country."[20] As such, he argued, it should have both a religious test
2   oath and an acknowledgement in the Constitution of "[a] belief of the existence of a Deity,
3   and of a state of future rewards and punishments."[21]

4   24. In fact, "[r]egret at the omission of any direct recognition of God or of the Christian
5   religion in the Federal Constitution was expressed in at least five of the state conventions
6   called to ratify the document."[22]

7   25. In other words, everyone – even those who objected to the lack of acknowledgements of
8   God – agreed that the Constitution, as written and understood, did not include any such
9   acknowledgements. Some objected, but all understood that this document was to create a
10   government free of even a "shadow" or a "particle" of religious dogma.

11

12   26. The extent to which this governmental design was meant to apply can be seen by
13   examining the actions of the First Federal Congress. On April 6, 1789, the House of
14   Representatives resolved:

15   That the form of the oath to be taken by this House, as required by the third clause of
16   the sixth article of the Constitution of the government of the United States, be as
17   followeth, to wit, "I, A.B., a representative of the United States in the Congress
18   thereof, do solemnly swear (or affirm, as the case may be), in the presence of
19   Almighty GOD, that I will support the Constitution of the United States. So help me
20   God."[23]

21

22   27. Despite the foregoing, after numerous exchanges and discussions in both houses of
23   Congress – in which "the third clause of the sixth article of the Constitution" obviously
24   played the central role – that proposed oath was revised, with the affirmative removal of
25   both references to "the Almighty." Thus, Statute I, "An Act to regulate the Time and
26   Manner of administering certain Oaths" – states:

27   Sec. 1. Be it enacted by the Senate and [House of] Representatives of the United States
28   of America in Congress assembled, That the oath or affirmation required by the sixth
29   article of the Constitution of the United States, shall be administered in the form

---

[20] Id., Vol. 2 (2.4.108), at 75.
[21] Id. See, also, Cornell S. *The Other Founders*: Anti-Federalism and the Dissenting Tradition in America, 1788-1828 (University of North Carolina Press: Chapel Hill, NC; 1999) at 57.
[22] Stokes AP. *Church and State in the United States*. (Harper & Brothers: New York, 1950),Volume III, at 583 (citation omitted).
[23] 1 Annals of Cong. 102 (1789).

1  following, to wit: "I, A.B., do solemnly swear or affirm (as the case may be) that I will

2  support the Constitution of the United States."[24]

3

4  28. In other words, **the very first statute of the government of the United States involved**

5  **the specific and affirmative removal of all references to God** in the oath of office to be

6  used by Congress, itself.

7  29. This secularity is remarkable. Religion was a huge issue when the Constitution was

8  created, and the fact that the Framers opted not to even acknowledge God in any way

9  shows their acute awareness of its tendency to divide rather than unify. If all men are

10  really "created equal" then government cannot – in any manner – show favoritism in

11  terms of religious belief.[25]

12  30. The importance of this principle is, perhaps, best shown by examining Madison's famous

13  *Memorial and Remonstrance*, which references equality no less than thirteen times in its

14  few pages. For instance, especially in terms of religion, "**equality** … ought to be the basis

15  of every law." The majority "cannot deny an **equal** freedom to those whose minds have

16  not yet yielded to the evidence which has convinced [them]." Any government favoritism

17  in terms of religious belief:

18  degrades from the **equal** rank of Citizens all those whose opinions in Religion do not
19  bend to those of the Legislative authority. Distant as it may be in its present form from
20  the Inquisition, it differs from it only in degree. The one is the first step, the other the
21  last in the career of intolerance.[26]

22

23  31. This was the view of the Framers **before** the Bill of Rights came into being. Thus, it was

24  corroboration of the intent of the framers (to have a society free from the divisiveness

25  caused by governmental partiality to any religious belief system) that occurred when the

26  First Amendment – with its initial sixteen words: "Congress shall make no law respecting

---

[24] 1 Stat. 23.

[25] Thus, of the three major areas of inequality that were ignored when the Declaration of Independence claimed that "all men are created equal" – i.e., race, gender and religion – only the latter was remedied by the Constitutional Convention.

[26] Madison J. *Memorial and Remonstrance*, The Founders' Constitution, Volume 5, Amendment I (Religion), Document 43, The University of Chicago Press, citing The Papers of James Madison. Edited by William T. Hutchinson et al. Chicago and London: University of Chicago Press, 1962--77 (vols. 1--10); Charlottesville: University Press of Virginia, 1977--(vols. 11--). Accessed on October 5, 2005 at http://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html. Emphases added.

1   an establishment of religion, or prohibiting the free exercise thereof" – was ratified on

2   December 15, 1791.[27]

3   32. As James Madison later wrote, "Every new & successful example … of a perfect

4   separation between ecclesiastical and civil matters, is of importance. … [R]eligion &

5   Govt. will both exist in greater purity, the less they are mixed together."[28]

6

7   33. Thus, with our federal government authorized to act only pursuant to the powers

8   enumerated in the Constitution, there is not only no authority to take any position on

9   religion, but there are specific prohibitions against such activity.

10  34. This limitation on the federal government was recognized throughout our early history.

11  35. For instance – in addition to the clear statement by James Madison (¶ 18, supra) – there is

12  the Treaty of Tripoli, which became the "supreme law of the land"[29] only six years after

13  the ratification of the Bill of Rights. Negotiated under President Washington and signed

14  into law by John Adams (with the **unanimous** consent of the Senate), that treaty stated

15  unequivocally that "the government of the United States is not in any sense founded on

16  the Christian religion."[30]

17  36. In the early 1800s, there was a significant controversy over the fact that post offices

18  remained open on Sundays. In 1830, the matter was taken up by Congress. Alluding to the

19  Constitution's Article VI test oath clause, as well as the Religion Clauses of the First

20  Amendment, the House Report noted that the request to stop mail delivery on Sundays

21  was based on religious belief, and – as such – "does not come within the cognizance of

22  Congress."[31] As a result, to pass the requested law would have been impermissible

23  because it "would constitute a legislative decision of a religious controversy."[32]

---

[27] Library of Congress, American Memory. accessed on October 23, 2005, at
http://memory.loc.gov/ammem/today/dec15.html.

[28] The Founders' Constitution, Volume 5, Amendment I (Religion), Document 66, The University of
Chicago Press (citing *The Writings of James Madison*. Edited by Gaillard Hunt. 9 vols. New York: G.
P. Putnam's Sons, 1900--1910.Accessed at http://press-
pubs.uchicago.edu/founders/documents/amendI_religions66.html on May 27, 2005.

[29] United States Constitution, Article VI, cl. 2. "This Constitution … and all Treaties made, or which
shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

[30] 8 Stat. 154.

[31] H.R. Rep. No. 271, 21st Cong., 1st Sess. 1 (1830).

[32] Id. at 2

37. After the history of religious intolerance in the world was discussed, along with the fact that the framers "evinced the greatest possible care in guarding against the same evil,"[33] the Report's authors wrote:

> In our individual character, we all entertain opinions, and pursue corresponding practice upon the subject of religion. However diversified these may be, we all harmonize as citizens, while each is willing that the other shall enjoy the same liberty which he claims for himself. But in a representative character, our individual character is lost. The individual acts for himself; the representative for his constituents. He is chosen to represent their *political*, and not their *religious* views – to guard the rights of man; not to restrict the rights of conscience.
>
> If the measure recommended should be adopted, it would be difficult for human sagacity to foresee how rapid would be the succession, or how numerous the train of measures which might follow, involving the dearest rights of all – the rights of conscience.[34]

38. Those men continued with the recognition that, "Religious zeal enlists the strongest prejudices of the human mind,"[35] as well as the proud declaration that:

> With the exception of the United States, the whole human race, consisting, it is supposed, of eight hundred millions of rational beings, is in religious bondage. … [T]he conclusion is inevitable, that the line cannot be too strongly drawn between Church and State."[36]

39. Perfectly applicable to the gravamen of the instant action, the Reporters wrote that, "if their motive be to induce Congress to sanction, by law, their *religious opinions* and *observances*, then their efforts are to be resisted,"[37] and went so far as to declare, "So far from stopping the mail on Sunday, the committee would recommend the use of all reasonable meanse [sic] to give it a greater expedition and a greater extension."[38]

40. In other words, "It is the duty of this Government to afford to *all* – to Jew or Gentile, Pagan or Christians, the protection and the advantages of our benignant institutions, on *Sunday*, as well as every day of the week."[39]

---

[33] Id.
[34] Id. (Emphases in original).
[35] Id. at 3.
[36] Id.
[37] Id. at 4. (emphases in original).
[38] Id. at 5.
[39] Id. at 5-6.

1    41. A similar adherence to the Constitution's demand for religious liberty and equality was

2        seen in the midst of the increased (Christian) religious fervor that followed the Civil War.

3        In tabling a petition calling for "'an acknowledgment of Almighty God and the Christian

4        religion' placed into the Constitution of the United States,"[40] the House Judiciary

5        committee concluded that:

6        [T]he fathers of the Republic in the convention which framed the Constitution …
7        decided, after grave deliberation, … that, as this country … was to be the home of the
8        oppressed of all nations of the earth, whether Christian or Pagan, and in full realization
9        of the dangers which the union between church and state had imposed upon so many
10       nations of the Old World, with great unanimity, [decided] that it was inexpedient to
11       put anything into the Constitution or frame of government which might be construed
12       to be a reference to any religious creed or doctrine.

13

14       And … that this decision was accepted by our Christian fathers with such great
15       unanimity that in the amendments which were afterward proposed, in order to make
16       the Constitution more acceptable to the nation, none has ever been proposed to the
17       States by which this wise determination of the fathers has been attempted to be
18       changed.[41]

19

20   42. As will herein be demonstrated, that "wise determination" was changed when – upon the

21       urging of a Christian minister – "recognition of Almighty God" was spatchcocked onto

22       the nation's monetary instruments by the unsupervised and unregulated acts of two

23       executive branch officials.

24

25

26

27   **B. HISTORY OF "IN GOD WE TRUST" ON THE COINS AND CURRENCY**

28   43. On September 2, 1789, Defendant Congress of the United States approved "An Act to

29       establish the Treasury Department."[42]

30   44. On April 2, 1792, Defendant Congress of the United States passed "An Act establishing a

31       Mint, and regulating the Coins of the United States" (The Coinage Act of 1792).[43]

32   45. That Coinage Act specified the types of coins to be minted, and further prescribed that:

---

[40] H.R. Rep No. 143, 43rd Cong., 1st Sess. 1 (1874).
[41] Id.
[42] 1 Stat. 65.
[43] 1 Stat. 246-51.

Upon one side of each of the said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins there shall be the figure or representation of an eagle, with this inscription, "United States of America" and upon the reverse of each of the copper coins, there shall be an inscription which shall express the denomination of the piece, namely, cent or half cent, as the case may require.[44]

46. On January 18, 1837, Defendant Congress of the United States enacted "An Act supplemental to the act entitled 'An Act establishing a mint, and regulating the coins of the United States.'"[45]

47. That Act of January 18, 1837 provided that "[t]he engraver shall prepare and engrave, with the legal devices and inscriptions, all the dies used in the coinage of the mint and its branches."[46]

48. That Act of January 18, 1837 also provided that:

[U]pon one side of each of said coins there shall be an impression emblematic of liberty, with an inscription of the word Liberty, and the year of the coinage ; and upon the reverse of each of the gold and silver coins, there shall be the figure or representation of an eagle, with the inscription United States of America, and a designation of the value of the coin ; but on the reverse of the dime and half dime, cent and half cent, the figure of the eagle shall be omitted.[47]

49. It is to be noted that – in keeping with the constitutionally-derived notion "that it was inexpedient to put anything into the … frame of government which might be construed to be a reference to any religious creed or doctrine"[48] – there was no religious inscription of any kind on any United States coin through 1837.

50. In fact, it would be another two and a half decades – when increased religious fervor took hold as the Civil War began – before the idea of violating that constitutional mandate would arise.

51. On November 13, 1861, Rev. M.R. Watkinson – **a "Minister of the Gospel"** – wrote to Secretary of the Treasury Salmon P. Chase, requesting that "the **recognition of Almighty**

---

[44] 1 Stat. 248.
[45] 5 Stat. 136-42.
[46] 5 Stat. 136.
[47] 5 Stat. 138.
[48] See ¶ 41, supra.

1    **God**" be placed upon the nation's coins.[49] Noting to the Secretary that "**You are**

2    **probably a Christian**," the minister claimed that such recognition was important to

3    "relieve us from the ignominy of heathenism." Additionally, it "would place us under the

4    Divine protection we have personally claimed. From my heart I have felt our national

5    shame in disowning God as not the least of our present national disasters."[50]

6    52. In response, on November 20, 1861, Secretary Chase wrote to James Pollock, then the

7    Director of the Mint in Philadelphia. In his short note, Secretary Chase claimed that "**No**

8    **nation can be strong except in the strength of God**, or safe except in His defense. **The**

9    **trust of our people in God** should be declared on our national coins." [51]

10   53. Secretary Chase then directed Director Pollock to "cause a device to be prepared without

11   unnecessary delay with a motto expressing in the fewest and tersest words possible this

12   national recognition."[52]

13   54. Director Pollock, it might be noted, was also a member of the National Reform

14   Association.[53] As early as 1861, the founders of that organization had begun working "to

15   amend the Constitution, which is the basis of the Union, as to acknowledge God, submit

16   to the authority of his Son, [and] embrace Christianity."[54]

17   55. Accordingly, in his 1863 Annual Report, Director of the Mint Pollock wrote that he

18   believed there should be "a distinct and unequivocal National **recognition of the Divine**

19   **Sovereignty**" on the nation's coins. He continued:

20   **We claim to be a Christian nation**  -- why should we not vindicate our character by
21   **honoring the God of Nations** in the exercise of our political Sovereignty as a Nation?
22   Our national coinage should do this.  Its legends and devices **should declare our trust**

---

[49] Rev. Watkinson was not alone in believing that a reference to God should be on the nation's coins. At least one other clergyman – the Reverend Henry Augustus Boardman of Philadelphia – voiced the same opinion one year late. Stokes AP. *Church and State in the United States*, Vol. III (New York: Harper, 1950), at 601.

[50] H.R. Rep. No. 662, 84th Cong., 1st Sess. 2 (1955). This information is also provided in a "fact sheet" on the Department of the Treasury's website, at http://www.treasury.gov/education/fact-sheets/currency/in-god-we-trust.shtml.

[51] H.R. Rep. No. 662, 84th Cong., 1st Sess. 3 (1955).

[52] Id.

[53] http://www.aclj.org/News/Read.aspx?ID=489, accessed on October 22, 2005.

[54] "[A] meeting [was held] in Allegheny City, Pennsylvania, on January 27, 1864, during which the NRA was formally organized. The NRA's first name was actually 'The National Association to Secure the Religious Amendment to the Constitution.' The name was changed to the National Reform Association in November 1875." http://www.natreformassn.org/ecp/chap1.html, accessed on October 22, 2005.

**in God -- in Him who is the "King of Kings and Lord of Lords."** … Let us **reverently acknowledge his sovereignty**, and let our coinage **declare our trust in God**.[55]

56. Thus, pursuant to Secretary Chase's request, Pollock suggested "Our country; our God," and "God our trust" as inscriptions.[56]

57. Secretary Chase responded on December 9, 1863:

> I approve your mottoes, only suggesting that on that with the Washington obverse the motto should begin with the word "Our," so as to read, "Our God and our country." And on that with the shield it should be changed so as to read: "In God we trust."[57]

58. On April 22, 1864, a new coinage act was passed. This one stated that "there shall be, from time to time, struck and coined at the mint a two-cent piece … and the shape, mottoes, and devices of said coi[n] shall be fixed by the Director of the Mint, with the approval of the Secretary of the Treasury."[58]

59. This act, obviously, did not address what specific "mottoes" or "devices" would be permitted. Thus, it was without specific authorization – and obviously inconsistent with the Framers' and the congressional determinations noted above (see at ¶¶ 14-41, supra) – that the first United States coin bearing the religious verbiage, "IN GOD WE TRUST," was minted. This occurred on the two-cent piece in 1864.

60. With the religious precedent in place, another Act of Congress was passed on March 3, 1865. That act – authorizing the creation of a three-cent piece, and allowing that "the shape, mottoes, and devices of said coin shall be determined by the Director of the Mint, with the approval of the Secretary of the Treasury"[59] – included the first codified reference to religious dogma on the coinage:

> And be it further enacted, That, in addition to the devices and legends upon the gold, silver, and other coins of the United States, it shall be lawful for the Director of the Mint, with the approval of the Secretary of the Treasury, to cause the motto 'In God we trust' to be placed upon such coins hereafter to be issued as shall admit of such legend thereon.[60]

---

[55] 1863 Annual Report of the Director of the Mint, at 10-11 (as provided in Stokes AP. *Church and State in the United States*, Vol. III (New York: Harper, 1950), at 602.

[56] H.R. Rep. No. 662, 84th Cong., 1st Sess. 3 (1955).

[57] Id. It might be noted that the capitalization of these words – as the motto and on the money – has varied.

[58] 13 Stat. 54-55.

[59] 13 Stat. 517. The identical provision was given for a five-cent coin in an act of May 16, 1866 (14 Stat 47).

[60] 13 Stat. 518.

61. Society immediately recognized that this act was purely religious. According to the New York Times, placement of "In God We Trust" on the coins was a **"new form of national worship."**[61]

62. This likely was quite satisfying to Director Pollock, who – in his zeal to impose (Christian) Monotheism on the nation – concluded his official June 30, 1866 report (on the previous year's activity) with the words, "**Happy is the Nation, whose God is the Lord.**"[62]

63. On February 12, 1873, the laws pertaining to coinage were revised, with the following language employed:

> [U]pon the coins of the United States there shall be the following devices and legends: Upon one side there shall be an impression emblematic of liberty, with an inscription of the word "Liberty" and the year of the coinage, and upon the reverse shall be the figure or representation of an eagle, with the inscriptions "United States of America" and "E Pluribus Unum," and a designation of the value of the coin; but on the gold dollar and three-dollar piece, the dime, five, three and one cent piece the figure of the eagle shall be omitted; and on the reverse of the silver trade-dollar the weight and the fineness of the coin shall be inscribed; and the director of the mint, with the approval of the Secretary of the Treasury, may cause the motto "In God we trust" to be inscribed upon such coins as shall admit of such motto: and any one of the foregoing inscriptions may be on the rim of the gold and silver coins. "[63]

64. In 1905, at President Theodore Roosevelt's urging, the sculptor, Augustus Saint-Gaudens, was commissioned to design new coinage. Considering the motto, "In God we trust," to be "an inartistic intrusion not required by law,"[64] Saint-Gaudens designed a ten dollar gold coin without those religious words.

---

[61] New York Times, December 18, 1865, p. 4.

[62] 1866 Annual Report of the Director of the Mint, at 9 (as provided in Stokes AP. *Church and State in the United States*, Vol. III (New York: Harper, 1950), at 603.

[63] 17 Stat. 427. Interestingly, the clause pertaining to "In God we trust" was omitted when the statutes were revised. 18 Stat 3517, and – pursuant to a general provision – subsequently repealed. 18 Stat 5596. This legislation is also available for viewing at http://memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=017/llsl017.db&recNum=468.

[64] Schwarz T. *A History of United States Coinage*. (A.S. Barnes & Co., New York; 1980) at 228 (citing a work by Saint-Gaudens' son).

1    65. President Roosevelt strongly supported the removal of that phrase from the coins "**in the**

2    **very interest of religion**."[65] To him, "to put such a motto on coins … not only does no

3    good but does positive harm, and is in effect irreverence which comes dangerously close

4    to sacrilege."[66] The use of the motto in this way, claimed the President, was "a constant

5    source of jest and ridicule."[67]

6    66. Thus, said President Roosevelt (referring to the possibility that Congress would order the

7    phrase placed onto the coin), "I very earnestly trust that **the religious sentiment** of the

8    country … will prevent any such action being taken."[68]

9    67. The President was quite mistaken. The absence of what the New York Times referred to

10    as "**one of the holiest religious expressions**"[69] was immediately decried by those wishing

11    to maintain this governmental endorsement of (Christian) Monotheism.

12    68. Accounts of the controversy were marked by recognition of "protests or expressions of

13    regret **from many clergy** and others,"[70] of "various **religious organizations** and

14    individuals, **especially clergymen**, [having] protested,"[71] of "a great number of **religious**

15    **people** in this country" considering President Roosevelt's decision "'a huge blunder.'"[72]

16    69. Highlighting the fact that religious sentiment was at the root of the controversy, it was

17    noted to be "strange that he did not foresee that **the great majority of religious people**,

18    Protestant, Catholic, many Jews, would be sensitive at the removal of those words at a

19    time when every vestige of **national recognition of God** is of importance."[73]

20    70. After all, "[t]here are a great many people … who think that to take such an inscription off

21    the coin is to disavow all trust in God and is therefore an act of irreligion. One clergyman

---

[65] *What Makes a Christian State?* The Independent, New York, Vol. LXIII, No. 3077 (November 21, 1907), at 1263 (emphasis added).

[66] November 11, 1907 Letter of Theodore Roosevelt to William Boldly, as reprinted in Schwarz T. *A History of United States Coinage*. (A.S. Barnes & Co., New York; 1980) at 230.

[67] President Roosevelt referenced "the innumerable cartoons and articles based on phrases like 'In God we trust for the other eight cents'; 'In God we trust for the short weight'; 'In God we trust for the thirty-seven cents we do not pay'; and so forth" in making this claim. Id.

[68] Id. (emphasis added).

[69] New York Times, November 15, 1907, p. 8 (emphasis added).

[70] The Independent, New York, Vol. LXIII, No. 3077 (November 21, 1907), at 1196 (emphasis added).

[71] The Outlook, New York, Vol. 87, No. 13 (November 30, 1907), at 707 (emphases added).

[72] Current Literature, New York, Vol. XLIV, No. 1 (January, 1908), at 68 (emphasis added).

1    is reported to have spoken of 'the religious sentiment of the American people' as being

2    'effaced.'"[74]

3  71. That the views of Atheists and others were considered of no consequence is illustrated in

4     the words of another clergyman who stated, "'The placing of the inscription 'In God We

5     Trust' upon the national coinage is a unique recognition of our dependency as a people

6     upon the Father of nations. … [F]rom my childhood I have heard the blatant protests of

7     infidels and unbelievers against this custom."[75]

8  72. In response to this religion-based outcry, Congress passed Public Law No. 120, which

9     President Roosevelt signed on May 18, 1908. That law stated, "That the motto 'In God we

10    trust,' heretofore inscribed on certain denominations of the gold and silver coins of the

11    United States of America, shall hereafter be inscribed upon all such gold and silver coins

12    of said denominations as heretofore."[76]

13 73. This was the first federal law mandating use of the "In God We Trust" phrase on United

14    States monetary instruments. As the history manifestly reveals, this resulted from

15    **religious** objection by **religious** individuals to the removal of **religious** words that were

16    initiated for **religious** purposes.

17 74. As the House Report on the matter (erroneously) stated, "['In God We Trust'] reflects the

18    reverent and **religious** conviction which underlies American citizenship."[77]

19 75. Indeed, the first sentence of the Department of the Treasury's "Fact Sheet" on the

20    "History of 'In God We Trust'" explains that "The motto IN GOD WE TRUST was

21    placed on United States coins largely **because of … increased religious sentiment.**"[78]

22 76. Moreover, "In God We Trust" was not rooted in general Monotheism. On the contrary, it

23    was Christian Monotheism that underlay this sequence of events. After all, the

24    subcommittee that authored that House Report was "unanimous in the belief that **as a**

---

[73] Id., at 69 (citing "the leading Methodist paper," and noting that "Similar views are expressed by clergymen of all denominations," and that religious organizations "have passed resolutions condemning the President's action.") (emphases added).

[74] Id., at 708.

[75] Rev. Dr. Charles Edward Locke, of Brooklyn, as quoted in Current Literature, New York, Vol. XLIV, No. 1 (January, 1908), at 69.

[76] Pub. L. 60-120, May 18, 1908, ch. 173, 35 Stat. 164.

[77] H.R. Rep. No. 1106, 60th Cong., 1st Sess. 1 (1908) (emphasis added).

[78] Accessed at http://www.treas.gov/education/fact-sheets/currency/in-god-we-trust.html on October 2, 2005 (emphasis added).

1   **Christian nation** we should restore the motto to the coinage ... [since] the best and only

2   reliance for the perpetuation of the republican institution is upon **a Christian patriotism**,

3   which, recogniz[es] the universal fatherhood of God."[79]

4

5   77. In sum, despite the Constitution's mandate for religious neutrality and the absence of any

6   authority vested in Congress to "pass any act concerning the religion of the country,"[80]

7   Congress made "In God We Trust" our national motto, and mandated its use on our

8   money. As a key figure in the intrusion of (Christian) Monotheistic religious dogma into

9   our government put it, "'In God We Trust' [is a] statement of faith [that] has appeared on

10  billions of coins."[81]

11

12  78. Unlike the coins, however, those religious words were not being used on the nation's

13  currency. This was noted by an Arkansas businessman and numismatist named Matthew

14  H. Rothert "as the collection plate was being passed" in church one Sunday in 1953.[82]

15  79. Accordingly, Mr. Rothert wrote to the Secretary of the Treasury, George M. Humphrey, to

16  suggest that those religious words be placed on the currency in order **to "affirm our trust**

17  **in God** in such a manner that it will be heard around the world and give moral and

18  spiritual strength to those who realize **a great nation humbly and reverently places its**

19  **trust in the Almighty**."[83]

20  80. This matter was also brought to the attention of Donald K. Carroll, president of the Florida

21  Bar, who (in turn) informed U.S. Representative Charles E. Bennett (FL).[84]

22  81. Rep. Bennett contacted the Department of the Treasury and – after learning that "In God

23  We Trust" was not only not required on the currency, but that there were coins that did not

24  require the use of that motto – introduced H.R. 619 ("the inscription 'In God We Trust' ...

---

[79] H.R. Rep. No. 1106, 60th Cong., 1st Sess. 2 (1908) (emphases added).
[80] See at ¶ 21, supra.
[81] S. Rep. No. 1287, 83rd Cong., 2nd Sess. 2 (1954) (Remarks of Senator Homer Ferguson).
[82] Petrucelli F. *Almighty Dollar Mentions God Because of Arkansan*. Arkansas Gazette, March 4, 1955, page 2F.
[83] *Camden Man Asks Treasury To Put Religious Motto on Bills*, Arkansas Gazette, December 6, 1953, page 10C (emphases added). It might be noted that when this story was related in 1987, the author did not hesitate to describe the use of the motto on the currency as "the affirmation of our nation's belief in Divine Guidance." Rochette E. *The Man Who Put God's Trust In Your Pocket* Antiques & Collecting, July, 1987, at 80.
[84] 101 Cong. Rec. 4384 (April 13, 1955).

1    shall appear on all United States currency and coins"), on the first day of the first session

2    of the 84th Congress.[85]

3    82. To Rep. Bennett, "In God We Trust" was appropriate because "**the sentiment of trust in**

4    **God is universal.**"[86]

5    83. Then-Senator Lyndon B. Johnson pushed for the Bill in the Senate, stating that the motto

6    "**reflect[s] the spiritual basis** of our way of life."[87]

7    84. The motto also obviously reflected the political disenfranchisement of Atheists in America

8    at the time, inasmuch as the bill was unanimously passed in both the House and the

9    Senate.[88]

10   85. The Report of the House Committee on Banking and Currency (which accompanied H.R.

11   619) demonstrates that the use of "In God We Trust" was intended to be as religious as is

12   its text.

13   86. The main portion of the Report was entitled, "**Religious Inscriptions** on Coins in the

14   United States." Its prose referenced Rev. Watkinson's 1861 letter to Treasury Secretary

15   Chase, stating, "**You are probably a Christian**," and decrying the "fact touching our

16   currency [that] has been seriously overlooked …**the recognition of Almighty God** in

17   some form in our coins."[89]

18   87. The hearing before that Committee was also revealing. After stating that "as far as I know

19   there is no opposition to this legislation,"[90] Rep. Bennett noted that "this motto …

20   expresses so tersely and with such dignity **the spiritual basis** of our way of life."[91] He

21   then proclaimed that:

22       Most of us agree wholeheartedly with the first advance of this motto, Secretary of the
23       Treasury S. P. Chase, when he said: "No nation can be strong except in the strength of
24       God, or safe except in His defense. **The trust of our people in God should be**
25       **declared** on our national coins,"[92]
26
27   concluding with:

---

[85] Id.
[86] 101 Cong. Rec. 7796 (June 7, 1955) (emphasis added).
[87] 101 Cong. Rec. 9448 (June 29, 1955).
[88] Id.
[89] H.R. Rep. No. 662, 84th Cong., 1st Sess. 2 (1955).
[90] United States Currency Inscription: Hearing on H.R. 619 and related bills, before the Committee on Banking and Currency, 84th Cong., 1st Sess. 47 (Tuesday, May 17, 1955).
[91] Id. at 48.

At the base of our freedom is **our faith in God** and the desire of Americans **to live by His will and by His guidance**. As long as **this country trusts in God,** it will prevail.[93]

88. Rep. Abraham J. Multer (NY) spoke next. After stating, "I don't want to get **into an argument on religion**,"[94] he echoed the opinion President Roosevelt voiced a half century earlier:

> [W]hile I would not oppose it or take any action in opposition to the bill, I want it made crystal clear on this record that I think **I am as religious as any man** in this House. We may differ in our forms, but I respect every other person's form or ritualistic observance, and I know they do mine, too, but I feel very strongly that it was a mistake to put it on coins in the first place, and this is perpetuating a grievous error. I think it is the base of **all of those who believe in God**; to put anything like that on anything so materialistic as our coins and our currency – I don't think anybody is made more religious by putting it on the coins and currency. … If we are going to have **religious concepts** – and I am in favor of them – I don't think the place to put them is on our currency or on our coins."[95]

89. It should be noted that no one at the hearing in any way disputed Rep. Multer's characterization of "In God We Trust" as being a "**religious concep[t]**."

90. Also demonstrating a complete lack of consideration of non-Monotheistic views, Rep. William E. McVey (IL) maintained, "I can't possibly see any objection to having the inscription "In God We Trust" on all of our currency, and I am very glad to support it."[96]

91. The Committee chairman, Rep. Brent Spence (KY), joined in:

> I think if there ever was a nation that has, by its course, demonstrated that God had a hand in its making and its progress, it is this country. I always believe that God was present in the Convention Hall where our Constitution was formed.[97]

92. The desire to intrude Monotheism into our government was so pervasive that Rep. Gordon L. McDonough (CA) exclaimed, "I don't think we can insert that phrase in too many places in regard to the Government of the United States."[98]

---

[92] Id. (emphasis added)
[93] Id. at 49 (emphases added). Rep. Bennett's remarks are also available at 101 Cong. Rec. 4384 (April 13, 1955).
[94] Id. (emphasis added)
[95] Id. at 50 (emphases added).
[96] Id. at 51.
[97] Id.
[98] Id. at 52.

1    93. When Rep. Herman P. Eberharter (PA) spoke – after having recently recovered from an

2        illness – Rep. Barratt O'Hara (IL) commended him for coming "at great sacrifice to

3        himself, to testify for this bill, which affirms his faith and **the faith of all others in our**

4        **country, in God**."[99]

5    94. Rep. Eberharter, incidentally, placed in the record a resolution passed by the National

6        Convention of the American Legion. That resolution stated that "the United States of

7        America is **a God-fearing country**."[100]

8    95. Rep. Oren Harris (AR) stated, "It does not take the inscription on our coins for me to

9        **proclaim my faith and trust in God**. … With the inscription on our coins it is another

10       expression, not only individually but collectively, in this country, **of our faith**."[101] He,

11       too, could "see no objection whatsoever to this further expression of this quotation on the

12       currency that we use in this country."[102]

13   96. Rep. Harris also placed a Resolution in the record. This one was from the American

14       Numismatic Association, and stated that "this legend relating to **the power of Almighty**

15       **God** shall be placed upon the currency."[103]

16   97. Rep. Lawrence H. Fountain (NC) referred to the words, "In God We Trust," as one of the

17       "many instances indicat[ing] **our belief in the existence of God**."[104] He further noted

18       that:

19           **The Bible begins** with the words "In the beginning, God" and I think more and more
20           it is essential for us to recognize the fact that we as individuals and as a nation are
21           merely the custodians of the things which **God has so graciously granted** to us."[105]
22

23   98.  Further evidence that this legislator – like every other legislator on the committee –

24       intended and assumed that the motto was unequivocally religious is provided by Rep.

25       Fountain's additional statements:

26           [B]y having this inscription on our coins and on our currency … we are indicating …
27           because of **the goodness of God** we have become a prosperous and powerful
28           nation.[106]

---

[99] Id. at 54 (emphasis added).
[100] Id. (Emphasis added.)
[101] Id. at 55 (emphases added).
[102] Id.
[103] Id. at 56 (emphasis added).
[104] Id. (Emphasis added.)
[105] Id. (Emphases added.)
[106] Id. (Emphasis added.)

1

2      [T]hat inscription indicates that even though this coin is necessary, it is not in this coin

3      we trust, but **it is in God that we trust**.[107]

4

5    99.   In signaling his agreement, Rep. Harris demonstrated that it was not only Monotheism

6          that Congress was endorsing, but Christian Monotheism, as he referenced "**our Lord**

7          **and Saviour**."[108]

8    100.  Thus, it should be noted that not one person at the key hearing that led to the mandatory

9          inscription of "In God We Trust" on all of the nation's coins and currency ever even

10         suggested that the phrase was anything other than purely religious. Nor did anyone

11         represent the views of Atheists and others among their constituencies who deny the

12         existence of "the Almighty."

13   101.  This, of course, was merely a reflection of the (Christian) Monotheistic bent that was

14         pervasive in Congress in the 1950s. APPENDIX E.

15

16   102.  The House Report accompanying H.R. 619 noted that "a mandatory provision of law

17         requiring inscription on all coins and currency of the United States of the motto "In God

18         We Trust" … expresses so tersely and with such dignity **the spiritual basis** of our way

19         of life."[109]

20   103.  Similarly, the corresponding Senate Report stated specifically that "for almost a century,

21         there has been no inscription on our currency reflecting **the spiritual basis** of our way

22         of life."[110]

23   104.  "Spiritual" is this context, of course, synonymous with "religious." This notion – that

24         government can decree a spiritual or religious "way of life" that reflects "our" nation –

25         clearly violates the Establishment Clause.

26   105.  Even if this were not the case, placing any "spiritual basis of our way of life" on the

27         nation's coins and currency could never be an interest that is "compelling" enough to

28         justify an infringement upon any citizen's fundamental constitutional right.

---

[107] Id. (Emphasis added.)
[108] Id. (Emphasis added.)
[109] H.R. Rep. No. 662, 84th Cong., 1st Sess. 4 (1955).
[110] S. Rep. No. 637, 84th Cong., 1st Sess. 2 (June 27, 1955), reprinted in 1955 U.S. Code Cong. & Ad. News 2417, 2417.

1   106.  That Congress, itself, recognized that this interest was not "compelling" can be

2          appreciated by noting that the printing of "In God We Trust" was to be delayed until

3          "such time as new dies for the printing of currency are adopted in connection with the

4          current program of the Treasury Department to increase the capacity of presses utilized

5          by the Bureau of Engraving and Printing."[111]

6   107.  Be that as it may, "An Act to provide that all United States currency shall bear the

7          inscription 'In God We Trust'" – which actually mandated that this religious inscription

8          be placed on all coins as well – became the law of the land on July 11, 1955.[112]

9   108.  The codification of this act – which will hereafter be referred to the "Act of 1955" – is

10         now found at 31 U.S.C. § 5112 (d)(1): "United States coins shall have the inscription 'In

11         God We Trust'. ;" and at 31 U.S.C. § 5114(b): "United States currency has the

12         inscription 'In God We Trust' in a place the Secretary decides is appropriate. …"

13

14

15

16  **C.  HISTORY OF "IN GOD WE TRUST" AS THE NATIONAL MOTTO**

17  109. (Christian) religious fervor, APPENDIX B, and anti-Atheism, APPENDIX C,

18         characterized the 1950s.

19  110.  As has been demonstrated already in this Complaint, the placement of "In God We

20         Trust" on the coins and currency was clearly done for religious purposes and to have

21         religious effects.

22  111.  Additional similar uses of that religious phrase corroborate this unequivocal fact.

23  112.  For instance, an attempt was made to have "In God We Trust" mandated for all postage

24         in order to acknowledge "the faith of Americans in divine providence."[113]

25  113.  That use of the religious motto on all postage was never mandated. However, on April 8,

26         1954 – in the "most impressive and most widely publicized ceremony of its kind in the

27         history of the United States Post Office Department"[114] – Postmaster General Arthur E.

---

[111] H.R. 619, 84th Cong., 1st Sess. 1 (July 11, 1955), reprinted in 1955 U.S. Code Cong. & Ad. News 318.
[112] Id. (reprinted in 1955 U.S. Code Cong. & Ad. News 318-19).
[113] 99 Cong. Rec. A2658 (May 15, 1953 Remarks of Senator Homer Ferguson).
[114] "In God We Trust" – New Postage Stamp to Carry Message to World. The Gideon, May, 1954, p. 24.

1  Summerfield led a celebration to "[t]he symbolism of God and Country."[115] The cause
2  of this extraordinary "celebration" was the introduction of a stamp with the words, "In
3  God We Trust."

4  114.  At this event, "[t]he stamp was introduced to a nationwide audience during a 15-minute
5  program in which President Eisenhower, Secretary of State John Foster Dulles and
6  Postmaster General Summerfield participated **with the leaders of the Nation's three**
7  **largest religious groups**."[116]

8  115.  With President Eisenhower in attendance, this event marked "the first time that **a**
9  **religious tone** ha[d] been incorporated into a regular or ordinary stamp."[117] This was
10  obviously contrary to the principles so nobly adhered to by Congress earlier in our
11  history. See at ¶¶ 36-40, supra.

12  116.  According to Postmaster General Summerfield, "This stamp rededicates our faith in the
13  spiritual foundations that has always been and is today the bulwark of this Nation – and
14  its greatest source of strength.[118]

15

16  117.  According to Senator Homer Ferguson, "In God We Trust" over the door of the Senate
17  serves not only to remind the senators that "belief in God is a part of our very lives,"[119]
18  but "recognizes that we believe there is a Divine Power, and that we, our children, and
19  children's children should always recognize it."[120]

20  118.  Turning Atheists into "political outsiders" at least as much as he was turning (Christian)
21  Monotheists into "political insiders," Rep. Louis C. Rabaut (MI), noted that "[w]e
22  cannot afford to capitulate to the atheistic philosophies of godless men."[121]

23  119.  Rep. Rabaut, it must be noted, had previously placed in the Congressional Record the
24  incredibly offensive claim that "An atheistic American … is a contradiction in terms."[122]

---

[115] Id. at 25. These were the Postmaster General's words.
[116] Id.
[117] Id. (Emphasis added.)
[118] Id.
[119] 100 Cong. Rec. 6348 (May 21, 1954 Remarks of Sen. Homer Ferguson).
[120] 100 Cong. Rec. 7833 (June 8, 1954 Remarks of Sen. Homer Ferguson).
[121] 101 Cong. Rec. 8156 (June 14, 1955 Remarks of Rep. Louis C. Rabaut).
[122] 100 Cong. Rec. 2, 1700 (Feb. 12, 1954) (Remarks of Rep. Louis C. Rabaut).

1   120.  Referencing "In God We Trust" on United States coins, Rep. Francis E. Dorn (NY)
2         declared that, "He is the God, undivided by creed, to whom we look, in the final
3         analysis, for the well-being of our Nation.[123]

4   121.  To Rep. Peter Rodino (NJ), the religious motto "expresses the constant attitude of the
5         American people … that we wish now, with no ambiguity or reservation, to place
6         ourselves under the rule and care of God."[124]

7   122.  After informing us that "our citizenship is of no real value … unless we can open our
8         souls before God and before Him conscientiously say, "I am an American," Rep. Hugh
9         J. Addonizio (NJ) referenced "In God we trust" as illustrating that "God is the symbol of
10        liberty to America."[125]

11  123.  His colleague, Rep. Charles A. Wolverton (NJ), told us that "In God we trust" – taken
12        "in conjunction" with "under God" in the Pledge of Allegiance – "can be taken as
13        evidence of our faith in that divine source of strength that has meant and always will
14        mean so much to us as a nation."[126] He did not hesitate to characterize those who deny
15        God as purveying "forces of evil."[127]

16  124.  Thus, it was within that milieu that H.R. Res. 396 – seeking to have "In God We Trust"
17        declared the national motto – was introduced on July 21, 1955.[128]

18  125.  On March 28, 1956, the House of Representatives' Committee on the Judiciary
19        considered H.J. Res. 396. With an incredibly superficial analysis, the Committee simply
20        stated: "At present the United States has no national motto. It is most appropriate that
21        'In God We Trust' be so designated."[129]

22  126.  In its Report, the Committee spent no time at all considering the constitutionality of the
23        verbiage. It simply noted (1) that the phrase had been used in the past on coins, and (2)

---

[123] 100 Cong. Rec. 6085 (May 5, 1954 Remarks of Rep. Francis E. Dorn).
[124] 100 Cong. Rec. 7764 (June 7, 1954 Remarks of Rep. Peter Rodino).
[125] 100 Cong. Rec. 7765 (June 7, 1954 Remarks of Rep. Hugh J. Addonizio).
[126] 100 Cong. Rec. 14919 (August 17, 1954 Remarks of Rep. Charles A. Wolverton).
[127] Id.
[128] 101 Cong. Rec. 11193. A copy of H. J. Res. 396 (84th Cong., 1st Sess.) – also noting this date – was inserted into the record during a meeting of Subcommittee No. 4 of the Committee of the Judiciary, held on Friday, February 24, 1956. (84) H.J. Res. 396, (84) HJ-T.114 (Feb. 24, 1956), House Committee on Judiciary, House Subcommittee No. 4 ("To Establish a National Motto of the United States").
[129] H.R. Rep. No. 1959, 84th Cong., 2nd Sess. 1 (March 28, 1956).

1      that the Star-Spangled Banner – which has similar words in one of its four stanzas – had

2      been adopted as the national anthem.[130]

3  127. The Committee concluded – despite the constitutional mandate for strict governmental

4      neutrality in terms of religious ideology – that "it is clear that 'In God We Trust' has a

5      strong claim as our national motto."[131]

6  128. It might be noted also that the Committee dismissively cast "E pluribus unum" aside.

7      Although it acknowledged that this phrase had "also received wide usage in the United

8      States," it declared by fiat: "However, the committee considers 'In God We Trust' a

9      superior and more acceptable motto for the United States."[132] ("E pluribus unum," of

10     course, has an extraordinary historical pedigree. See at ¶ 264, page 49, infra.)

11  129. Apparently, this is because of its "great **spiritual** and psychological value to our

12     country."[133]

13  130. Thus, H.J. Res. 396 was quickly approved and signed into law[134] by President

14     Eisenhower on July 30, 1956.[135]

15  131. The codification of this act – which will hereafter be referred to the "Act of 1956" – is

16     now found at 36 U.S.C. § 302: "'In God we trust' is the national motto."

17

18

19

20  **D.  THE POLITICAL CLIMATE WAS PRO-MONOTHEISTIC AND ANTI-**

21     **ATHEISTIC WHEN THE CHALLENGED ACTS WERE IMPLEMENTED**

22

23  132. The foregoing demonstrates unequivocally that the government's use of the patently

24     religious words "In God We Trust" (on the coins and currency and as the nation's

25     motto) occurred as a result of officials acting with patently religious purposes.

26  133. Such patently unconstitutional activity, Lemon v. Kurtzman, 403 U.S. 602, 612-613

27     (1971), can only occur in a political climate that empowers those advocating (Christian)

28     Monotheism while disenfranchising Atheists. Such a climate existed in the 1950s.

---

[130] Id. at 1-2.
[131] Id. at 2.
[132] Id.
[133] Id. (emphasis added).
[134] Pub. L. 84-851 is now codified at 36 U.S.C. Section 186.

134. For instance, there was marked support for (Christian) Monotheism at that time. APPENDIX B.

135. Simultaneously, there was pervasive anti-Atheistic sentiment. APPENDIX C.

136. In fact, that era in our nation's history was filled with governmental activities devoted towards fostering "dedication of our Nation and our people to the Almighty."[136]

137. For instance, in adding the words, "under God" to the Pledge of Allegiance, it's clear that Congress was intent upon endorsing (Christian) Monotheism and disapproving of Atheism. APPENDIX D.

138. The Pledge's implementation also demonstrates that – like the acts mandating "In God We Trust" on the money and turning that religious phrase into our national motto – the government's purpose was religious in nature. APPENDIX F.

**E.  THE POLITICAL CLIMATE HAS REMAINED PRO-MONOTHEISTIC AND ANTI-ATHEISTIC SINCE THE CHALLENGED ACTS WERE IMPLEMENTED**

139. It should be noted that the history just provided is not a reflection of a predilection for religion that ended in the 1950s. Rather, governmental endorsement of (Christian) Monotheism has persisted since that time. Furthermore – with remarkable hypocrisy – our government has engaged in the very same behaviors it alleged were violating religious freedoms when occasioned by officially Atheistic regimes.

140. In 1965, for example, Congress reported on "Antireligious Activities in the Soviet Union and in Eastern Europe."[137] Among the activities deemed to be demonstrating religious persecution in the Soviet Union was "active propagation of the concepts of atheism."[138] Certainly, governmental "active propagation of (Christian) Monotheism" is no less offensive to the ideals of religious liberty.

---

[135] 70 Stat. 732.
[136] 100 Cong. Rec. 7, 8618 (June 22, 1954) (Statement by President Dwight D. Eisenhower, as reported by Sen. Homer Ferguson.)
[137] H. Rep. 532, 89th Cong., 1st Sess. (June 21, 1965) (as reported in House Miscellaneous Reports on Public Bills IV, 12665-4).
[138] Id., at 2.

1   141.  Similarly, that House Report denounced the fact that, in communist countries, "jobs and
2         promotion opportunities are lost"[139] due to governmental acts disfavoring
3         (Monotheistic) religious beliefs. Yet jobs and promotion opportunities have been (and
4         continue to be) lost in the United States due to governmental acts disfavoring Atheistic
5         religious beliefs. (In fact, Plaintiff Newdow has personally suffered this very harm.
6         APPENDIX I, ¶¶ 34-36.)

7   142.  The Report also decried the fact that under Soviet rule, "Islam was declared to be a
8         'hostile ideology.'"[140] Yet – while self-righteously engaging in this disapprobation –
9         Congress had been maligning "atheistic communism" and "atheistic materialism" in
10        numerous ways over and over and over again.[141]

11  143.  Similarly, while the anti-Atheistic sentiment officially espoused by Congress was
12        fueling anti-Atheistic views in the media here, the Report berated the Soviets over the
13        fact that "[v]irulent anti-Islamic propaganda is prevalent in newspapers and
14        magazines."[142]

15  144.  In view of the foregoing, one could well imagine how Congress would have responded
16        had the Soviet government given their citizens no choice but to utilize monetary
17        instruments stating that "God does not exist," or espousing that claim as its national
18        motto.

19  145.  Without question, such an act on the part of our rivals would have resulted in severe
20        castigation and rebuke by our Congress. Yet there is no legal, moral or rational
21        difference between that motto – which the Soviets did NOT use – and "In God We
22        Trust" – which Congress DID use.

23  146.  Had the Soviet Union utilized its national currency to export its Atheistic beliefs,
24        Congress would also undoubtedly have registered the highest of protestations. Yet doing

---

[139] Id., at 3.
[140] Id., at 4.
[141] These terms were repeatedly employed by congressmen and other governmental actors, always in a reproachful manner. As but a small representative sample, see, e.g., 99 Cong. Rec. A1428 (March 23, 1953 Remarks of Senator John M. Butler (MD)); 99 Cong. Rec. A4130 (July 7, 1953 Remarks of Rep. Donald L. Jackson (CA)); 100 Cong. Rec. A2515 (April 1, 1954 Remarks of Louis C. Rabaut (MI)); 100 Cong. Rec. 5915 (May 4, 1954 Remarks of Senator Alexander Wiley (WI)); 100 Cong. Rec. 8618 (June 22, 1954 Remarks of Senator Homer Ferguson (MI)); 100 Cong. Rec. 7758 (June 7, 1954 Remarks of Rep. Overton Brooks (LA)).
[142] Id., at 5.

1    just that is one of the expressed goals of our government. In the United States Mint

2    Annual Report for the year 2003, for example, it was written that:

3        Wherever United States coins travel, they serve as reminders of the
4        values that all Americans share. The words and symbols that define us as
5        Americans have a permanent place in our coins: "Liberty" … "In God
6        We Trust" … E Pluribus Unum" … … Our coins are small declarations
7        of our beliefs. They showcase how we see ourselves and our sense of
8        sovereign identity. And they serve as ambassadors of American values
9        and ideals.[143]

10

11   147. Although obviously aware that many citizens find the motto offensive (e.g., "This use of

12       the national motto has been challenged in court many times over the years that it has

13       been in use[144]), Defendant Snow's Treasury Department is almost defiant as it snubs

14       those who seek to have their fundamental liberties upheld:

15           The Department of the Treasury and the Department of Justice intend to actively
16           defend against challenges to the use of the national motto."[145]

17

---

[143] Accessed at http:// www.usmint.gov/downloads/about/annual_report/2003AnnualReport.pdf on
May 8, 2005.
[144] Accessed at http://www.moneyfactory.com/document.cfm/18/107 on May 8, 2005.
[145] Id.

1              **<u>CLAIM FOR RELIEF</u>**

2

3    **A.  PLAINTIFF NEWDOW DOES NOT TRUST IN GOD**

4    148.  Plaintiff Newdow is an Atheist whose religious beliefs are specifically and explicitly

5              based on the idea that there is no god. He finds belief in such an entity to be a

6              significantly distasteful notion. He has no desire to impart his Atheistic beliefs upon

7              others or to proselytize regarding Atheism. Nor does he need assistance dealing with the

8              significant amounts of (Christian) Monotheism that pervades American society.

9              However, he finds it deeply offensive to have his government and its agents advocating

10             for a religious view he specifically decries.

11   149.  Whether or not that opinion is actionable within our judicial system, there are other

12             definite injuries that Newdow suffers as a result of the constitutional violations being

13             challenged in this lawsuit.

14   150.  Plaintiff Michael Newdow is a minister, having been ordained in 1977. His ministry

15             espouses the religious philosophy that the true and eternal bonds of righteousness and

16             virtue stem from reason rather than mythology. It recognizes that it is never possible to

17             prove that something does not exist, but finds that fact to be an absurd justification to

18             accept the unproved. The bizarre, the incredible and the miraculous deserve not blind

19             faith, but rigorous challenge. To Plaintiff Newdow and his religious brethren, belief in a

20             deity represents the repudiation of rational thought processes, and offends all precepts of

21             science and natural law. His religion incorporates the same values of goodness, hope,

22             advancement of civilization and elevation of the human spirit common to most others.

23             However, it presumes that all these virtues must ultimately be based on truth, and that

24             they are only hindered by reliance upon a falsehood, which its adherents believe any

25             God to be.

26   151.  Plaintiff Newdow is a Grand Lubitz in the First Amendmist Church of True Science

27             (FACTS). Believing that "commandments" are the antithesis of any true religion,

28             FACTS has three "suggestions" for its members. Those suggestions are (1) Question, (2)

29             Be honest, and (3) Do what's right. A Grand Lubitz is one who has chosen to live his or

30             her life devoted to those principles.

1    152. Following all three of the FACTS suggestions has led Newdow and his fellow FACTS

2           adherents to deny of the existence of any god.

3

4

5

6    **B. THE DEFENDANTS IN THIS CASE, INDIVIDUALLY AND COLLECTIVELY,**

7        **HAVE ACTED AND CONTINUE TO ACT TO FURTHER THE PRO-**

8        **MONOTHEISTIC AND ANTI-ATHEISTIC BIAS THAT STEMS FROM THE USE**

9        **OF THE MOTTO**

10

11    153. 31 U.S.C. § 5103 states that "United States coins and currency … are legal tender for all

12           debts …."

13    154. Pursuant to 31 U.S.C. § 5111(a)(1), "The Secretary of the Treasury – shall mint and

14           issue coins described in section 5112 of this title in amounts the Secretary decides are

15           necessary to meet the needs of the United States."

16    155. Pursuant to 31 U.S.C. § 5112(a), Defendant Snow – as Secretary of the Treasury – is

17           authorized to mint and issue dollar, half dollar, quarter dollar, dime, 5-cent and one-cent

18           coins.

19    156. Pursuant to 31 U.S.C. § 5112(d)(1), "United States coins shall have the inscription "In

20           God We Trust."

21    157. Pursuant to 31 U.S.C. § 5112(e)(4), "the Secretary shall mint and issue, in quantities

22           sufficient to meet public demand, coins which … have inscriptions of … the words …

23           "In God We Trust."

24    158. Defendant Snow does mint coins with this inscription.

25    159. Pursuant to 31 U.S.C. § 304(b)(2), Defendant Fore – as Director of the Mint – shares in

26           minting and issuing the coins bearing that religious motto.

27

28    160. Pursuant to 31 U.S.C. 5114(b), "United States currency has the inscription 'In God We

29           Trust' in a place the Secretary decides is appropriate."

30    161. Pursuant to 31 U.S.C. § 5115, "The Secretary of the Treasury may issue United States

31           currency notes."

162. Defendant Snow does issue United States currency notes with the inscription "In God We Trust" in a place he has decided is appropriate.

163. Pursuant to 31 U.S.C. § 303(b)(1), Defendant Ferguson – as Director of the Bureau of Engraving and Printing (BEP) – shares in engraving, printing and issuing United States currency and currency notes.

164. 2 U.S.C. § 285b (3) states that the Law Revision Counsel "shall … prepare and publish periodically a new edition of the United States Code … with annual cumulative supplements reflecting newly enacted laws."

165. Defendant Peter LeFevre – as the Law Revision Counsel – has been responsible for the preparation and publication of 36 U.S.C. § 302, in which it is stated that ''In God we trust'' is the national motto.

166. His activity in this regard "degrades [Newdow and other Atheists] from the equal rank of citizens," turning them into "political outsiders, not full members of the political community."

167. He also has been responsible for the preparation and publication of 31 U.S.C. § 5112(d)(1), which states, "United States coins shall have the inscription 'In God We Trust.'" Similarly, he has been responsible for the preparation and publication of 31 U.S.C. § 5114(b), which states, "United States currency has the inscription 'In God We Trust.'"

168. These Code sections – in addition to their Establishment Clause effects – also infringe on Free Exercise rights, as individuals such as Newdow are forced to further a religious message with which they may disagree.

1   C. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE
2       NATION'S MOTTO – TURNS NEWDOW INTO A "POLITICAL OUTSIDER,"
3       THUS VIOLATING THE ESTABLISHMENT CLAUSE
4
5   169.  In his *Memorial and Remonstrance* – which the Supreme Court has repeatedly
6         referenced to explain the Religion Clauses of the First Amendment[146] – James Madison
7         spoke of equality no less than thirteen times.
8   170.  Perhaps the clearest statement in this regard – highlighting the key injury that
9         individuals suffer from religious establishments of any sort – is that any such
10        constitutional transgression "degrades from the equal rank of Citizens all those whose
11        opinions in Religion do not bend to those of the Legislative authority."[147]
12  171.  Newdow – who specifically denies that there exists a god and who finds it offensive to
13        be included among those who would trust in what he believes is a pure fiction – has
14        been "degrade[d] from the equal rank of citizens" by Defendants' activities.

---

[146] See, e.g., Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301, 2332 (2004) (Thomas, J.,
concurring); Locke v. Davey, 540 U.S. 712, 722 (2004); Zelman v. Simmons-Harris, 536 U.S. 639,
711 (2002) (Souter, J., dissenting); Mitchell v. Helms, 530 U.S. 793, 871 (2000) (Souter, J.,
dissenting); City of Boerne v. Flores, 521 U.S. 507, 560-61 (1997) (O'Connor, J., dissenting);
Agostini v. Felton, 521 U.S. 203, 243 (1997) (Souter, J., dissenting); Rosenberger v. Rector & Visitors
of the Univ. of Va., 515 U.S. 819, 853 (1995) (Thomas, J., concurring); Lee v. Weisman, 505 U.S.
577, 590 (1992); Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints
v. Amos, 483 U.S. 327, 341 n.2 (1987) (Brennan, J., concurring); Edwards v. Aguillard, 482 U.S. 578,
605-606 (1987) (Powell, J., concurring); Wallace v. Jaffree, 472 U.S. 38, 55 n.38 (1985); Marsh v.
Chambers, 463 U.S. 783, 804 (1983) (Brennan, J., dissenting); Valley Forge Christian College v.
Americans United for Separation of Church & State, 454 U.S. 464, 502 (1982) (Brennan, J.,
dissenting); Meek v. Pittenger, 421 U.S. 349, 383 (1975) (Brennan, J., dissenting); Committee for
Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 760, 772, 783, 798 (1973); Lemon v.
Kurtzman, 411 U.S. 192, 209 (1973) (Douglas, J., dissenting); Wisconsin v. Yoder, 406 U.S. 205, 218
(1972); Lemon v. Kurtzman, 403 U.S. 602, 633 (1971) (Douglas, J., concurring); Tilton v. Richardson,
403 U.S. 672, 696 (1971) (Douglas, J., dissenting); Walz v. Tax Com. of New York, 397 U.S. 664,
675 n.3 (1970); Flast v. Cohen, 392 U.S. 83, 103 (1968); Board of Education v. Allen, 392 U.S. 236,
266 (1968) (Douglas, J., dissenting); School Dist. v. Schempp, 374 U.S. 203, 213, 225 (1963); Engel
v. Vitale, 370 U.S. 421, 433 n.13, n.15, 436 n.22 (1962); Torcaso v. Watkins, 367 U.S. 488, 491
(1961); McGowan v. Maryland, 366 U.S. 420, 431 n.7 (1961); Illinois ex rel. McCollum v. Bd. of
Educ., 333 U.S. 203, 214, 216 (1948); Everson v. Board of Education, 330 U.S. 1, 12, 13 n.12 (1947)
(plus extensive discussion in Justice Rutledge's dissent); Reynolds v. United States, 98 U.S. 145, 163
(1878).
[147] *The Founders' Constitution*, Volume 5, Amendment I (Religion), Document 43 (citing The Papers
of James Madison. Edited by William T. Hutchinson et al. Chicago and London: University of
Chicago Press, 1962--77 (vols. 1--10); Charlottesville: University Press of Virginia, 1977--(vols. 11--
)). Accessed at http://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html on May
29, 2005.

1   172. Evidence of this – and the severe effects of this as it applies to Plaintiff here – can be

2          appreciated by noting that Newdow (who acquired some notoriety due to his challenges

3          to the phrase "under God" in the Pledge of Allegiance[148]) was just recently refused a job

4          because of the (mis-)perception of his activism.[149] APPENDIX I, ¶¶ 34-36.[150]

5   173. This is in no small part due to government's constant reinforcement of the twin notions

6          that belief in God is "good," and disbelief in God is "bad." "In God We Trust" on the

7          money plays a significant role in that reinforcement.

8   174. As repeatedly phrased more recently by the Supreme Court, government may not act to

9          turn individuals into political "outsiders" on the basis of their religious beliefs:

10                 The second and more direct infringement is government endorsement or
11                 disapproval of religion. Endorsement sends a message to nonadherents that they
12                 are outsiders, not full members of the political community[151]
13

14   175. That the Defendants have done this in and of itself reveals the violation of the

15          Establishment Clause. That their activities have also failed the many Supreme Court

16          tests for Establishment Clause violations gives further evidence of their constitutional

17          transgressions.

18   176. For instance, the history provided above demonstrates that "In God We Trust" was

19          chosen and utilized to serve a religious purpose. Thus it violates the "purpose prong" of

20          the test enunciated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 612-613

21          (1971). See, also, Van Orden v. Perry, 125 S. Ct. 2854 (2005).

22   177. The foregoing also demonstrates that there was no secular purpose in choosing "In God

23          We Trust" for use on the coins or as the national motto. Any alleged secular purpose is

24          clearly pretextual.

25   178. Lemon's "effects prong" has also been violated. By serving its intended religious

26          purposes, "In God We Trust" has the religious effects its promoters have sought.

---

[148] Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).
[149] Many have interpreted Newdow's advocacy as being in favor of Atheism. It is nothing of the sort. It is in favor only of (religious) equality.
[150] It cannot be reasonably contended that Newdow would ever have been refused those jobs had his notoriety resulted from attempts to further (rather than end) government-sponsored (Christian) monotheism. In other words, violating the Constitution would not have resulted in this significant harm. Only upholding that document's principles has yielded this interference with Newdow's ability to earn a living.
[151] Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).

1   179.   "In God We Trust" implies there is a God, which is disputed by millions of American

2           citizens, including Newdow. Thus it violates the religious neutrality required by the

3           Establishment Clause.

4   180.   "In God We Trust" places government's imprimatur on the religious ideas that (a) there

5           exists a God, and (b) the United States' citizens believe in God. Thus, "In God We

6           Trust" violates the Establishment Clause.

7   181.   "In God We Trust" endorses the religious idea that there exists a God. Thus, "In God

8           We Trust" violates the Establishment Clause.

9   182.   In addition to turning Newdow and his religious brethren into political outsiders, "In

10          God We Trust" sends "an accompanying message to adherents that they are insiders,

11          favored members of the political community." Lynch v. Donnelly, 465 U.S. 668 (1984).

12          Thus, for this reason as well, "In God We Trust" violates the Establishment Clause.

13  183.   When "the power, prestige and financial support of government is placed behind a

14          particular religious belief,"[152] there are adverse effects upon those who hold different

15          beliefs.[153]

16  184.   "In God We Trust" on the coins and currency (and as our national motto) lends that

17          "power, prestige and financial support" to the sectarian view that there exists a God.

18  185.   In significant part as a result of this governmental decree, nearly half of Americans

19          maintain that belief in God is necessary to be moral.[154]

20  186.   Similarly, this endorsement of (the Christian) God has led to a situation where two-

21          thirds of Americans believe that the United States is a Christian Nation.[155]

22  187.   When government ends its policies that send messages to the population that politically

23          disenfranchised groups are second-class citizens, that second-class citizenship ends.

24          Thus, when government stopped sending messages (with its segregation policies) that

25          blacks are second-class citizens, the percentage of those refusing to vote for a black

26          candidate decreased from 53% in 1958 to 4% in 1999. Similarly, as policies for equality

---

[152] Engel v. Vitale, 370 U.S. 421, 431 (1962).

[153] In fact, that is largely the reason our nation has its Establishment Clause.

[154] Poll conducted by the Pew Research Center, March 20, 2002, entitled, *Americans Struggle with Religion's Role at Home and Abroad.* Accessed on October 23, 2005 at http://people-press.org/reports/display.php3?ReportID=150.

[155] Id.

1    towards women replaced policies of repression, those refusing to vote for a woman

2    candidate decreased from 41% to 7%. The diminution of anti-Catholic bias took a great

3    leap forward when John Kennedy took office as president. Accordingly, those refusing

4    to vote for a Catholic went from 22% to 4% during that interval. Yet for Atheists –

5    where government continues to send messages (especially with its use of "In God We

6    Trust") that "real Americans believe in God" – the percentage of those refusing to vote

7    for such an individual has remained extraordinarily high, with the last Gallup poll

8    showing the figure to be 48%![156]

9  188.  This statistic has been replicated by other organizations. For instance, the results of a

10       poll performed by Zogby International (in 2000) led to the following summary:

11            In picking a candidate for vice president of the United States, it would be acceptable to
12            choose a woman, a black or a Jew, somewhat acceptable to pick an Arab American,
13            somewhat less acceptable to nominate a homosexual -- but do not on any account
14            choose an atheist.[157]

15

16

17

18  **D.  NEWDOW IS FORCED TO PAY TAX DOLLARS TO SUPPORT THE PURELY**
19  **RELIGIOUS NOTION – WHICH TURNS HIM, PERSONALLY, INTO A**
20  **POLITICAL "OUTSIDER" – THAT "WE" TRUST IN GOD**
21

22  189.  Plaintiff is a federal taxpayer, APPENDIX I, ¶ 38, and some of his federal tax dollars

23       are used to propagate a religious opinion that he expressly denies – i.e., that "In God We

24       Trust." As Thomas Jefferson wrote, "to compel a man to furnish contributions of money

25       for the propagation of opinions which he disbelieves, is sinful and tyrannical."[158]

26  190.  In addition to the government's general propagation of that opinion, Newdow's tax

27       dollars are also used to propagate the opinion in a manner that directly impinges upon

28       Newdow himself. For example, Newdow's tax dollars are used to manufacture the coins

29       and currency that Newdow, himself, must utilize.

---

[156] Polls given July 30-August 4, 1958 and February 19-21, 1999. Copyright: The Gallup
Organization, Princeton, NJ. A.I.P.O. See, www.gallup.com and www.gallupjournal.com.
[157] Accessed at http://www.zogby.com/search/ReadClips.dbm?ID=2192 on November 6, 2005.
[158] Thomas Jefferson, *Bill for Establishing Religious Freedom* (1799), in *Basic Writings of Thomas
Jefferson*, Foner PS (ed.) (Wiley Book Company: New York, 1944), p. 48.

191. Some of the federal tax dollars paid by Plaintiff Newdow are used to pay for the salaries of Defendants LeFevre, Snow, Fore and Ferguson, who – while employed – serve to perpetrate the injuries described herein.

192. The aforementioned tax moneys are also used to pay for (i) the salaries of the employees under Defendants' authority, (ii) the manufacture of the coins and currency that bears the religious motto, (iii) the physical plants wherein the perpetuation and promotion of the religious motto occurs (including construction, maintenance and utilities), and (iv) the printing of the United States Code, which – by way of the various code sections previously mentioned – codifies and officially establishes the (Christian) Monotheism in which Newdow "disbelieves."

193. Some (if not all) of the federal dollars spent in the aforementioned activities are apportioned under the taxing and spending power of Article I, Section 8 of the Constitution of the United States. ("[F]ederal taxpayers have standing to raise Establishment Clause claims against exercises of congressional power under the taxing and spending power of Article I, § 8, of the Constitution." Bowen v. Kendrick, 487 U.S. 589, 618 (1988).)

194. Although even a minimal expenditure of funds that serves religious ends violates the Constitution,[159] these funds are not minimal.

195. The preceding examples show that Plaintiff's tax monies are used for governmental functions designed to bolster the use and status of the religious motto. The taking by the government of Plaintiff's (and the rest of the citizenry's) personal wealth to be used to advocate for a statement that places the government's imprimatur on religious beliefs to which Plaintiff does not adhere is a violation of both the Establishment and Free Exercise clauses.

---

[159] "Who does not see … that the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" James Madison, *Memorial and Remonstrance against Religious Assessments*, II Writings of Madison 183, at 185-186.

E. **"IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE NATION'S MOTTO – INFRINGES UPON NEWDOW'S RIGHT TO THE FREE EXERCISE OF HIS RELIGION**

196. In addition to the Establishment Clause violations caused by this governmental practice, Plaintiff – by being forced by government to countenance religious dogma he disputes as the price to pay for simply participating in American society – has had his fundamental constitutional right of Free Exercise violated as well.

197. Because there is no other practical way to pay for (or receive payment for) the small incidentals in life, "In God We Trust" on the coins repeatedly forces Newdow to confront a religious belief he finds offensive.

198. Furthermore, since – as the Mint claimed only two years ago – "[o]ur coins are small declarations of our beliefs. They showcase how we see ourselves and our sense of sovereign identity. And they serve as ambassadors of American values and ideals," then those monetary instruments coerce Newdow to make those "small declarations," to assist in that showcasing, and to support those ambassadors. This violates Newdow's Free Exercise rights.

199. Defendants' acts have had other direct effects on Newdow's abilities to live fully and freely in our society.

200. For instance, the government-perpetuated (if not created) anti-Atheistic bias that Defendants have maintained has caused Plaintiff Newdow to give up hope of obtaining elected office. APPENDIX I, ¶ 37.

201. Newdow owns undeveloped real estate in a commercial area in Elk Grove, California. He has used that property for religious purposes.

202. He has worshipped on that property. He has discussed the FACTS religious philosophy on that property. Additionally, he has used the property for attempts at church fund-raising.

203. Like ministers of other religions, Newdow would assemble with his congregants to worship – in conjunction with raising money – were that latter endeavor not now futile (due to the Defendants' acts in placing offensive religious dogma on the nation's monetary instruments). APPENDIX I, ¶ 13. Thus, not only his ability to raise funds for

his ministry, but his right to assemble with others to worship has been negatively impacted by the Defendants. "[T]he 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service." Employment Div. v. Smith, 494 U.S. 872, 877 (1990)

204. Newdow recently was told he would not be hired for emergency physician positions due solely to his activism to restore the religious equality that underlies our constitutional scheme. There is no question that this is a severe injury, and that it occurred only because of what has been perceived as his efforts on behalf of Atheists. Newdow never would have been kept from work had he been on the "other side," advocating for placing (or maintaining) "under God" in the Pledge of Allegiance.

205. This loss of employment undoubtedly was a result of the persistent messages, sent by Defendants, that the United States is a nation that trusts in God.

206. Plaintiff Newdow has been collecting coins since his early childhood, and has continuously maintained a significant collection for well over forty years. He routinely checks the coins he obtains during his normal purchasing activities, and he not infrequently pulls out portions of his collection to admire the uniqueness and beauty of many of his specimens.

207. When he does this, Newdow is forced to confront government-endorsed, purely religious dogma that is directly contrary to his faith and to the tenets of his church.

208. Anticipating that Defendants will raise issues of standing, it might be noted that these confrontations are far more pervasive and offensive than those which occurred in such cases as Lynch v. Donnelly, 465 U.S. 668 (1984), Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573 (1989) and Van Orden v. Perry, 125 S. Ct. 2854 (2005).

209. In fact, the very incident that precipitated Newdow's activism on the part of religious equality occurred during Thanksgiving, 1997, when he again noticed "In God We Trust" on all of his coins and currency. APPENDIX I, ¶ 4. That phrase – which he had always considered offensive – struck an especially disharmonious chord that day, and triggered the efforts that will likely, to a large extent, define this man's life.

210.   One of the expressed purposes of placing the purely religious phrase, "In God We Trust," on the coins and currency was to proselytize for the purely religious claim which that phrase makes.

211.   Thus, for instance, when Matthew H. Rothert first wrote to the Secretary of the Treasury, he noted that placing "In God We Trust" on the currency would "affirm our trust in God in such a manner that it will be heard around the world."[160]

212.   Similarly, at the hearing before the House Banking and Currency Committee, Rep. Herman P. Eberharter (PA) noted that:

> the American dollar travels all over the world, into every country of the world, and frequently gets behind the Iron Curtain, and if it carries this message in that way I think it would be very good. I think that is one of the most compelling reasons why we should put it on our currency.[161]

213.   The American Legion – advocating for the use of the religious motto on the money – felt the same. In a resolution placed into the Congressional Record, that organization wrote that "the principles laid down by God and the teachings of our way of life should be kept alive in the hearts and minds of our friends enslaved behind the Iron Curtain."[162]

214.   Rep. Lawrence H. Fountain reiterated this idea, as well:

> [T]hat inscription … indicates to the world that … the material is not the thing upon which we should rely, but it is God."[163]

215.   As noted in ¶ 146, supra, the position of the United States Mint is that America's coins – with the words "In God We Trust" – "serve as ambassadors of American values and ideals."

216.   In other words, "In God We Trust" on the coins and currency serves as a form of religious evangelism, in which all who pass those monetary instruments – whether willingly or unwillingly – participate. Newdow is forbidden by his religion from participating in such evangelism for (Christian) Monotheism, spreading the word that there is a God, and that, as a United States citizen, he trusts in that God. Newdow trusts in nothing of the sort.

---

[160] See at ¶ 17, supra.

[161] *United States Currency Inscription: Hearing on H.R. 619 and related bills, before the Committee on Banking and Currency*, 84th Cong., 1st Sess. 53 (Tuesday, May 17, 1955).

[162] Id. at 54.

[163] Id. at 56.

217. Newdow has traveled to numerous foreign lands, including Andorra, Aruba, Ascension Island, Australia, the Bahamas, Bali, Barbados, Belgium, Canada, Chile, Cuba, Denmark, Dominican Republic, Ecuador, Egypt, England, France, Germany, Gibraltar, Greece, Haiti, Holland, Honduras, Hong Kong, Indonesia, Israel, Italy, Japan, Malaysia, Mexico, New Zealand, Norway, Palau, Panama, Puerto Rico, St. Thomas, South Korea, Spain, Sri Lanka, Sweden, Switzerland, Taiwan, Thailand, Tobago, and Trinidad. APPENDIX I, ¶ 40. Although he often would take travelers' cheques on these trips, he frequently would need to exchange small quantities of American currency in order to avoid financial losses (due to exchanges of large denomination cheques). Id., ¶ 41. In so doing, he was forced to evangelize for (Christian) Monotheism precisely as Congress and others envisioned.

218. Newdow plans to continue his foreign travels – including, possibly, as a minister of FACTS. Id., ¶ 42. He will likely continue to be forced to spend United States currency, thus further being placed in a situation where Defendants' acts have required him to evangelize for a religious view he explicitly denies. Id

219. By being thus forced to evangelize for a religious belief that he explicitly denies, Newdow's Free Exercise rights are infringed upon.

220. This injury is even greater when that evangelism occurs while – as a minister of FACTS – he needs to use coins or currency to make purchases for church activities.

221. In addition to evangelizing against his will, simply being forced to carry the religious message infringes upon Newdow's Free Exercise rights. Could the government make a Jew carry coins with crucifixes as the price to pay for using cash? A Hindu carry currency depicting Buddha? A Catholic carry money with clearly marked King James versions of the Bible? Why is government in this business altogether?

222. This notion – that it is problematic for individuals to carry money with religious ideology they expressly deny – is highlighted by the derogatory remarks that have repeatedly been hurled at Newdow since his Atheism became known. Time and again, those who wish to castigate him have argued that he is a hypocrite for using money that has the "In God We Trust" verbiage. APPENDIX I, ¶ 12.

1   .

2   223.  Newdow has also attempted to raise money for his church in various ways.

3   224.  On Saturday, October 1, 2005, for instance – on his Elk Grove property – a toy and

4          game give-away was held. Toys and games that had been donated to the church were

5          offered to any and all. Newdow also intended to proselytize, and to secure monetary

6          donations for further church activities.

7   225.  A sign indicating that the event was sponsored by FACTS was erected, and Newdow

8          did, at times, proselytize and ask for donations.

9   226.  Newdow has also attended numerous events where he has attempted to sell items (such

10         as FACTS pens) to raise money for the church.

11  227.  In none of these situations was Newdow able to take any donations, since all that were

12         offered were in the form of currency or coin, engraved or inscribed with the phrase, "In

13         God We Trust." Accepting and/or using money with that phrase for church activities –

14         when the fundamental religious belief of the church is that there is no god in which trust

15         can be placed – would violate the second and third FACTS suggestions.

16  228.  On October 11, 2005, another FACTS Grand Lubitz attempted to raise funds at

17         Sacramento's annual Freethought Day festivities. Again, no money could be raised due

18         to the precepts of FACTS.

19  229.  Newdow envisions a network of FACTS churches around the country and around the

20         world. Imagine encouraging the natural tendency of children to question everything,

21         rather than to simply accept what others say are true. Imagine teaching them to be

22         honest – with themselves as well as with others. Newdow feels this will lead to truth,

23         happiness and achievement, as FACTS adherents place their faith in themselves and

24         their fellow men, rather than in mythical deities.

25  230.  In achieving this dream, however, Newdow is hamstrung. He can't raise money without

26         violating his church's basic tenets. The Supreme Court has acknowledged that "the

27         passing of the collection plate in church," Murdock v. Pennsylvania, 319 U.S. 105, 111

28         (1943), is a standard part of religion practice. Unlike the adherents of Monotheistic

29         religions, Newdow and his Atheistic brethren cannot – consistent with their religious

30         beliefs – reap the benefits of that practice … all because the government has chosen to

1  place purely religious dogma on its coins and currency, as is forbidden under the

2  Constitution of the United States.

3  231. Newdow has also wished to make purchases of books and other items related to his

4  Atheism. At times, the only means of paying for those materials is with United States

5  coins and currency, bearing the claim that "In God We Trust." Newdow cannot – in

6  keeping with his religious principles – make purchases for such items with such

7  monetary instruments. APPENDIX I, ¶ 39.

8  232. As the founder and a Grand Lubitz of FACTS, Plaintiff Newdow desires to have

9  gatherings – both local and national – where adherents of the religious ideals espoused

10  by the Church will assemble and worship. To facilely plan and run such gatherings

11  requires the use of cash and currency. Plaintiff cannot freely exercise his religious rights

12  to engage in such assembly and worship by utilizing such monetary instruments when

13  they contain religious dogma that specifically contradicts the tenets of his religion.

14  233. As the foregoing makes abundantly clear, Defendants – through their unconstitutional

15  activities – have unequivocally infringed upon Newdow's Free Exercise rights.

16

17

18

19  **F.  "IN GOD WE TRUST" – ON THE COINS AND CURRENCY AND AS THE**
20  **NATION'S MOTTO – VIOLATES NEWDOW'S RIGHTS UNDER RFRA[164]**
21

22  234. Plaintiff Newdow has already detailed how his free exercise rights have been infringed

23  upon by the government's use of "In God We Trust" on the nation's money.

24  Specifically, he has been forced to evangelize and proselytize for a religious belief that

25  is directly contrary to those of his church, his ability to raise funds generally for his

26  church has been severely impeded, he has been forced to pay tax dollars for the support

27  of a purely religious idea that is the antithesis of his personal religious beliefs, his ability

28  to purchase items related to his religious beliefs has been infringed upon, his plans to

---

[164] Although the Supreme Court has struck down RFRA as it applies to the states, City of Boerne v. Flores, 521 U.S. 507 (1997), multiple circuits – including the Ninth Circuit – have found that RFRA is still constitutional as it applies to the federal government. See, Guam v. Guerrero, 290 F.3d 1210, 1221 (9th Cir. 2002).

1        assemble for worship have been negatively impacted upon, and his use of his real

2        property for raising funds for his church has been severely impeded.

3    235.  Thus, Newdow's Free Exercise rights have been "substantially burdened."

4    236.  Additionally, any individual's Free Exercise of his religion is "substantially burdened"

5        when government sets up a system whereby that individual cannot escape the advocacy

6        of religious ideals with which he disagrees. The government constantly tells Newdow

7        that there is a God – a religious idea that he specifically rejects – every time he spends

8        or receives the only legal tender that the government provides or permits. This occurs,

9        on average, far more often than most people spend in worship. APPENDIX I, ¶ 3.

10   237.  Contrary to the requirements of RFRA, the government has no compelling interest in

11       placing the purely religious phrase, "In God We Trust," on the coins and currency, nor

12       in using that phrase as the national motto. In fact, what government is attempting to

13       accomplish – encouraging and declaring a religious ideology under which the people

14       will rally – is an "interest" that is directly contrary to government's constitutional

15       mandate.

16   238.  Furthermore, especially as it pertains to the coinage, the motto is a hindrance to the

17       beauty and design of the products. "Artistic rendering and a superabundance of lettering

18       do not go hand in hand towards the best results. Our artists at the start are handicapped

19       by having to place on the coin "United States of America, "E Pluribus Unum,"

20       "Liberty," "In God We Trust," the date and the denomination. In other words, six

21       separate mottoes or legends. Consequently, the artist cannot strive for simplicity, and,

22       despite his best endeavors, one or both sides of the coin are bound to be chopped up

23       with a lot of discordant elements."[165]

24   239.  Certainly, the Defendants have met none of their obligations under "strict scrutiny" to

25       justify the use of "In God We Trust" on the money or as our national motto.

26

27

28

---

[165] Schwarz T. *A History of United States Coinage*. (A.S. Barnes & Co., New York; 1980) at 281.

**G. "IN GOD WE TRUST" – ON THE COINS AND CURRENCY, AND AS THE NATION'S MOTTO – VIOLATES NEWDOW'S FREE SPEECH AND EQUAL PROTECTION RIGHTS**

240. It should be noted that, in addition to the Establishment Clause and Free Exercise Clause violations, the coercion noted in paragraph 198 results in a Free Speech violation as well. Wooley v. Maynard, 430 U.S. 705 (1977).[166]

241. Additionally, by endorsing the religious notion that God exists, the motto creates a societal environment where prejudice against Atheists – and, thus, against Plaintiff here – is perpetuated. Accordingly, in addition to the Religion Clause and Free Speech violations, the governmental use and advocacy of "In God We Trust" violates the requirements of Equal Protection as found in the Fifth Amendment to the United States Constitution.[167]

**H. DEFENDANT LEFEVRE HAS INJURED NEWDOW IN OTHER WAYS**

242. Defendant LeFevre also has been responsible for the preparation and publication of other United States Code sections that "degrade [Newdow and other Atheists] from the equal rank of citizens."

243. He prepares and publishes 36 U.S.C. § 119, which requires that the President issue an annual proclamation designating a national day of prayer.[168] This further turns Newdow and other Atheists into "political outsiders." As James Madison noted, "Religious proclamations by the Executive … imply a religious agency, making no part of the trust delegated to political rulers."[169]

---

[166] It should be noted that the phrase at issue in Wooley had no religious overtones. "In God We Trust" is purely religious.

[167] Although there is no explicit Equal Protection Clause in the Fifth Amendment, the Supreme Court has read the requirement of Equal Protection into that amendment's Due Process Clause. Adarand Constructors, Inc. v. Mineta, 534 U.S. 103, 105 (2001).

[168] "The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 119.

[169] The Founders' Constitution, Volume 5, Amendment I (Religion), Document 64, The University of Chicago Press (citing Madison J. *Detached Memoranda*, *W. & M. Q., 3d ser., 3:554--60 (1946)*),

1  244.  Law Revision Counsel LeFevre prepares and publishes 28 U.S.C. § 453.[170] This Code

2        section mandates that every justice and judge take his or her oath of office with the

3        words, "So help me God." This not only further turns Newdow and other Atheists into

4        "political outsiders," but it results in a judiciary completely devoid of individuals who

5        adhere to their religious views. This Code section also clearly violates the test oath

6        clause of the United States Constitution (Article VI, cl. 3).

7  245.  He also prepares and publishes the oath for "Each clerk of court and his deputies," 28

8        U.S.C. 951.[171] There, again, the "So help me God" phrase is required.

9  246.  He prepares and publishes 10 U.S.C. § 6031(b).[172] That Code Section states that "it is

10       earnestly recommended to all officers, seamen, and others in the naval service diligently

11       to attend at every performance of the worship of Almighty God." Such an official

12       "earnest recommendation" to worship "Almighty God" further degrades Newdow and

13       other Atheists from the equal rank of citizens.

14  247. Law Revision Counsel LeFevre prepares and publishes 36 U.S.C. § 22903,[173] which

15       suggests that one fulfills his or her obligations in the military only by "serving our

16       Nation under God." This adds to the outsider status of Newdow and other Atheists, as

17       they are deemed incapable of assisting in the defense of the nation.

18  248. In fact, this exclusion of Atheists from the armed services is two-fold. Law Revision

19       Counsel LeFevre prepares and publishes an assortment of other military Monotheistic

20       oaths as well, including those for any "individual, except the President, elected or

---

accessed at http://press-pubs.uchicago.edu/founders/documents/amendI_religions64.html on October 23, 2005.

[170] Each justice or judge of the United States shall take the following oath or affirmation before performing the duties of his office: ''I, _ _ _ _ _ _ _, do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as _ _ _ under the Constitution and laws of the United States. So help me God.''

[171] "Each clerk of court and his deputies shall take the following oath or affirmation before entering upon their duties: 'I, _ _ _ _ _ _ _, having been appointed _ _ _, do solemnly swear (or affirm) that I will truly and faithfully enter and record all orders, decrees, judgments and proceedings of such court, and will faithfully and impartially discharge all other duties of my office according to the best of my abilities and understanding. So help me God.'"

[172] "The commanders of vessels and naval activities to which chaplains are attached shall cause divine service to be performed on Sunday, whenever the weather and other circumstances allow it to be done; and it is earnestly recommended to all officers, seamen, and others in the naval service diligently to attend at every performance of the worship of Almighty God."

1      appointed to an office of honor or profit in the civil service or uniformed services," 5

2      U.S.C. § 3331; for "[e]ach person enlisting in an armed force," 10 U.S.C. § 502; for

3      "[e]ach person enlisting in the National Guard," 32 U.S.C. § 304; and for "[e]ach person

4      who is appointed as an officer of the National Guard," 32 U.S.C. § 312.

5    249.  The governmental mandate that no Atheist will be among those within this mass of

6        public servants furthers still Newdow's "political outsider" status.

7    250.  Moreover, Newdow has recently been contacted regarding a possible position in the

8        National Guard, and has been weighing the costs and benefits of the opportunity.

9        Learning that he is not allowed to obtain that employment due to his religious beliefs

10      has put an end to his consideration of the position.

---

[173] "The purposes of the [Army and Navy Union of the United States of America] … include … (2) serving our Nation under God."

## DEFENDANTS HAVE NO COMPELLING INTEREST

251. The first right listed in the Bill of Rights is that relating to the fact that "Congress shall make no law respecting an establishment of religion." As James Madison wrote, this right exists to prevent any governmental act that "degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority.[174] As the Supreme Court has phrased it, this right prevents government from "send[ing] a message to nonadherents that they are outsiders, not full members of the political community."[175]

252. The second right listed in the Bill of Rights is that "Congress shall make no law … prohibiting the free exercise [of religion]."

253. These rights, therefore, are fundamental constitutional rights. As such, the demands of strict scrutiny are called into play.[176]

254. Even were this not the case constitutionally, there is a statutory requirement for government to meet those strict scrutiny demands. This is found in RFRA, which applies to any governmental act that "substantially burdens" an individual's free exercise of his or her religion.[177]

255. There is no compelling interest in having "In God We Trust" on the nation's coins and currency or as the national motto.

---

[174] Madison J. *Memorial and Remonstrance*, The Founders' Constitution, Volume 5, Amendment I (Religion), Document 43, The University of Chicago Press, citing The Papers of James Madison. Edited by William T. Hutchinson et al. Chicago and London: University of Chicago Press, 1962--77 (vols. 1--10); Charlottesville: University Press of Virginia, 1977--(vols. 11--). Accessed on October 5, 2005 at http://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html. Emphases added.

[175] Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).

[176] "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." Clark v. Jeter, 486 U.S. 456, 461 (1988) (citations omitted).

[177] 42 U.S.C. § 2000bb-1(b)(1) and (b)(2) state, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."

## A. "IN GOD WE TRUST" IS – AND WAS INTENDED TO BE – RELIGIOUS, AND ANY CLAIM TO THE CONTRARY IS PRETEXTUAL

256. "In God We Trust" is clearly and unequivocally religious, and – as has been demonstrated – was intended to be clearly and unequivocally religious.

257. As Plaintiff Newdow has declared under oath, APPENDIX I at ¶¶ 12 and 19, he has received myriad contacts from strangers who have pointed to "In God We Trust" on the coins, currency and as our motto as evidence that "we" are a nation that believes in God.

258. This view has been confirmed scientifically. In 1994, a poll commissioned by the Freedom from Religion Foundation was performed by an independent research firm. The results of that poll revealed that Americans – by a two to one margin – believed that "In God We Trust" is religious, and – by a three to one margin – they opined that the phrase endorsed a belief in God. APPENDIX N.

259. In fact, it is only in court briefs and legal arguments that "In God We Trust" is stripped of its religious meaning. In our daily lives, its purely religious nature is unquestionable.[178]

260. The claim that "In God We Trust" is "ceremonial" is nothing but a bogus excuse to justify the majority's desire to do what the Constitution forbids. APPENDIX G. The same is true for the claim that "In God We Trust" causes a "*de minimis*" injury. Id.

261. The Claim that "In God We Trust" is an "acknowledgement" of religion and not an "endorsement" of religion is bogus as well. APPENDICES H and N.

262. "In God We Trust" is also not excusable because of any "historical" significance. There are all sorts of historical violations of the equality that underlies our constitutional framework. For instance, it is "historical" that our nation was founded by people who felt that it was acceptable to enslave the Negro race, and to forbid basic liberties to women. Yet no one would permit those past historical truths to be placed on our money, or used as our national motto. Thus, it is not the "history" that underlies the use of "In God We Trust." Rather, it is the message being provided by that history. And that message – being purely religious – is one which government may not espouse. To quote Justice Scalia, "The government may not … lend its power to one or the other side in

1     controversies over religious … dogma." <u>Employment Div. v. Smith</u>, 494 U.S. 872, 877

2     (1990).

3   263. In anticipation of the claim that "In God We Trust" is patriotic, it should be noted that

4     there is nothing patriotic about trusting in God. Patriotism is demonstrated by trusting in

5     the Constitution, which forbids governmental advocacy for any religious view.

6   264. It should also be noted that the *de facto* motto of the United States was "E pluribus

7     unum" for the 180 years from 1776 until 1956. This motto was chosen by a committee

8     formed on July 4, 1776, whose members were none other than Benjamin Franklin,

9     Thomas Jefferson and John Adams.[179]

10  265. Now that's historic! Yet that motto – in place since its creation by a committee that had

11     its birth on the day we declared our independence, and that was comprised of three of

12     the most renowned and important architects of our constitutional democracy – was

13     discarded by Congress.

14  266. This was done even though "an unbroken practice . . . is not something to be lightly cast

15     aside." <u>Marsh v. Chambers</u>, 463 U.S. 783, 790 (1983) (citing <u>Walz v. Tax Comm'n</u>, 397

16     U.S. 664, 678 (1970).

17  267. That no concern for "history" was heard from Congress when "E Pluribus Unum" was

18     replaced by "In God We Trust" shows clearly that the "history" justification is a mere

19     pretext.

20  268. It should be noted that while the United States (which holds itself out as the beacon of

21     religious liberty) has deemed it necessary to choose a purely religious motto, the

22     overwhelming majority of nations (including those where religion has historically been

23     wedded to the state) have seen no need for this at all.

24  269. With the United States – which has been enriched more than any other nation by the

25     diversity of its citizens – choosing to have a pure statement of religious ideology as its

26     motto (in violation of its Constitution), it deserves mention that the European Union –

---

[178] A typical example was seen on a popular television show. That show revolved around the idea of a living, personal God. In one episode, the protagonist stated, "Look at that penny. Does it say 'In Luck We Trust?'"*Touched by an Angel*. Broadcast on March 13, 2000.

[179] July 30, 1956, ch. 795, 70 Stat. 732.

1    comprised of distinctly religious nations – has chosen "Unity in diversity" for its
2    motto.[180]

3  270.  The history is clear that "In God We Trust" was chosen purely for its religious message.
4        The virtually infinite number of alternative mottoes is further evidence of the truth of
5        this assertion. Even limiting the motto to the current format, myriad other nonreligious
6        choices have always existed. "In Equality We Trust," "In Liberty We Trust," "In
7        Diversity We Trust," "In Justice We Trust," In the Constitution We Trust," "In
8        Principles We Trust," In Fairness We Trust," In Honesty We Trust," "In Humanity We
9        Trust," "In Truth We Trust," "In Wisdom We Trust," "In Trust We Trust," and on and
10       on, are all inclusive candidates that embrace the noble principles underlying our
11       governmental structure without compromising (or even implicating) constitutional
12       mandates. The fact that – as among all of these many alternatives – Congress opted for a
13       purely religious phrase is strong evidence of the fact that it was nothing but the
14       advocacy of a (Christian) Monotheistic ideology that was the driving force of those
15       involved.

16 271.  A "motto" is defined as:
17          **1 :** a sentence, phrase, or word inscribed on something as appropriate to or indicative
18              of its character or use
19          **2 :** a short expression of a guiding principle[181]
20
21 272.  Thus, the national motto should be the distillation, in one concise phrase, of that which
22       is "indicative of" our nation, or evincing our nation's "guiding principle." For a nation
23       that has a guarantee of governmental neutrality in matters of religion – **as the first**
24       **clause in its Bill of Rights**, no less – to contend that a disputed religious precept serves
25       as its guiding principle (and is indicative of its character) is absurd.

---

[180] http://en.wikipedia.org/wiki/European_symbols#Motto. Accessed on October 21, 2005.
[181] Merriam-Webster Online Dictionary, accessed http://www.m-w.com/dictionary/motto on November 12, 2005.

1  **B.  CONSIDERATION OF ANALOGOUS INFRINGEMENTS OF**
2  **CONSTITUTIONAL RIGHTS – IN WHICH DEFENDANTS WOULD NEVER**
3  **ENGAGE – HIGHLIGHTS THE DEGREE TO WHICH THE ACTIVITIES**
4  **BEING CHALLENGED HERE ARE IMPERMISSIBLE.**
5

6  273.  To highlight the constitutional infirmities of Defendants' acts, two sorts of analogous

7  behaviors might be considered. First, one can look at analogous religious statements,

8  and, second, an examination can be made of analogous infringements of other basic civil

9  rights.

10  274.  Among the possibilities of the first type, the lesson the Supreme Court provided in

11  Board of Regents v. Southworth, 529 U.S. 217, 235 (2000) – i.e., that "[t]he whole

12  theory of viewpoint neutrality is that minority views are treated with the same respect as

13  are majority views" – is instructive. Recognizing that esteemed individuals in our

14  history have been unabashed Atheists,[182] would we tolerate, "We Deny God Exists" on

15  our coins and currency or as our national motto? How about "In Allah We Trust?" Many

16  have sought to have Jesus Christ recognized by our government as the son of God.

17  Would "In Jesus We Trust" be permissible? How about "In Joseph Smith We Trust?"

18  "In The Pope We Trust?" Our current motto, "In God We Trust," is constitutionally

19  indistinguishable from any of these other statements.

20  275.  The other analogous situations to consider are those which actually occurred in our past,

21  but which, fortunately, have been addressed: "A prime part of the history of our

22  Constitution … is the story of the extension of constitutional rights and protections to

23  people once ignored or excluded." United States v. Virginia, 518 U.S. 515, 557 (1996).

24  276.  Could we have "In White Superiority We Trust?" Our history of treating blacks as less

25  than equal is at least as pervasive as our history of the poor treatment of Atheists. Would

26  anyone tell us that it's "ceremonial racism?" That the harm is "*de minimis*?"

27  277.  If Congress were filled with male chauvinists who were as blatantly anti-female as the

28  congressmen of the 1950s were anti-Atheist, would "In Male Dominion We Trust" be

29  thought of now as a mere "acknowledgement" of our past, and not an endorsement of

30  what is the clear message of that text? That certainly was a historic view upon which our

31  nation was founded. "The paramount destiny and mission of woman are to fulfill the

---

[182] Thomas Alva Edison and Samuel Clemens (Mark Twain) are but two examples.

1    noble and benign offices of wife and mother. This is the law of the Creator." <u>Bradwell v.</u>
2    <u>State</u>, 83 U.S. 130, 141 (1873) (Bradley, J., concurring).

3

4    278. The past discrimination against blacks and women has diminished largely because there
5         was an end to "the power, prestige and financial support of government" perpetuating
6         the view that blacks and women are second-class citizens.

7    279. Yet that is not the case with Atheists. On the contrary, with "the power, prestige and
8         financial support of government … placed behind [Monotheistic] religious belief,"[183]
9         the discrimination against Atheists such as Newdow not only persists, but it is actively
10        fueled.

11   280. This official governmental favoritism of (Christian) Monotheism and its official disfavor
12        of Atheists leads to the exact same harms as occurred to Catholics when they were
13        disfavored, to Jews when they were disfavored, to blacks when there was official racial
14        discrimination, and to women when there was official governmental favoring and
15        disfavoring of the different genders.

16   281. To ensure that this point is made, it might once more be useful to ponder these
17        hypotheticals from the given minority's vantage point. Imagine being a Jew, and having
18        no choice but to use currency stating, "In Jesus We Trust." Imagine being a lone
19        Christian among Muslims, where the national motto – proclaimed by the Islamic
20        majority and posted in innumerable venues – is "In Allah We Trust."[184] Constitutionally,
21        there is not one iota of difference between those mottos and the one currently in
22        existence.

23   282. Alternatively, a situation might be thought of where our citizens were asked to proclaim,
24        "We Don't Believe in God." The uproar over such a recitation – deafening as it would
25        be – would have no greater justification in terms of constitutional principles than the
26        claims brought by Plaintiff here.

27

28

---

[183] <u>Engel v. Vitale</u>, 370 U.S. 421, 431 (1962).
[184] "Allah," of course, is simply the Arab word for God. However, in the context of a predominantly Muslim country – where anti-Christian sentiment were pervasive – its limited meaning would undoubtedly be understood by all.

1

## C.  "IN GOD WE TRUST," CONSTITUTIONALLY, IS SECTARIAN

283.  Plaintiff readily acknowledges that the majority of Americans – certain of their belief in the existence of a God – are completely blind to the offensiveness the words "In God We Trust" as the nation's motto and on the coins and currency hold for Plaintiff and his religious brethren. That is precisely what one would expect to see as a result of religious bias, and the Framers' recognition of this sort of ecclesiastically-based myopia is largely why the Religion Clauses were created.

284.  The rights of religious freedom are fundamental constitutional rights, and, as such, they must be examined from the perspective of those individuals whose rights are abridged. "The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 894 (1992).

285.  Accordingly, with respect to the Religion Clauses, this "focus" is measured in terms of sectarianism, which – in constitutional terms – refers not only to beliefs held by any one religious sect, but to all religious beliefs that are not universal. In other words, any belief that is not adhered to by all is – from the point of view of the Constitution as well as the nonadherent – a sectarian belief. This is graphically illustrated in APPENDIX K.

286.  Sectarianism – on the part of government – is forbidden by the First Amendment. ("[T]he *government's* use of religious symbols is unconstitutional if it effectively endorses sectarian religious belief." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 765 (1995) (emphasis in original).)

287.  The phrase "In God We Trust" expresses a religious belief to which a significant segment of the population does not adhere.[185] Again, this phrase is constitutionally sectarian, especially in the current American society that has become increasingly religiously diverse. "This Nation is heir to a history and tradition of religious diversity that dates from the settlement of the North American Continent. Sectarian differences

---

[185] A recent poll found that approximately 10% of Americans are atheists or agnostics. This is more than five times the percentage of the population that is Jewish, Muslim, and a multitude of other non-Christian religions. Nonetheless, because those other theistic sects can join with the majority in claiming that "In God We Trust," they are not politically disenfranchised. It is only the Atheists – who

1    among various Christian denominations were central to the origins of our Republic.

2    Since then, adherents of religions too numerous to name have made the United States

3    their home, as have those whose beliefs expressly exclude religion." <u>Allegheny County</u>

4    <u>v. Greater Pittsburgh ACLU</u>, 492 U.S. 573, 589 (1989). <u>See</u>, <u>also</u>, <u>Elk Grove Unified</u>

5    <u>Sch. Dist. v. Newdow</u>, 124 S. Ct. 2301, 2326 (2004) (O'Connor, J., concurring) (noting

6    that the 1950s was "a time when our national religious diversity was neither as robust

7    nor as well recognized as it is now.").

8    288.  Sectarianism is often denied as such by legislators, scholars, "experts" and courts.

9    Viewing themselves as broadminded because they have embraced religions and sects

10   beyond their own, some such individuals fail to see that they still are taking a limited

11   view when they don't embrace all religions and sects. In colonial New Jersey, for

12   instance, those who set forth:

13       That there shall be no establishment of any one religious sect in this Province, in
14       preference to another; and that no Protestant inhabitant of this Colony shall be denied
15       the enjoyment of any civil right, merely on account of his religious principles; but that
16       all persons, professing a belief in the faith of any Protestant sect, who shall demean
17       themselves peaceably under the government, as hereby established, shall be capable of
18       being elected into any office of profit or trust, or being a member of either branch of
19       the Legislature, and shall fully and freely enjoy every privilege and immunity, enjoyed
20       by others their fellow subjects.[186]
21

22   apparently felt themselves to be advocating nonsectarianism. New Jersey's Catholics

23   likely felt otherwise. In <u>Abington School District v. Schempp</u>, 374 U.S. 203 (1963), it

24   was noted that "Dr. Weigle stated that the Bible was non-sectarian." <u>Id</u>. at 210. Perhaps

25   it was in response to Jewish objections that "[h]e later stated that the phrase 'non-

26   sectarian' meant to him non-sectarian within the Christian faiths." <u>Id</u>. (quoting the trial

27   court's summary).

28   289.  Similarly, when Representative Overton Brooks sponsored the introduction of a

29   National Day of Prayer, he must have felt himself to be quite the liberal by

30   encompassing "Catholics, Jewish and Protestants" in his definition of "all

31   denominations." 98 Cong. Rec. 771 (1952). Would Muslim, Hindu and other Americans

32   not take issue with that proclamation?

---

cannot join with the majority in matters of religious belief – who are "left out." (For references on
percentages of religious adherents in the United States, please see at footnotes 190 and Appendix N.)

1  290.  For Atheists, of course, exclusion such as that just noted is the norm.[187] The

2        endorsement of theism, as a religious belief system in opposition to Atheism, involves

3        sectarianism exactly as occurs when Catholics are excluded from other Christians, Jews

4        are excluded from other Judeo-Christians, and non-Judeo-Christians are excluded from

5        other Monotheists.

6  291.  Justice Blackmun, in Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 615

7        (1989), addressed this exact idea when he wrote that "The simultaneous endorsement of

8        Judaism and Christianity is no less constitutionally infirm than the endorsement of

9        Christianity alone." And, similarly, the simultaneous endorsement of all Monotheistic

10       religions is no less constitutionally infirm than the endorsement of any one of those

11       Monotheistic religions alone.

12 292.  "In God We Trust" places the government on one side in the quintessential theological

13       debate: Does God exist? This is forbidden under the Federal Constitution. "[T]he First

14       Amendment [requires] ... on the part of all organs of government a strict neutrality

15       toward theological questions" Abington School District v. Schempp, 374 U.S. 203, 243

16       (1963) (Brennan, J., concurring).[188]

---

[186] Constitution of the State of New Jersey (1776), Section XIX.

[187] As was written in 1955, "Americans are proud of their tolerance in matters of religion: one is expected to 'believe in God,' but otherwise religion is not supposed to be a ground of 'discrimination.'" Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology*. (Garden City, NY: Doubleday & Co., 1955), p. 88.

[188] Neutrality has been deemed essential by every current member of the Supreme Court: Zelman v. Simmons-Harris, 536 U.S. 639, 662 (2003) (Chief Justice Rehnquist ruled that a voucher program accords with the Establishment Clause when it "is entirely neutral with respect to religion."); Mitchell v. Helms, 530 U.S. 793, 809 (2000) (Justice Thomas wrote, "In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality."); Agostini v. Felton, 521 U.S. 203, 231 (1997) (Justice O'Connor approved of "neutral, secular criteria that neither favor nor disfavor religion"); Rosenberger v. University of Virginia, 515 U.S. 819, 839 (1995) (Justice Kennedy referenced "the guarantee of neutrality"); Board of Education of Kiryas Joel v. Grumet, 512 U.S. 687, 704 (1994) (Justice Souter wrote that "civil power must be exercised in a manner neutral to religion."); Employment Div. v. Smith, 494 U.S. 872, 886 (1990) (Justice Scalia focused on "generally applicable, religion-neutral laws"); Wallace, 472 U.S. at 60 (Justice Stevens explained that "government must pursue a course of complete neutrality toward religion"). Justices Ginsburg and Breyer joined Justice Souter's dissent in Rosenberger, 515 U.S. at 879 (noting that it is key for a law to be "truly neutral with respect to religion") and Justice Stevens' majority opinion in Santa Fe, 530 U.S. at 304 ("'The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views'" (quoting Board of Regents v. Southworth, 529 U.S. 217, 235 (2000)).

293.   To tell Plaintiff there is a God is no less an affront than it is to tell Buddhists there is no Buddha, Christians there is no Jesus, Muslims there is no Allah,[189] and so on for every other faith.

294.   Atheists are a disenfranchised minority in this nation. National polls have revealed that 93-96% of Americans believe in God – only 3% to 4% do not.[190] APPENDIX J.

295.   The history, purpose and effect of the Acts of 1955 and 1956 was to endorse the ideas that (a) there is a God, and (b) that we trust in that God. Such an endorsement violates the Federal Constitution. "Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any – or all – religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated." Grand Rapids School District v. Ball, 473 U.S. 373, 389 (1985).

296.   There is an overwhelming amount of principled dicta that supports Plaintiff's position in this case. APPENDIX L (revealing principled quotes from twenty-eight separate justices, inconsistent with government claiming that "In God We Trust"), and APPENDIX M (providing – as just a sample – two hundred dicta incompatible with government claiming that "In God We Trust").

297.   There are no principled dicta supporting the governmental advocacy of the phrase "In God We Trust." All one finds is attempts to manufacture excuses for what is an obvious constitutional violation.

---

[189] "Allah," of course, is simply the Arab word for God. However, in the context of a predominantly Christian country, its limited meaning would undoubtedly be understood by all.

[190] Polls have actually shown a fairly wide divergence. These figures represent what Plaintiffs believe are a best integration of the various data, including such sources as Harris Interactive® (Harris Poll #59, October 15, 2003; American Religious Identification Survey, 2001 ("ARIS 2001"), from The Graduate Center of the City University of New York; Louis Harris and Associates, August 12, 1998; Opinion Dynamics, December 5, 1997; the Pew Research Center for the People and the Press, May 31 through June 9, 1996. Of course, constitutional principles do not change based on the percentages, whatever they may actually be.

## __PRAYER FOR RELIEF__

WHEREFORE, Plaintiff prays for relief and judgment as follows:

I.    To declare that Congress, in passing the Acts of 1955 and 1956, violated the Establishment and Free Exercise Clauses of the United States Constitution.

II.   To declare that by having (much less mandating) "In God We Trust" on our coins and currency, 31 U.S.C. § 5112(d)(1) and 31 U.S.C. § 5114(d)(1) violate the Establishment and Free Exercise Clauses of the United States Constitution, and that they violate RFRA;

III.  To declare that by having "In God We Trust" as our national motto, 36 U.S.C. § 302 violates the Establishment and Free Exercise Clauses of the United States Constitution, and that it violates RFRA;

IV.   To enjoin Defendants from continuing to mint coins and print currency on which is engraved "In God We Trust;"

V.    To enjoin Defendants from including in the United States Code any act or law that claims that "In God We Trust;"

VI.   To allow Plaintiff to recover costs, expert witness fees, attorney fees, etc. as may be allowed by law; and

VII.  To provide such other and further relief as the Court may deem proper.

Respectfully submitted,

/s/ - Michael Newdow

Michael Newdow, in pro per
First Amendmist Church of True Science
PO Box 233345
Sacramento, CA  95823

Phone: (916) 427-6669
Fax:    (916) 392-7382

E-mail:FirstAmendmist@cs.com

## APPENDIX A

## PERTINENT CONSTITUTIONAL PROVISIONS AND CODE SECTIONS

THE CONSTITUTION OF THE UNITED STATES OF AMERICA

ARTICLE I. SECTION 1.

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

AMENDMENT I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

AMENDMENT V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

UNITED STATES CODE

28 U.S.C. § 1331

TITLE 28 – JUDICIARY AND JUDICIAL PROCEDURE
PART IV – JURISDICTION AND VENUE
CHAPTER 85 –DISTRICT COURTS; JURISDICTION
SECTION 1331 – Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1346 (a) (2)

      TITLE 28 – JUDICIARY AND JUDICIAL PROCEDURE
      PART IV – JURISDICTION AND VENUE
      CHAPTER 85 – DISTRICT COURTS; JURISDICTION
      SECTION 1346 – United States as defendant

      (a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

            (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or …

28 U.S.C. § 1361

      TITLE 28 – JUDICIARY AND JUDICIAL PROCEDURE
      PART IV – JURISDICTION AND VENUE
      CHAPTER 85 – DISTRICT COURTS; JURISDICTION
      SECTION 1361 – Action to compel an officer of the United States to perform his duty

      The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

28 U.S.C. § 1391(b) and (e)

      TITLE 28 – JUDICIARY AND JUDICIAL PROCEDURE
      PART IV – JURISDICTION AND VENUE
      CHAPTER 87 – DISTRICT COURTS; VENUE
      SECTION 1391 – Venue generally

      (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in … (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated …

      (e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which … (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

31 U.S.C. § 301(a) and (b)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE I – GENERAL
> CHAPTER 3 – DEPARTMENT OF THE TREASURY
> SECTION 301 – DEPARTMENT OF THE TREASURY

> (a) The Department of the Treasury is an executive department of the United States Government at the seat of the Government.
> (b) The head of the Department is the Secretary of the Treasury. The Secretary is appointed by the President, by and with the advice and consent of the Senate.

31 U.S.C. § 321(a)(4)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE I – GENERAL
> CHAPTER 3 – DEPARTMENT OF THE TREASURY
> SECTION 321 – General authority of the Secretary

> The Secretary of the Treasury shall – … mint coins, engrave and print currency and security documents, and refine and assay bullion, and may strike medals;

31 U.S.C. § 304(b)(2)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE I – GENERAL
> CHAPTER 3 – DEPARTMENT OF THE TREASURY
> SECTION 304 – United States Mint

> The Director shall carry out duties and powers prescribed by the Secretary of the Treasury.

31 U.S.C. § 303(b)(1)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE I – GENERAL
> CHAPTER 3 – DEPARTMENT OF THE TREASURY
> SECTION 304 – Bureau of Engraving and Printing

> The Director - shall carry out duties and powers prescribed by the Secretary.

31 U.S.C. § 5112(d)(1)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE IV – MONEY
> CHAPTER 51 – COINS AND CURRENCY
> SECTION 5112 – Denominations, specifications, and design of coins
>
> (d)(1) United States coins shall have the inscription "In God We Trust". …

31 U.S.C. § 5114(b)

> TITLE 31 – MONEY AND FINANCE
> SUBTITLE IV – MONEY
> CHAPTER 51 – COINS AND CURRENCY
> SECTION 5114 – Engraving and printing currency and security documents
>
> (b) United States currency has the inscription "In God We Trust" in a place the Secretary decides is appropriate. …

36 U.S.C. § 302

> TITLE 36 – PATRIOTIC AND NATIONAL OBSERVANCES, CEREMONIES AND ORGANIZATIONS
> SUBTITLE I – Patriotic and National Observances and Ceremonies
> CHAPTER 3 – NATIONAL ANTHEM, MOTTO, FLORAL EMBLEM AND MARCH
> SECTION 302 – National motto
>
> "In God we trust" is the national motto.

42 U.S.C. § 2000bb et seq.

TITLE 42 – THE PUBLIC HEALTH AND WELFARE
CHAPTER 21B – RELIGIOUS FREEDOM RESTORATION

(Religious Freedom Restoration Act (RFRA)) states, in pertinent parts:

§ 2000bb(a)(3): "The Congress finds that governments should not substantially burden religious exercise without compelling justification."

§ 2000bb(b)(1) and (b)(2): "The purposes of this chapter are to restore the compelling interest test … and to guarantee its application in all cases where free exercise of religion is substantially burdened; and to provide a claim or defense to persons whose religious exercise is substantially burdened by government."

§ 2000bb-1(b)(1) and (b)(2): "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."

§ 2000bb-1(c): A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

§ 2000bb-2(4): "[T]he term "exercise of religion" means religious exercise, as defined in section 2000cc–5 of this title." [§ 2000cc–5(7)(A) "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."]

§ 2000bb-3(a): "This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."

§ 2000bb-3(c): "Nothing in this chapter shall be construed to authorize any government to burden any religious belief."

§ 2000cc–5(7)(A): "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."

§ 2000cc–5(7)(B): "The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."

<u>APPENDIX B</u>

**AMERICAN SOCIETY WAS OVERTLY PARTIAL TO (CHRISTIAN) MONOTHEISM AT THE TIME OF THE PASSAGE OF THE ACTS OF 1955 AND 1956, WHICH WERE INTENDED TO ENDORSE (CHRISTIAN) MONOTHEISM**

After the Second World War and into the 1960s, the United States was in the grips of the "Cold War." This was the period of time in which Senator Joseph McCarthy rose to power with his wanton accusations of communist affiliations, and "an admission of membership in the Communist Party … [could] be used to prosecute the registrant under … federal criminal statutes." <u>Albertson v. Subversive Activities Control Board</u>, 382 U.S. 70, 77 (1965) (Brennan, J., majority).[1] Within this milieu were serious infringements upon American civil liberties.[2] Even suspected affiliation with the Communist Party could lead to the loss of job and friends.[3] "In 1947 [President Truman] sought to root out subversion through the Federal Employee Loyalty Program. The program included a loyalty review board to investigate government workers and fire those found to be disloyal. The government dismissed hundreds of employees, and thousands more felt compelled to resign. By the end of Truman's term, 39 states had enacted antisubversion laws and loyalty programs. In 1949 the Justice Department prosecuted 11 leaders of the Communist Party, who were convicted and jailed under the Smith Act of 1940."[4] President Eisenhower – who followed President Truman – had a loyalty program of his own. "Under [Eisenhower's] loyalty program, some 10,000 federal employees resigned or were dismissed."[5]

The world's main communist stronghold was the Union of Soviet Socialist Republics (USSR), which had instituted a repressive, totalitarian form of government. As a result, Soviet citizens were deprived of many of the freedoms that Americans cherish. One of those lost

---

[1] The Communist Control Act of 1954 contained the following: "The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States." Under the Act, "any" participation – including preparing documents, mailing material, or imparting information of any kind – was to be considered by the jury. U.S. Statutes at Large (1954), Public Law 637, Chap. 886, p. 775-780 (Sec. 2, "Findings of Fact").

[2] "When Senator Joseph McCarthy was at his prime … there were scarcely a dozen papers in this Nation that stood firm for the citizen's right to due process and to First Amendment protection." <u>Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee</u>, 412 U.S. 94, 154-155 (1973) (Douglas, J., concurring).

[3] The blacklisting of the "Hollywood Ten" is but one example of the vile consequences of that era's mindset.

[4] http://encarta.msn.com/encyclopedia_1741500823_16/United_States_(History).html

freedoms was the right to worship freely, because the USSR – lacking the protections found in our First Amendment's religion clauses – officially espoused Atheism. Wishing to differentiate our nation from that evil regime (but failing to recognize that the difference was America's guarantee of religious liberty, not our de facto majoritarian (Christian) monotheism[6]), our politicians took to touting the superiority of a belief in God and in Jesus Christ. Vermont Senator Ralph Flanders, for instance, attempted to put through a Constitutional Amendment stating that "this nation devoutly recognizes the authority and law of Jesus Christ, Saviour and Ruler of Nations, through whom are bestowed the blessings of Almighty God."[7] Adlai Stevenson, the Democratic candidate for President in both 1952 and 1956, claimed that, "We are all children of the same Judaic-Christian civilization, with very much the same religious background,"[8] and that "God has set for us an awesome mission: nothing less than the leadership of the free world."[9] Earl Warren, then the newly-appointed Chief Justice of the United States Supreme Court, stated in 1954 that the United States is "a Christian land governed by Christian principles."[10] While serving as Secretary of State from 1953-1959, John Foster Dulles stated that, "there is no way to solve the great perplexing international problems except by bringing to bear on them the force of Christianity."[11] In fact, President Eisenhower's staff was so monotheistically religious that one writer, in referring to the Secretary of Defense, stated he was "the only man in the Administration who doesn't talk about God."[12]

The Congressional Record clearly reflected this religious zeal. As shown in the bar graph in Appendix E, the number of entries pertaining to religion increased **fifty-fold** between the five years prior to 1954 and the five years after. A review of the Index volumes starting in 1954 shows such extraordinary titles as "Meditation, Christ, our hope," "Christians in Politics," "Duty of Christian Politician," "Free Government Based on Faith," "God's Answer to Communism," "Strengthening America Under God," "We Pray or We Perish," "Drive to Erect World's Largest

---

[5] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 177.
[6] "Faith in God and Father of our Lord Jesus Christ and the recognition of His moral law are the only effective antidotes for the godlessness of present-day Communism." Crawford CC. *The American Faith*, (Ann Arbor, Michigan: Edwards Brothers, 1955) p. 3.
[7] Miller, William Lee. *Piety Along the Potomac*. The Reporter (11 August 1954) p. 25.
[8] Stevenson, Adlai. *Major Campaign Speeches of Adlai E. Stevenson*, 1952 (New York, 1953), p. 282.
[9] Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 307.
[10] "Eisenhower Joins in a Breakfast Prayer Meeting." New York Times, February 5, 1954, A-10.
[11] "Miller, William Lee. *Piety Along the Potomac*. The Reporter (11 August 1954), pp. 41-42.

Cross," "God Meant Us To Find Atom," "God and U.N.," "Great Christian," "President Honored for Religious Aim," "What Did Jesus Believe About Wealth?," "Who Are Disciples of Christ?," "I Speak for Christian Citizenship," "Communists versus God," "Seeking God's Way for World Peace," "Eisenhower Should Lead Godly Against Reds," "Our Home and God," "Religious Illiteracy Is Problem for Home," "Thanks Be to Providence," "The Christian Leader and Politics," "Bible ABC Verses," "Christ Did Not Wear Crown of Thorns To Teach Appeasement," "Christianity, Patriotism, and Myth of National Communism," "Unfair Trial of Jesus," "Christian Survival at Stake," "Convert Russia Through Prayer," "God's Time," "Prayer Is Power," "Why Not Teach Religion?," "Errors in trial of Jesus," "Atheistic Character of Communism," "Antichrists on Prowl," "Moses, Prophets, Jesus Fought To Erase Inequality," "Speak for Christian citizenship," "Subsidy for ministers," "Protestantism speaks on justice and integration," "Reaffirm Christian faith in Middle East crisis," "Aggressive Secularism Undermining Nation," "Can-Do Christians," "Christianity or Communism?," "Christian Philosophy of Civil Government," "We Believe in Prayer," "Lecture: Existence of God," "Christ and Politics," "Power of Prayer," "Union of Church and State," "Jesus, the Perfect Man," "Washington's Lady Ambassador for Christ," "Make yourself a rubberstamp for God," "Bible: eternal source of strength," It is odd, to say the least, to see this in the Congressional Record of the nation that holds itself out to the world as the beacon of religious freedom.

Perhaps most important than the foregoing were the words and acts of President Eisenhower, himself. Starting with his 1953 inauguration, where "[t]he lead float … was 'God's Float,' exhibiting pictures of churches and other religious places and the slogans 'In God We Trust' and 'Freedom of Worship' written in Gothic script,"[13] faith in God permeated his presidency. The new President was actually baptized two weeks after taking office.[14] He worked "to get legislative support for a national day of prayer, attend[ed] annual presidential prayer breakfasts, and appoint[ed] a minister to a new special presidential post for religious matters."[15] "On April

---

[12] Brogan, D.W. *Unnoticed Changes in America*. Harper's Magazine (February, 1957) p. 33.
[13] Oakley, J. Ronald. *God's Country: America in the Fifties.*(New York: Dembner, 1986) p. 320.
[14] Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 303..
[15] Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 303.

8, 1954, Eisenhower issued the first stamp bearing the motto "In God We Trust,'"[16] after an attempt in Congress to have – as with the coins and currency – that motto mandated for all postage.[17] The President participated in the American Legion's *Back to God* crusade,[18] proclaiming that "Recognition of the Supreme Being is the first, the most basic, expression of Americanism. Without God, there could be no American form of government, nor an American way of life."[19] As Chief Executive, he was "determined to use his influence and his office to help make this period a spiritual turning point in America."[20] In fact, the Republican National Committee declared that "in every sense of the word, [President Eisenhower] is not only the political leader, but the spiritual leader of our times,"[21] an assessment that was widely shared.[22] In short, "Eisenhower often used religious phrases and talked about the need for religious faith and spiritual values. He frequently called on divine aid for himself and his country in speeches, held prayer breakfasts, received church delegations in his office, and had Billy Graham and Norman Vincent Peale as overnight guests at the White House. He also began cabinet meetings with a prayer."[23] As another author wrote of the President:

> His priesthood was part of his role as leader of a "crusade," as he called it, against "godless Communism" … "The things that make us proud to be Americans are of the soul and of the spirit," Eisenhower declared. And being American, for a president who was baptized and who joined a church for the first time after having been elected, meant being a theist.[24]

---

[16] Medhurst MJ. "*God Bless the President: The Rhetoric of Inaugural Prayer*." (The Pennsylvania State University, 1980). (Available on microfilm from University Microfilms International, Ann Arbor, MI (800-521-0600). At 231-232.

[17] 99 Cong. Rec. A2659 (May 15, 1953).

[18] It might be noted that the American Legion – through both its leadership and its members – had been largely responsible for the brutalization of Jehovah's Witnesses in the aftermath of the Supreme Court's ruling in <u>Minersville v. Gobitas</u>, 310 U.S. 586 (1940). See, Ellis R. *To the Flag* (Lawrence, Kansas: University Press of Kansas, 2005) pp 106-07.

[19] <u>Life Magazine, April 11, 1955, page 138; New York Herald Tribune, February 22, 1955.</u>

[20] <u>High, Stanley. *What the President Wants*. Reader's Digest (April, 1953) pp 2-4.</u>

[21] Resolution of the Republican National Committee, February 17, 1955, as reported Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 295.

[22] "The central symbol of the nation's political piety was the President himself." Miller, Douglas T. & Nowak, Marion. *The Fifties: The Way We Really Were* (Garden City, NY, Doubleday & Co. 1977) p. 89-90.

[23] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 153.

[24] Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 296.

This entanglement of religiosity and politics led to the precise circumstances the Establishment Clause was meant to address. In the 1950s it was noted that "hardly an official, statesman, politician or leader in general, however complaisant he may be in such matters in private, takes a public step or makes a speech without some genuflexion to the Deity."[25] Thus, governmental officials not only routinely spoke of "godless communism," but they filled their speeches with references to Americans as "freedom-loving, God-fearing people."[26] In fact, at the nation's military academies, the "one clear purpose [was] to build good, strong, God-fearing character in men like ourselves – men who, before long, will have the job of running this great country of ours."[27] In 1955, President Eisenhower implemented the *Code of Conduct for Members of the Armed Forces*. Under that Code, "all members of the armed forces of the United States" were required to "trust in my God and in the United States of America."[28] Thus, "[a]mong a growing number of Americans, belief in God became intertwined with patriotism."[29] In other words, it became "un-American to be unreligious."[30] In fact, as was reflected in the words and deeds of their governmental officials, it wasn't simply belief in a Supreme Being that was involved. Belief in the Christian God was often specifically implicated. Thus, "th[e] nationalization of Christianity in the fifties" was "pervasive."[31] As written in Time Magazine in 1954, "today in the U.S., the Christian faith is back in the center of things."[32]

---

[25] Weissman David L. *Gott Mit Uns*. The Nation, January 19, 1957 at 32.

[26] 1956 year-end statement of John Foster Dulles, President Eisenhower's Secretary of State, as noted in Weissman David L. *Gott Mit Uns*. The Nation, January 19, 1957 at 32.

[27] Wilton B. Persons, Deputy Assistant to the President of the United States, Commencement Speech delivered to the Staunton Military Academy, Staunton, Virginia, May 30, 1954, as provided in Vital Speeches of the Day. Vol. XX, No. 22, September 1, 1954, at 688.

[28] Eisenhower Presidential Library. Official File Series; Box 108 OF 3-R-9 - *Code of Conduct for Members of the Armed Forces*. See, also, Code of Federal Regulations, Title 3, 1954-1958 Compilation (Government Printing Office (1961)) at 266.

[29] Reader's Digest Association, *Our glorious century*. Harvey, Edmund H. Jr., ed. (Pleasantville, N.Y.: Reader's Digest Association, 1994), p. 266.

[30] Eckardt, A. Roy. *The New Look in American Piety*. The Christian Century 71 (17 November 1954), p. 1396. See, also, Miller, Douglas T. & Nowak, Marion. *The Fifties: The Way We Really Were* (Garden City, NY, Doubleday & Co. 1977) p. 92. ("Patriotism and religion seemed synonymous. Atheists or agnostics were not tolerated."); Herberg, Will. *Protestant-Catholic-Jew* (Garden City, 1960) p. 53 ("[B]eing a Protestant, a Catholic, or a Jew is understood as the specific way, and increasingly perhaps the only way, of being an American and locating oneself in American society."); Wittner, Lawrence S., *Cold War America: From Hiroshima to Watergate* (New York: Praeger, 1974), p. 123. ("Recognition of the Supreme Being is the first, most basic expression of Americanism."); Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 324 ("[I]n the fifties … atheists were automatically considered to be unpatriotic, un-American, and perhaps even treasonous.")

[31] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 324.

[32] Time Magazine, April 19, 1954, p. 62

Americans flocked to their churches in droves: "the conservative fifties saw a major revival of religion. Year after year the statistics pointed to unprecedented increases in church membership."[33] In 1955, "of adult Americans … 96.9 per cent were found to identify themselves religiously (70.8 per cent Protestants, 22.9 per cent Catholics, 3.1 per cent Jews)."[34] From 1949-1953, alone, "the distribution of Scripture in the United States increased 140 per cent."[35] Clergymen – with remarkably successful books, radio shows, television shows, crusades and the like – became increasingly popular and influential.[36] In 1942, when Americans were questioned about which groups did the most "good" for the country, religious leaders came in third. By the mid-fifties, "[n]o other group – whether government, congressional, business, or labor – came anywhere near matching the prestige and pulling power of the men who are the ministers of God."[37] Billy Graham,[38] Fulton Sheen[39] and Norman Vincent Peale,[40] for example, became household names.

As might be expected, popular culture and mercantilism reflected this religious growth. Thus, when the Chairman of the Board of the Chamber of Commerce of the United States spoke, he

---

[33] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 185.

[34] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology*. (Garden City, NY: Doubleday & Co., 1955), p. 78 (note 2) (citing Public Opinion News Service, March 20, 1955).

[35] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology*. (Garden City, NY: Doubleday & Co., 1955), p. 14 (citing Report of the American Bible Society at its 138th annual meeting, *Time*, May 24, 1954).

[36] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) pp. 321-327.

[37] Polls conducted by Elmo Roper, as reported in Miller, Douglas T. & Nowak, Marion. *The Fifties: The Way We Really Were* (Garden City, NY, Doubleday & Co. 1977) p. 85-86.

[38] Billy Graham's masterful crusades are legendary. See, e.g., *The New Evangelist* Time Magazine 64 (25 October 1954), at 54. "Like many other evangelists of the day, [Rev. Graham] also often equated Christianity with Americanism and with anticommunism." Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 322. As Graham characterized it, "a great sinister and anti-Christian movement masterminded by Satan has declared war upon the Christian God." Lewis, Peter *The fifties* (New York: Lippincott, 1978) p. 73-74.

[39] *Life Is Worth Living*, a TV show with Rev. Fulton J. Sheen, aired from 1952-1957. Rev. Sheen "warned that no peace was possible with Russia, the leader of international godless communism." Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 322-3.

[40] Norman Vincent Peale's *The Power of Positive Thinking* "quickly went to the top of the nonfiction best-seller list and stayed there for 112 consecutive weeks. In 1954 it sold more copies than any other book except the Bible." Id., at 323. That book, according to Dr. Peale, "teaches applied Christianity," [Peale, Norman Vincent *The Power of Positive Thinking* (New York: Prentice-Hall, 1952) at ix], noting that "there is no problem, difficulty, or defeat that you cannot solve or overcome by faith, positive thinking, and prayer to God." Id., at 275. The concluding line of the work is: "God will help you – so believe and live successfully." Id., at 276.

---

felt no need to hesitate in stating that "our Christian religion and our competitive business system are in themselves the two most revolutionary forces in the world today."[41] Reflecting this view – and "the resurgence of religious feeling and practice in America today" – the Ideal Toy Company manufactured "praying dolls" with flexible knees for kneeling.[42] Religious songs were noted to be obtaining a stronghold in the nation's juke boxes.[43] In the February 1955 "Little Leaguer Magazine, the new *Little League Pledge*, beginning with "I trust in God," was published.[44] The Boy Scouts of America – which had previously maintained a relatively tepid religious emphasis – increased its ecclesiastical fervor "in the fifth edition (1948) [when] the authors of the [Boy Scout] *Handbook* began to expand their explanation of 'duty to God.'"[45] And Norman Rockwell – arguably the most popular and influential artist of America of the 1950's – ably "'combined "duty to God" and "duty to country" in a single picture.'"[46]

---

[41] Johnston Clement D. *The Spiritual Responsibility of American Business and Industry*. Vital Speeches of the Day. Vol. XXII, No. 5, December 15, 1955, at 151.

[42] Time Magazine, 20 September 1954, *Words and works*, p. 65.

[43] *Life Magazine*, April 11, 1955, pp. 138-40.

[44] Little League online, http://www.littleleague.org/about/pledge.asp, accessed on July 26, 2005.

[45] That edition contained the admonition that, "Above all you are faithful to Almighty God's Commandments." Mechling, Jay. *On my honor : Boy Scouts and the making of American youth* (University of Chicago Press: Chicago, 2001), p. 41. Mechling notes that the 1948 *Handbook* incorporated a "wedding of religion and democratic ideology, of religion and patriotism." Id., at 42. Even in this book – on the Boy Scouts – can one find acknowledgement of the entanglement of religion, government and politics:

> Religion had become an important marker distinguishing between the Communists and the Western democracies. "They" were "godless communists," while we were religious. … [I]t was living in Eisenhower's America of the 1950s that made so clear to everyone the ways Protestant Christianity and Cold War ideology became tangled in the definitions of America … A boy had to have a faith, for atheism—and probably agnosticism—was the characteristic of Communists, our sworn enemies.

Id., at 43-44.

[46] Mechling, Jay. *On my honor : Boy Scouts and the making of American youth* (University of Chicago Press: Chicago, 2001), p. 46 (quoting Hillcourt W. *Norman Rockwell's World of Scouting* (Abrams: New York, 1977), p. 144).

**APPENDIX C**

**AMERICAN SOCIETY WAS OVERTLY ANTAGONISTIC TO ATHEISM AT THE TIME OF THE PASSAGE THE ACTS OF 1955 AND 1956**

As is the case with discrimination against blacks and women, discrimination against atheists predates the founding of our nation. However, whereas conscientious efforts have been made to end racial and gender prejudice, government – to this day – has continued to foster anti-atheistic sentiment. Thus, antagonism to atheism was still extant when the Acts of 1955 and 1956 were passed.

In tracing the history of this bigotry, one can start with the Bible, in which it is stated that Atheists are "corrupt … there is none that doeth good"[1] and disbelief in God is equated with "unrighteousness."[2] Under the common law of England, from which our legal system arose, denying God's existence was punishable "by fine and imprisonment, or other infamous corporal punishment."[3] Additionally, of the eleven state constitutions in existence during the framing of our secular federal Constitution, nine required professions of belief in God to obtain full benefits of citizenship.[4]

With this background, the secular nature of our federal Constitution – with no reference to God or Jesus – is remarkable. Yet, although objection was heard from the

---

[1] Psalms 14:1.

[2] 2 Corinthians 6:14.

[3] 4 Blackstone Commentaries 59.

[4] Delaware (1776) Article 22: "I …do profess faith in God the Father, and in Jesus Christ His only Son, and in the Holy Ghost;" Pennsylvania (1776) Article 2, Section 10: "I do believe in one God, the creator and governor of the universe;" New Jersey (1776) Article 19: "[A]ll persons, professing a belief in the faith of any Protestant sect. … shall be capable of being elected into any office;" Georgia (1777) Article VI: "The representatives … shall be of the Protestant religion;" Massachusetts (1780) Article 2: "It is … the duty of all men in society, publicly, and at stated seasons, to worship the SUPREME BEING." Article 3 : "[E]very denomination of christians …shall be equally under the protection of the law;" Maryland (1776) Section 33: "[A]ll persons, professing the Christian religion, are equally entitled to protection in their religious liberty;" South Carolina (1778) Article 38: "[A]ll persons … who acknowledge that there is one God … shall be freely tolerated. The Christian Protestant religion … is … the established religion of this State;" New Hampshire (1784) Article VI: "[E]very denomination of christians … shall be equally under the protection of the law;" North Carolina (1776) Article 32: "[N]o person, who

outset,[5] criticism was quite rare as the nation took root.[6] Only as an increasing number of

citizens more fervently embraced (Christian) monotheistic belief – thus leading to the

very circumstances that the principles underlying the Religion Clauses seek to address –

did cries for a reversion to the melding of religion and government become prominent.[7]

Hopes for governmental godliness increased during the Civil War era, too, as

Christian Americans claimed that the nation's conflict was a sign of His wrath. In fact,

that theory was used in an attempt to Christianize the nation with a Constitutional

amendment. The movement was led by the newly formed National Reform Association,

whose goal was to alter the Preamble so that it would begin with the following verbiage:

> We, the people of the United States, humbly acknowledging Almighty God as the
> source of all authority and power in civil government, the Lord Jesus Christ as the

---

shall deny the being of God or the truth of the Protestant religion, …shall be capable of holding any office."

[5] For instance, the First Presbytery Eastward in Massachusetts and New Hampshire complained about the absence of "some explicit acknowledgment of the only true God and Jesus Christ whom He has sent, inserted somewhere in the Magna Carta of our country" in a letter written to George Washington on October 27, 1789. McAllister D. *Testimonies to the religious defect of the Constitution of the United States*. Christian Statesman *Tract No. 7*, Philadelphia (1874) at 2-3. Similarly, Luther Martin of Maryland decried the fact that there was no acknowledgment of "[a] belief of the existence of a Deity, and of a state of future rewards and punishments."[5] The Complete Anti-Federalist, Strong HJ, ed. (Chicago: University of Chicago Press, 1981), Vol. 2 (2.4.108), at 75. See, also, Cornell S. *The Other Founders*: Anti-Federalism and the Dissenting Tradition in America, 1788-1828 (University of North Carolina Press: Chapel Hill, NC; 1999) at 57.

[6] McAllister's tract was an attempt to demonstrate that "[t]his defect … never passed altogether unnoticed" by placing all "testimony" into "one complete summary." *Tract No. 7* at 1. Yet, for the 22 years between 1790 and 1812, McAllister apparently could find only three protestations within all of the colonial literature. *Tract No. 7* at 3-4.

[7] Perhaps the most renowned example was Timothy Dwight's 1812 oratory:

> We formed our Constitution without any acknowledgement of GOD; without any recognition of his mercies to us, as a people, of his government, or even of his existence. The Convention, by which it was formed, never asked, even once, his direction, or his blessing upon their labours. Thus we commenced our national existence under the present system, without GOD.

A discourse in two parts: delivered July 23, 1812, on the public fast, in the chapel of Yale College by Timothy Dwight, D.D.L.L.D., President of that Seminary; Published at the request of the students, and others; New Haven, Published by Howe and Deforest; Sold also by A.T. Goodrich and Co. No, 124, Broadway, New-York; Printed by J. Seymour, 49, John Street, New York, p. 40.

---

Ruler among the nations, his revealed will as the supreme law of the land, in order to constitute a Christian government, …[8]

As might be expected, anti-Atheistic sentiment was blatant during that campaign. For instance, at the National Reform Association convention held on February 26–27, 1873 in New York, Jonathan Edwards, D. D. uttered the following:

Tolerate atheism, sir? There is nothing out of hell that I would not tolerate as soon! The atheist may live, as I have said; but, God helping us, the taint of his destructive creed shall not defile any of the civil institutions of all this fair land! Let us repeat, atheism and Christianity are contradictory terms. They are incompatible systems. They cannot dwell together on the same continent![9]

With such a legacy of antipathy towards Atheism, the official espousal of that creed by the nation's chief political rival was seized upon by the (Christian) monotheistic majority as the Cold War took shape. "Believing that 'atheistic Communism' threatened America both without and within, Americans saw the world in terms of good and evil, godly and godless."[10] In fact, "[i]n th[e] confused times of the fifties, socialists and Atheists were often thought to be communists."[11] Accordingly, it was believed that "Communists were our mortal enemies and they were atheists. Religion, therefore, came to seem essential in the fight against communism,"[12] which the monotheistic majority readily joined.[13]

---

[8] *American State Papers Bearing on Sunday Legislation*.[1st Edition] Compiled and Annotated by Blakely WA (1890). Revised and Enlarged Edition, [2nd Edition] Edited by Colcord W (The Religious Liberty Association: Washington, DC; 1911) pp 341-343.

[9] Jones AT. *Civil Government and Religion, or Christianity and the American Constitution*, American Sentinel, 26 & 28 College Place, Chicago, Ill. 1059 Castro St. Oakland, Cal.; 43 Bond St. N Y Atlanta, Georgia. 1889. Facsimile Reproduction Printed 1973 by Atlantic Printers & Publishers Sherrington, P. Q. pp. 53-56

[10] Miller, Douglas T. & Nowak, Marion. *The Fifties: The Way We Really Were* (Garden City, NY: Doubleday & Co. 1977) p.82.

[11] Oakley, J. Ronald. *God's Country: America in the Fifties*.(New York: Dembner, 1986) p. 185.

[12] Miller, Douglas T. & Nowak, Marion. *The Fifties: The Way We Really Were* (Garden City, NY, Doubleday & Co. 1977) p. 91.

[13] For example, a National Conference on the Spiritual Foundations of Our Democracy was held shortly after the Act of 1954 was passed. There, "[t]he interfaith leaders [sought] a statement of common faith on which to fight Communism." *The New York Times*, November 11, 1954.

"Godless communism" became a catch-phrase, permeating that era's American society. Even dictionary definitions of "godless" standardly included "wicked" as one of the synonyms,[14] and that word's relative, "ungodly," was defined to include "sinful."[15] Thus, the stage was set for governmental agents to parlay this manifest prejudice against adherents of a minority religious belief system to their advantage in terms of popular support. For instance, the Director of the Federal Bureau of Investigation, J. Edgar Hoover, stated:

> I think that the criminal flood is an inescapable result of our earlier failure to teach God convincingly to the youthful unfortunates who are our juvenile delinquents of today and who will be our adult criminals of tomorrow.[16]

Former President Herbert Hoover wrote that, "[w]hat the world needs today is a definitive, spiritual mobilization of the nations who believe in God against this tide of Red agnosticism," and actually suggested reorganizing or replacing the United Nations with a "moral and spiritual co-operation of God-fearing free nations." He concluded that, "in rejecting an Atheistic other world, I am confident that the Almighty God will be with us."[17]

The phrase "godless communists" filled the pages of the Congressional Record as the movement to intrude "under God" into the Pledge took hold. Rep. Louis Charles Rabaut – the chief House sponsor of the Act of 1954 – went so far as to place in that setting the

---

[14] "Godless" was defined in *Webster's New Twentieth Century Dictionary of the English Language – Unabridged.* (Standard Reference Works Publishing Co., Inc.: New York, 1956) as "Having no reverence for God; impious; ungodly; irreligious; wicked." Page 749. In *Funk & Wagnalls New Practical Standard Dictionary of the English Language*, Volume One: A-P (Funk & Wagnalls Co.: New York, 1956) the definition was "Ungodly; atheistical; wicked." Page 569.
[15] *The New Century Dictionary of the English Language*, Volume 2 (D. Appleton-Century Co.:New York, 1948), p. 2095. Reinforced by "under God" in the Pledge, that unabashedly deprecating definition exists to this day: "ungodly: 1 a : denying or disobeying God : IMPIOUS, IRRELIGIOUS b : contrary to moral law : SINFUL, WICKED." Merriam-Webster Online Dictionary, accessed at http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=ungodly on August 24, 2005.
[16] 99 Cong. Rec. 12 (Appendix), A4155 (May 22, 1953) (Attributed to J. Edgar Hoover in article inserted into the record by Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge of Allegiance)
[17] Hoover, Herbert. *Addresses upon the American Road 1948-1950* (Stanford, California: Stanford University Press, 1951) pp. 66-67.

incredible assertion that "[a]n atheistic American … is a contradiction in terms."[18] On Flag Day in 1955 – commemorating the one-year anniversary of the religious alteration of the Pledge – Rep. Rabaut stated, "We cannot afford to capitulate to the atheistic philosophies of godless men."[19] Rep. George H. Fallon felt the Congressional Record was a proper locale to claim that "when Francis Bellamy wrote this stirring pledge, the pall of atheism had not yet spread its hateful shadow over the world."[20] Also placed into the Congressional Record (with the unanimous consent of the Senate) was an editorial from the Milwaukee Sentinel that stated, "[I]n times like these when Godless communism is the greatest peril this Nation faces, it becomes more necessary than ever to avow our faith in God and to affirm the recognition that the core of our strength comes from Him."[21] As Congress changed our national motto from "e pluribus unum" – which had been chosen by a committee formed on July 4, 1776 (and comprised of Benjamin Franklin, Thomas Jefferson and John Adams) – to "In God We Trust,"[22] Rep. Louis C. Rabaut sponsored another bill; this one to have "Pray for Peace" as the cancellation stamp of all first- and second-class mail. This, he contended, would help counter "the ever increasing attacks upon us by forces of godlessness and atheism."[23]

The other branches of government joined in the fray. The Supreme Court equated Atheism with subversion: "[T]he Court of Appeals felt that the Legislature's reasonable belief in such conditions justified the State in enacting a law to free the American group from infiltration of such atheistic or subversive influences."[24] And the nation's "spiritual leader" – President Eisenhower – succinctly stated that, "Recognition of the Supreme Being is the first, the most basic, expression of Americanism."[25]

---

[18] 100 Cong. Rec. 2, 1700 (Feb. 12, 1954).
[19] 101 Cong. Rec. 6, 8156 (June 14, 1955) (Rep. Louis C. Rabaut's statement during the 1955 Flag Day ceremonies.)
[20] 100 Cong. Rec. 18 (Appendix), A3448 (May 11, 1954).
[21] 100 Cong. Rec. 5, 5915 (May 4, 1954).
[22] July 30, 1956, ch. 795, 70 Stat. 732.
[23] Silk M. *Spiritual Politics: Religion and America since World War II.* (New York; Simon and Schuster, 1988) p. 100.
[24] Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 109 (1952).
[25] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology.* (Garden City, NY: Doubleday & Co., 1955), p. 274 (citing the President's "address launching the American Legion's 'Back to God' campaign" for 1955.)

The media, also, fanned the flames of this bigotry. For instance, William Randolph Hearst – who was eventually to use his vast newspaper empire to advocate for interlarding the Pledge with "under God" – wrote a 1940 opinion column denigrating "atheism, anarchism and Godless despotism."[26] Thus, socially and politically, Atheists were set up to be disenfranchised, as it was accepted by the majority that "[n]ot to be … either a Protestant, a Catholic, or a Jew is somehow not to be an American."[27] Worse yet, Atheism "may imply being obscurely 'un-American.'"[28]

At the time of the Acts of 1955 and 1956, therefore, "a professed 'unbeliever' … would have no chance whatever in political life."[29] The statistics bore this out, demonstrating that any complaints about this barrage of societal monotheistic indoctrination[30] were to no avail. In 1946, for instance, 57% of Americans felt that Atheists should be denied the opportunity to even broadcast their religious views on radio.[31] A poll taken eight years later showed that 60% of the population would not grant Atheists the right to do the same in a speech, 60% favored removing any of their books on the topic from the public libraries, and an amazing 84% believed that Atheists should not be permitted to teach in college or universities.[32] In 1958, more than three-quarters of the population stated they would not vote for an otherwise qualified candidate for

---

[26] Coblentz Edmond D. William Randolph Hearst: A Portrait in his Own Words (Simon and Schuster: New York, 1952) Pp 302-303.

[27] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology.* (Garden City, NY: Doubleday & Co., 1955), p. 274.

[28] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology.* (Garden City, NY: Doubleday & Co., 1955), p. 274.

[29] Herberg, Will. *Protestant – Catholic – Jew: An Essay in American Religious Sociology.* (Garden City, NY: Doubleday & Co., 1955), p. 65. As Herberg also noted, "every candidate for public office is virtually required to testify to his high esteem for religion." Id.

[30] "From every corner and on every level, high, low, and middle brow, we have for years been bombarded with theological propaganda." Russell, B. *Why I am not a Christian* (Touchstone / Simon & Schuster, Inc.: New York; 1957) (Editor's Introduction by P. Edwards, at xii.)

[31] Gallup Poll – A.I.P.O. (December 18, 1946).

[32] Joint survey conducted in 1954 by the Gallup Poll and the National Opinion Research Center of the University of Chicago, as reported in Stouffer, Samuel. *Communism, Conformity, and Civil Liberties: A Cross Section of the Nation Speaks Its Mind* (Garden City, NY: Doubleday & Co. 1955), pp. 32-33.

president if that person were an Atheist.[33] Perhaps most incredible of all, 27% of the population stated in 1965 that they didn't think Atheists should even be allowed to vote! In contrast, when asked if "people who have quit school and never completed high school" should be have that right, only 6% of the population felt that group should be excluded.[34] As the author of a treatise on the Supreme Court and the Religion Clauses noted in 1962, "Atheism is fair game for the sniper, and overtones of 'blasphemy' and 'sacrilege' still linger."[35]

---

[33] The poll looked into other religions and race as well. The results are revealing: Would not vote for a: Baptist (4%), Catholic (27%), Jew (29%), Negro (54%), Atheist (77%). Id.
[34] Gallup Poll – A.I.P.O. (July 21, 1965).
[35] *The Supreme Court on Church and State*. Tussman J. (ed.). (Oxford University Press: New York; 1962), at xxi.

## APPENDIX D

## THE CONTEMPORANEOUS PASSAGE OF THE ACT INSERTING "UNDER GOD" INTO THE PLEDGE OF ALLEGIANCE REVEALS THAT CONGRESS WAS INTENT ON ENDORSING (CHRISTIAN) MONOTHEISM AND DISAPPROVING OF ATHEISM

It was in the previously described markedly pro-monotheistic (APPENDIX B) and anti-Atheistic (APPENDIX C) environment that the formerly secular Pledge of Allegiance was interlarded with the words, "under God." This contemporaneous act of Congress – along with the other contemporaneous acts about to be mentioned here – further reveals the degree to which this religious favoritism pervaded American society at the time of the passage of the Act of 1955 and the Act of 1956.

The specific movement to have the Pledge infused with (Christian) monotheism began in 1951, when the Knights of Columbus – "the largest Catholic laymen's organization"[1] – inserted those two words after "one Nation" for their members to recite when uttering the Pledge. The Knights recommended the change to our federal leaders in 1952,[2] the same year Congress requested that the president "set aside and proclaim … a National Day of Prayer, on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals."[3]

In 1953, the proposal to add "under God" to the Pledge was made at the annual dinner of the obviously religiously-oriented Washington Pilgrimage of American Churchmen.[4] The initial legislative backing for the idea came on April 20, 1953, two months after the introduction of H. Con. Res. 60 to create a "Prayer Room" in the Capitol "to seek Divine strength and guidance."[5] On that date, the first of eighteen separate bills to place "under God" into the Pledge was proposed.[6] Authored by Michigan's Rep. Louis Charles Rabaut, the bill

---

[1] Elk Grove Unified Sch. Dist. v. Newdow, 159 L. Ed. 2d 98, 124 S. Ct. 2301 (2004), *Brief for amicus curiae Knights of Columbus* at 1.

[2] *Id*. at 1-2.

[3] 66 Stat. 64 (1952); 36 U.S.C. § 169h.

[4] 100 Cong. Rec. 2, 2008-09 (Feb. 18, 1954) (Remarks of Rep. Oliver P. Bolton).

[5] *The Prayer Room in the United States Capitol*, Document No. 234, 84th Cong., 1st Sess. (1954); US GPO, Washington: 1956, at 1.

[6] *Big Issue in D.C.: The Oath of Allegiance*. New York Times, May 23, 1954, E-7. The eighteen separate resolutions of the 83rd Congress which were introduced to place the words, "under God," into the Pledge of Allegiance were: S.J. Res. 126, H.J. Res. 243, H.J. Res. 334, H.J. Res. 371, H.J. Res.

gathered its main support on February 7, 1954, when the Rev. George M. Docherty spoke before his congregation at Washington, DC's New York Avenue Presbyterian Church. Thus, the chief catalyst for placing purely religious words into our perfectly functioning secular pledge was a Sunday sermon – a sermon in which Rev. Docherty made the incredibly offensive and discriminatory assertion that "[a]n atheistic American is a contradiction in terms."[7]

Voicing no objection whatsoever to those words of patent bigotry while attending that sermon was President Eisenhower. Three days earlier, the President and other of the nation's leaders publicly joined in attending a prayer breakfast sponsored by the International Council for Christian Leadership.[8] On the afternoon of Rev. Docherty's sermon, the President took part in a radio and television broadcast of the American Legion's "Back to God" program. The program was "an appeal to the people of America and elsewhere to seek Divine guidance in their everyday activities, with regular church attendance, daily family prayer and the religious training of youth."[9] From the White House, the President stated he was "delighted that our veterans are sponsoring a movement to increase our awareness of God in our daily lives."[10] He also claimed, "In battle, they learned a great truth – that there are no atheists in the foxholes."[11]

Over the next months, the House and Senate worked together on the legislation, with numerous congressmen openly expressing pro-Monotheistic and anti-Atheistic biases. APPENDIX E (providing nine pages of citations). As noted in the New York Times, the Act was religious: "All of the various sponsors, as well as the Rev. Mr. Docherty, agree on one thing: the widespread support the bill is receiving must bear testimony to a religious revival of

---

383, H.J. Res. 479, H.J. Res. 497, H.J. Res. 502, H.J. Res. 506, H.J. Res. 513, H.J. Res. 514, H.J. Res. 518, H.J. Res. 519, H.J. Res. 521, H.J. Res. 523, H.J. Res. 529, H.J. Res. 531, and H.J. Res. 543.
[7] Marty, Martin. *Modern American Religion*, vol. 3, "A Civic Religion of the American Way of Life," (Chicago: University of Chicago Press, 1986) p. 301.
[8] *Eisenhower Joins in a Breakfast Prayer Meeting*. New York Times, February 5, 1954, A-10.
[9] *Nation Needs Positive Acts of Faith, Eisenhower Says*. New York Times, February 8, 1954, A-1, 11.
[10] "Text of President's Talk on Faith." New York Times, February 8, 1954, A-11.
[11] *The Public Papers of the Presidents, Dwight D. Eisenhower, 1954* (Office of the Federal Register, National Archives and Records Service, General Services Administration, U.S. Government Printing Office, 1960) pp 243-244. For those not struck by the egregious offensiveness of this oft-repeated statement, the analogous claims that, "There are no Jews in foxholes," or "There are no Catholics in foxholes," might be considered.

significance."[12] An article in the same edition spoke of a lecture delivered the day before by Agnes E. Meyer, a Washington author and civic leader:

> Mrs. Meyer said that among some people religion had simply become the latest fad.
>
> "If you don't bring God into every cabinet meeting, political convention or other assembly it is bad public relations," she asserted.
>
> She cited as being contrary to the principle of separation of church and state Senator Homer Ferguson's resolution to insert "under God" in the pledge of allegiance. She also was critical of Senator Ralph E. Flanders' proposed amendment to the Constitution which reads:
>
> > "This nation devoutly recognizes the authority and law of Jesus Christ, Saviour and Ruler of Nations, through whom are bestowed the blessings of Almighty God."[13]

With Rep. Rabaut stating that the new Pledge would remind children that "democratic… institutions presuppose a Supreme Being,"[14] the final bill passed without objection in either house.[15] The result was the Act of 1954. As noted, this Act did nothing but add the two purely religious words, "under God," to the Nation's Pledge of Allegiance, which – up until that time – had never included any religious dogma. As one commentator noted, the Act resulted from "the pressure of sanctimonious zeal unrestrained by constitutional principle."[16]

Perhaps the most unequivocal evidence that the act of 1954 was passed as a result of the desire to endorse (Christian) monotheism and to disapprove of Atheism can be found in the Summary of the Act delivered to the Senate by the Senate's chief sponsor of the legislation, Senator Homer Ferguson.[17] The fifteen most glaring excerpts are provided here:

> (1)   Recognizing that the pledge did not specifically acknowledge that we are a people who do believe in and want our Government to operate under divine guidance, I introduced in the Senate a resolution to add the words which forever, I hope, will be on the lips of Americans.

---

[12] Knowles, Clayton. *Big Issue in D.C.: The Oath of Allegiance* NY Times May 23, 1954, pg E7.
[13] *Surpass Orthodoxy, Christianity Urged*. NY Times May 23, 1954 pg 30
[14] "Under God," *Newsweek*, May 17, 1954
[15] 100 Cong. Rec. H7757-66 (June 7, 1954); 100 Cong. Rec. S7833-34 (June 8, 1954).
[16] *The Supreme Court on Church and State*. Tussman J. (ed.). (Oxford University Press: New York; 1962), at xvii.
[17] 100 Cong. Rec. S8617-18 (June 22, 1954).

(2)   To put the words "under God" on millions of lips is like running up the believer's flag as the witness of a great nation's faith. It is also displayed to the gaze of those who deny the sacred sanctities which it symbolizes.

(3)   Then, appropriately, as the flag was raised a bugle rang out with the familiar strains of "Onward, Christian Soldiers!"

(4)   Thus at the White House and at the Capital was "under God" written across the Stars and Stripes, in its homage to deity taking its place with the "In God We Trust" on our coinage and "the power that hath made and preserved us a Nation" in our national anthem. Concerning this meaningful event the White House made this thrilling pronouncement, to which is the sound of a great "Amen" in a mighty host of God-fearing hearts:

(5)   "From this day forward the millions of our schoolchildren will daily proclaim in every city and town, every village and rural schoolhouse the dedication of our Nation and our people to the Almighty.

(6)   To be "under God" is to be under an intelligible explanation of the mysterious universe in which we find ourselves. To believe in nothing higher than the flag of one's nation is to thwart the soul's highest instincts, as well as to insult the intellect.

(7)   The results of blasphemous denials of God on a tremendous scale already are being shudderingly shown by the baneful social pattern of atheistic materialism.

(8)   Suspicion begins to grow that it is not the believer who is irrational, but the cynical denier.

(9)   Certainly, one who accepts the beliefs of unbelief, with its assumption of a universe that is dead and godless, is called before the bar of reason to explain such undeniable facts as self-sacrifice, nobility, and heroism, which have made the earthen vessels of humanity blaze with a shining glory.

(10)  The unbeliever has to assert that the grandeur and splendor of life at its best are but the product of blind chance. To deny the implications of "under God" and to point to dust to explain destiny is about as sensible as declaring that you could take a bag containing the letters of the alphabet and, throwing a few handfuls of them into the air, expect them to fall to the ground in the form of a Shakespeare's sonnet or of a Tennyson's In Memoriam. The thing is absurd.

(11)  There is no liberty anywhere except under God.

(12)  The promising streams of freedom disappeared in the sands of futility when there is nothing higher than the state. With a deified state in a godless realm iron curtains but hide broken strands of rainbows which once arched the sky of those who imagined themselves pioneers of a new freedom. Without God, unkept

promises became the fetters of a worse thralldom at the hands of alleged emancipators.

(13)   We are suddenly aghast at the dire possibilities of stupendous power in the hands of men who have no God in their hearts.

(14)   Any so-called freedom, if it is not under God, is under sentence of death.

(15)   I hope, and respectfully suggest, that every newspaper in the country, at least once before the Fourth of July, print on its front page the new Pledge of Allegiance with the words "under God" in bold-face type, so that all the people may know the new pledge of allegiance.

## APPENDIX E

## THE CONGRESSIONAL RECORD: 1949-1959



Congressional Record "Religion" Entries by Year, 1949-1959

This bar graph was created by counting the number of entries under the heading "Religion" (and associated terms) in each Index volume of the Congressional Record for the years 1949 through 1959. For the five years from 1949-1953, there was an average of 3.2 entries. For the five years from 1955-1959, the average shot up to 176.6 … a greater than fifty-fold increase!

These data clearly reveal the increased influence and involvement of religion in government (and of government in religion) that occurred contemporaneously with Congress mandating "In God We Trust" on the money and as the national motto. Two hundred sample titles (from 1954-1960) follow, after which are provided ten pages of Congressional Record excerpts. This evidence demonstrates that Congress's activities did not stem from "history" or "patriotism." Rather, the challenged legislation was unquestionably driven by a desire to use the machinery of the state to infuse government and society with the majority's (Christian) monotheistic religious belief.

# SELECTED CONGRESSIONAL RECORD INDEX ENTRIES
# 1954-1960

(1) Transcript of Back to God Program[1]
(2) Celebration, 300 years of Protestantism[2]
(3) Thank God for Freedom[3]
(4) City Under God[4]
(5) Religion Versus Communism[5]
(6) Threats to Christianity and Democracy[6]
(7) Faith Versus Fear[7]
(8) "Under God" this Nation lives[8]
(9) For God and Country[9]
(10) Meditation, Christ, our hope[10]
(11) Ninety-first Psalm[11]
(12) Proceedings of Dedicatory Prayer Breakfast[12]
(13) Dedication of Crucifix in Gary, Ind.[13]
(14) Christian in Politics[14]
(15) Christians in Politics[15]
(16) Duty of Christian Politician[16]
(17) Faith in Our Time[17]
(18) Faiths of Our Presidents[18]
(19) Free Government Based on Faith[19]
(20) God's Answer to Communism[20]
(21) No Coexistence of Religion and Communism[21]
(22) One Hundred Years of Spiritual Blessing[22]
(23) Strengthening America Under God[23]
(24) This Nation Under God[24]
(25) We Pray or We Perish[25]
(26) With Faith and Flag They Called It America[26]
(27) Beloved Man of God[27]
(28) Christian and Debt[28]
(29) Congressmen Get Prayer Room[29]
(30) Drive to Erect World's Largest Cross[30]
(31) God Meant Us To Find Atom[31]
(32) God and U.N.[32]
(33) Great Christian[33]
(34) Harvesting Lord's Acre[34]
(35) Has Your Home a Prayer Room?[35]
(36) Our Father's God to Thee[36]

(37) Our Prayers Could Change World[37]
(38) President Honored for Religious Aim[38]
(39) What Did Jesus Believe About Wealth?[39]
(40) Who Are Disciples of Christ?[40]
(41) Effect of Spiritual Guidance[41]
(42) I Speak for Christian Citizenship[42]
(43) One Nation Under God[43]
(44) Communists versus God[44]
(45) Atheists misquote George Washington[45]
(46) God: acknowledge in the Constitution[46]
(47) Erection of Giant Cross[47]
(48) Religion in American Life[48]
(49) This I Believe[49]
(50) Christian Impact[50]
(51) Christian Life[51]
(52) Love of Neighbor Is God's Guided Missile to Peace[52]
(53) Need for Spiritual Values in These Times[53]
(54) Our Holy Father[54]
(55) Place of God In Education[55]
(56) Religion Should Accompany Student[56]
(57) Seeking God's Way for World Peace[57]
(58) Spiritual Statesmanship[58]
(59) Spiritual Strength in Cold War[59]
(60) Supplying Education with Religious Spirit[60]
(61) This Nation Under God[61]
(62) World Must Choose Between Religion and Ruin[62]
(63) Christian and Jew[63]
(64) Eisenhower Should Lead Godly Against Reds[64]
(65) Man Who Sees Inside Heaven[65]
(66) Our Home and God[66]
(67) Prayer - Exposure to God[67]

(68)  Religious Illiteracy Is Problem for Home[68]
(69)  Supping With Devil[69]
(70)  Thanks Be to Providence[70]
(71)  The Christian Leader and Politics[71]
(72)  Worship and Work[72]
(73)  World Day of Prayer[73]
(74)  "I Met God There"[74]
(75)  Christian amendment flier[75]
(76)  Bible ABC Verses[76]
(77)  Christ Did Not Wear Crown of Thorns To Teach Appeasement[77]
(78)  Christianity, Patriotism, and Myth of National Communism[78]
(79)  Faith That Built America[79]
(80)  Role of Church in American Politics[80]
(81)  Unfair Trial of Jesus[81]
(82)  Appeal to Churches[82]
(83)  Apostolic Blessing[83]
(84)  Christian in Politics[84]
(85)  Christian Survival at Stake[85]
(86)  Church Versus Dictatorships[86]
(87)  Convert Russia Through Prayer[87]
(88)  Cross Against Sky[88]
(89)  Direction of Our Gratitude[89]
(90)  Faith Is Target[90]
(91)  God's Time[91]
(92)  Ideas Are God's Weapons for New World[92]
(93)  Prayer Is Power[93]
(94)  Why Not Teach Religion?[94]
(95)  Church of Christ[95]
(96)  Mobilizing religious influence[96]
(97)  Prayer breakfast: proceedings[97]
(98)  Amendment to Constitution recognizing God[98]
(99)  Christian Reformed Church in America[99]
(100) Errors in trial of Jesus[100]
(101) Power of prayer[101]
(102) Proceedings of sixth annual presidential prayer breakfast[102]
(103) Atheistic Character of Communism[103]
(104) Church-Related Colleges[104]
(105) Importance of Easter and Good Friday[105]

(106) Modern Delusions and God's Design[106]
(107) Politics and Christian Service[107]
(108) Antichrists on Prowl[108]
(109) Christ in Marketplace[109]
(110) Churches Under Open Skies[110]
(111) Contemporary Church Heraldry in America[111]
(112) Has My Church Left Me?[112]
(113) Holy Week Holds the Answer[113]
(114) Moses, Prophets, Jesus Fought To Erase Inequality[114]
(115) Opposes Asking God's Aid for United States[115]
(116) 139 Joined Church During Crusade[116]
(117) Presidential Prayer Breakfast[117]
(118) Religious Imperatives and Foreign Aid[118]
(119) Religious Overseas Aid[119]
(120) Uriel, Flame of God[120]
(121) World Day of Prayer[121]
(122) Yes; My Church Has Left Me - Thank God[122]
(123) Faith of our forefathers[123]
(124) Speak for Christian citizenship[124]
(125) Subsidy for ministers[125]
(126) Voting according to religious precepts[126]
(127) Spiritual faith of our fathers[127]
(128) Catholicism and politics[128]
(129) God, peace, and you[129]
(130) Protestantism speaks on justice and integration[130]
(131) Reaffirm Christian faith in Middle East crisis[131]
(132) Essay: Christian Principles and Citizenship[132]
(133) Proceedings at presidential prayer breakfast[133]
(134) Aggressive Secularism Undermining Nation[134]
(135) Can-Do Christians[135]
(136) Catholic President?[136]
(137) Christian Amendment Resolution[137]
(138) Faith[138]
(139) Faith and Learning[139]

(140) For God and Country[140]
(141) In Remembrance of Him[141]
(142) Our Religious Heritage[142]
(143) Religion Today[143]
(144) Religious Acknowledgements in Political Documents[144]
(145) Religious Education and Democracy[145]
(146) Spirituality and Prayer: Weapons Against Communism[146]
(147) Ten Commandments[147]
(148) Catholic Can Become President[148]
(149) Catholic in Politics[149]
(150) Christianity or Communism?[150]
(151) Christ United Church of Christ[151]
(152) Christian Philosophy of Civil Government[152]
(153) Everybody Prays at Sholl's[153]
(154) Ex-Coach Blaik Believes in Prayer[154]
(155) Foreign Policy and Christian Conscience[155]
(156) Jesuit Denounces Racism as Pagan[156]
(157) Let's Not Forget Power of Faith[157]
(158) Man Sent From God[158]
(159) Our Religious Heritage[159]
(160) Sunday Change Shocks God Fearing[160]
(161) Will Science Ever Replace God?[161]
(162) God and Mr. Dulles[162]
(163) Khrushchev, Nikita: minute of silent prayer to greet[163]
(164) American spiritual values versus Lenin and Marx[164]
(165) Lord's Day Observance[165]
(166) Vaughn Bible Class[166]
(167) We Believe in Prayer[167]
(168) We Pay Taxes for Sin[168]
(169) Lecture: Existence of God[169]
(170) Proceedings at Presidential Prayer breakfast[170]
(171) Text on broadcast on Christian amendment[171]
(172) Christian amendment[172]
(173) Christ and Politics[173]
(174) Dedication of "In God We Trust" Plaque in Post Offices[174]
(175) Power of Prayer[175]
(176) Union of Church and State[176]

(177) Apostate Clergymen Battle for God-Hating Communist China[177]
(178) Christianity and Capital Punishment[178]
(179) Did God Attend the Summit?[179]
(180) Guide to Atheism[180]
(181) How Much God Is There in Government[181]
(182) Jesus, the Perfect Man[182]
(183) Millennium of Christianization[183]
(184) Washington's Lady Ambassador for Christ[184]
(185) What Faith in God Has Meant to Me[185]
(186) Christian Citizenship[186]
(187) Faith by William Jennings Bryan[187]
(188) Shrine of the Immaculate Conception[188]
(189) Make yourself a rubberstamp for God[189]
(190) Religious qualificqations for the Presidency[190]
(191) Spiritual values are our basic need[191]
(192) Revised Standard Version of the Holy Bible: adoption of[192]
(193) World Day of Prayer[193]
(194) Bible: eternal source of strength[194]
(195) Bible: light that illumines the pathway[195]
(196) Good Shepherd and the abundant life[196]
(197) Holy Week[197]
(198) In the beginning God[198]
(199) Prayer rooms, U.S. Capitol[199]
(200) Psalm 23[200]

[1] 100-a Cong. Rec. A1204 (1954).
[2] 100-a Cong. Rec. A5288 (1954).
[3] 100-a Cong. Rec. A5674 (1954).
[4] 100-a Cong. Rec. A5519 (1954).
[5] 100-a Cong. Rec. A5569 (1954).
[6] 100-a Cong. Rec. A3187 (1954).
[7] 100-a Cong. Rec. 13977 (1954).
[8] 100-a Cong. Rec. 15828 (1954).
[9] 100-a Cong. Rec. A5879 (1954).
[10] 101-a Cong. Rec. 11120 (1955).
[11] 101-a Cong. Rec. 4767 (1955).
[12] 101-a Cong. Rec. 1212 (1955).
[13] 101-a Cong. Rec. 6264 (1955).
[14] 101-a Cong. Rec. 1698 (1955).
[15] 101-a Cong. Rec. A129 (1955).
[16] 101-a Cong. Rec. 8792 (1955).
[17] 101-a Cong. Rec. A4822 (1955).
[18] 101-a Cong. Rec. A4625 (1955).
[19] 101-a Cong. Rec. A2167 (1955).
[20] 101-a Cong. Rec. A2057 (1955).
[21] 101-a Cong. Rec. 275 (1955).
[22] 101-a Cong. Rec. A505 (1955).
[23] 101-a Cong. Rec. 11111 (1955).
[24] 101-a Cong. Rec. A2982 (1955).
[25] 101-a Cong. Rec. A3247 (1955).
[26] 101-a Cong. Rec. A145 (1955).
[27] 101-a Cong. Rec. A150 (1955).
[28] 101-a Cong. Rec. A2262 (1955).
[29] 101-a Cong. Rec. A836 and A1211 (1955).
[30] 101-a Cong. Rec. 2872 (1955).
[31] 101-a Cong. Rec. 2853 (1955).
[32] 101-a Cong. Rec. A4664 (1955).
[33] 101-a Cong. Rec. A742 (1955).
[34] 101-a Cong. Rec. A1972 (1955).
[35] 101-a Cong. Rec. A5881 (1955).
[36] 101-a Cong. Rec. A2149 (1955).
[37] 101-a Cong. Rec. A786 (1955).
[38] 101-a Cong. Rec. A3368 (1955).
[39] 101-a Cong. Rec. A4210 (1955).
[40] 101-a Cong. Rec. A1953 (1955).
[41] 101-a Cong. Rec. 4942, A2945, A2946, A2987, A2990, A2991, A2996, and A5468 (1955).
[42] 101-a Cong. Rec. A3151 (1955).
[43] 101-a Cong. Rec. A3154 (1955).
[44] 101-a Cong. Rec. 6265 (1955).
[45] 101-a Cong. Rec. 13135 (1955).
[46] 101-a Cong. Rec. 6848 (1955).
[47] 101-a Cong. Rec. 4400 (1955).
[48] 101-a Cong. Rec. 3217 (1955).

[49] 101-a Cong. Rec. 6603 (1955).
[50] 102-a Cong. Rec. A1957 (1956).
[51] 102-a Cong. Rec. A6037 (1956).
[52] 102-a Cong. Rec. A1589 (1956).
[53] 102-a Cong. Rec. A542 (1956).
[54] 102-a Cong. Rec. A4893 (1956).
[55] 102-a Cong. Rec. A2131 (1956).
[56] 102-a Cong. Rec. A2659 (1956).
[57] 102-a Cong. Rec. 2272 (1956).
[58] 102-a Cong. Rec. 4547 (1956).
[59] 102-a Cong. Rec. 9454 (1956).
[60] 102-a Cong. Rec. A4122 (1956).
[61] 102-a Cong. Rec. A3533 and 9277 (1956).
[62] 102-a Cong. Rec. A429 (1956).
[63] 102-a Cong. Rec. A2803 (1956).
[64] 102-a Cong. Rec. A452 (1956).
[65] 102-a Cong. Rec. A5129 (1956).
[66] 102-a Cong. Rec. 6895 (1956).
[67] 102-a Cong. Rec. A1493 (1956).
[68] 102-a Cong. Rec. A1650 (1956).
[69] 102-a Cong. Rec. A5842 and A6209 (1956).
[70] 102-a Cong. Rec. A3960 (1956).
[71] 102-a Cong. Rec. 8031 (1956).
[72] 102-a Cong. Rec. A5366 (1956).
[73] 102-a Cong. Rec. 2751 (1956).
[74] 102-a Cong. Rec. 1519 (1956).
[75] 102-a Cong. Rec. A700 (1956).
[76] 103-a Cong. Rec. A4891 (1957).
[77] 103-a Cong. Rec. A2221 (1957).
[78] 103-a Cong. Rec. A291 (1957).
[79] 103-a Cong. Rec. A4008 (1957).
[80] 103-a Cong. Rec. A4184 (1957).
[81] 103-a Cong. Rec. 8121 (1957).
[82] 103-a Cong. Rec. A4124 (1957).
[83] 103-a Cong. Rec. A45 (1957).
[84] 103-a Cong. Rec. A4236 (1957).
[85] 103-a Cong. Rec. A532 (1957).
[86] 103-a Cong. Rec. A5220 (1957).
[87] 103-a Cong. Rec. A1008 (1957).
[88] 103-a Cong. Rec. A3083 (1957).
[89] 103-a Cong. Rec. A1512 (1957).
[90] 103-a Cong. Rec. A2671 (1957).
[91] 103-a Cong. Rec. A1357 (1957).
[92] 103-a Cong. Rec. A4515 (1957).
[93] 103-a Cong. Rec. A3467 (1957).
[94] 103-a Cong. Rec. A7212 (1957).
[95] 103-a Cong. Rec. A154 (1957).
[96] 103-a Cong. Rec. 8249 (1957).
[97] 103-a Cong. Rec. 2085 (1957).
[98] 103-a Cong. Rec. 234 (1957).
[99] 103-a Cong. Rec. 6128 (1957).

[100] 103-a Cong. Rec. 5848 (1957).

[101] 103-a Cong. Rec. 2452 (1957).

[102] 104-a Cong. Rec. 2192 (1958).

[103] 104-a Cong. Rec. A32 (1958).

[104] 104-a Cong. Rec. A3246 (1958).

[105] 104-a Cong. Rec. A3578 (1958).

[106] 104-a Cong. Rec. A2159 (1958).

[107] 104-a Cong. Rec. 10790 (1958).

[108] 104-a Cong. Rec. A2214 (1958).

[109] 104-a Cong. Rec. A5975 (1958).

[110] 104-a Cong. Rec. A6724 (1958).

[111] 104-a Cong. Rec. A1257 (1958).

[112] 104-a Cong. Rec. A3993 (1958).

[113] 104-a Cong. Rec. A3199 (1958).

[114] 104-a Cong. Rec. A883 (1958).

[115] 104-a Cong. Rec. A2494 (1958).

[116] 104-a Cong. Rec. A690 (1958).

[117] 104-a Cong. Rec. A1119 (1958).

[118] 104-a Cong. Rec. 6283 (1958).

[119] 104-a Cong. Rec. A927 (1958).

[120] 104-a Cong. Rec. A3253 (1958).

[121] 104-a Cong. Rec. A1606 (1958).

[122] 104-a Cong. Rec. A4976 (1958).

[123] 104-a Cong. Rec. A4646 (1958).

[124] 104-a Cong. Rec. A5262 (1958).

[125] 104-a Cong. Rec. A869 (1958).

[126] 104-a Cong. Rec. A7215 (1958).

[127] 104-a Cong. Rec. 18591 (1958).

[128] 104-a Cong. Rec. A7518 (1958).

[129] 104-a Cong. Rec. A3088 (1958).

[130] 104-a Cong. Rec. 1918 (1958).

[131] 104-a Cong. Rec. A7264 (1958).

[132] 105-a Cong. Rec. A4622 (1959).

[133] 105-a Cong. Rec. 4418 (1959).

[134] 105-a Cong. Rec. A8440 (1959).

[135] 105-a Cong. Rec. A1524 (1959).

[136] 105-a Cong. Rec. A5345 (1959).

[137] 105-a Cong. Rec. 6158 (1959).

[138] 105-a Cong. Rec. A174 (1959).

[139] 105-a Cong. Rec. A4918 (1959).

[140] 105-a Cong. Rec. A1966 (1959).

[141] 105-a Cong. Rec. A3369 (1959).

[142] 105-a Cong. Rec. 9499 (1959).

[143] 105-a Cong. Rec. A7022 (1959).

[144] 105-a Cong. Rec. A1125 (1959).

[145] 105-a Cong. Rec. A7057 (1959).

[146] 105-a Cong. Rec. A8446 (1959).

[147] 105-a Cong. Rec. A7354 (1959).

[148] 105-a Cong. Rec. 3482 (1959).

[149] 105-a Cong. Rec. 12008 (1959).

[150] 105-a Cong. Rec. A4465 (1959).

[151] 105-a Cong. Rec. A5375 (1959).

[152] 105-a Cong. Rec. A4536 (1959).

[153] 105-a Cong. Rec. A4718 (1959).

[154] 105-a Cong. Rec. A1529 (1959).

[155] 105-a Cong. Rec. A4653 (1959).

[156] 105-a Cong. Rec. A4950 (1959).

[157] 105-a Cong. Rec. A1278 (1959).

[158] 105-a Cong. Rec. A5186 (1959).

[159] 105-a Cong. Rec. A5838 (1959).

[160] 105-a Cong. Rec. A6542 (1959).

[161] 105-a Cong. Rec. A3542 (1959).

[162] 105-a Cong. Rec. A648 (1959).

[163] 105-a Cong. Rec. 17448 (1959).

[164] 105-a Cong. Rec. 5346 (1959).

[165] 105-a Cong. Rec. A6540 (1959).

[166] 105-a Cong. Rec. A1568 (1959).

[167] 105-a Cong. Rec. A1573 (1959).

[168] 105-a Cong. Rec. A4315 (1959).

[169] 106-a Cong. Rec. 13735 (1960).

[170] 106-a Cong. Rec. 3591 (1960).

[171] 106-a Cong. Rec. A478 and A410 (1960).

[172] 106-a Cong. Rec. A1538 (1960).

[173] 106-a Cong. Rec. A6547 (1960).

[174] 106-a Cong. Rec. A5504 (1960).

[175] 106-a Cong. Rec. 15044 (1960).

[176] 106-a Cong. Rec. A1578 (1960).

[177] 106-a Cong. Rec. A1476 (1960).

[178] 106-a Cong. Rec. A6053 (1960).

[179] 106-a Cong. Rec. A5421 (1960).

[180] 106-a Cong. Rec. A5601 (1960).

[181] 106-a Cong. Rec. 3903 and 9337 (1960).

[182] 106-a Cong. Rec. A3291 (1960).

[183] 106-a Cong. Rec. A2563 (1960).

[184] 106-a Cong. Rec. A404 (1960).

[185] 106-a Cong. Rec. 17414 (1960).

[186] 106-a Cong. Rec. A3910 (1960).

[187] 106-a Cong. Rec. 6744 (1960).

[188] 106-a Cong. Rec. A170 (1960).

[189] 106-a Cong. Rec. A5895 (1960).

[190] 106-a Cong. Rec. A5673 (1960).

[191] 106-a Cong. Rec. A6441 (1960).

[192] 106-a Cong. Rec. 8272 (1960).

[193] 106-a Cong. Rec. 6009 (1960).

[194] 106-a Cong. Rec. 8708 (1960).

[195] 106-a Cong. Rec. 8849 (1960).

[196] 106-a Cong. Rec. 12072 (1960).

[197] 106-a Cong. Rec. 8070 (1960).

[198] 106-a Cong. Rec. 10519 (1960).

[199] 106-a Cong. Rec. 3403 (1960).

[200] 106-a Cong. Rec. 8850 (1960).

# SELECTED EXCERPTS FROM THE CONGRESSIONAL RECORD
## Circa 1954[1]

"I think that the criminal flood is an inescapable result of our earlier failure to teach God convincingly to the youthful unfortunates who are our juvenile delinquents of today and who will be our adult criminals of tomorrow."[2]

"Without these words, … the pledge ignores a definitive factor in the American way of life and that factor is belief in God."[3]

"[T]he fundamental issue which is the unbridgeable gap between America and Communist Russia is a belief in Almighty God."[3]

"From the root of atheism stems the evil weed of communism."[3]

"An atheistic American … is a contradiction in terms."[3]

"[T]he American way of life is … 'a way of life that sees man as a sentient being created by God and seeking to know His will, whose soul is restless till he rests in God.'"[3]

"From their earliest childhood our children must know the real meaning of America. Children and Americans of all ages must know that this is one Nation which 'under God' means 'liberty and justice for all.'"[3]

"[T]he fundamental basis of our Government is the recognition that all lawful authority stems from Almighty God."[4]

"[W]e recognize the spiritual origins and traditions of our country as our real bulwark against atheistic communism."[4]

"[O]nly under God will our beloved country continue to be a citadel of freedom."[4]

"The pledge of allegiance should be proclaimed in the spirit … recogni[zing] God as the Creator of mankind, and the ultimate source both of the rights of man and of the powers of government."[5]

---

[1] These quotations were originally used in Plaintiff's prior challenge to "under God" in the Pledge of Allegiance. Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004). They are just as pertinent in revealing how the political climate of the 1950s was permeated with (Christian) monotheism, which Congress was intent on infusing into society.

[2] 99 Cong. Rec. 12 (Appendix), A4155 (May 22, 1953) (Attributed to J. Edgar Hoover in article inserted into the record by Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[3] 100 Cong. Rec. 2, 1700 (Feb. 12, 1954) (Statement of Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[4] 100 Cong. Rec. 17 (Appendix), A2515-A2516 (Apr. 1, 1954) (Statement of Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

"Certainly, in these days of great challenge to America, one can hardly think of a more inspiring symbolic deed than for America to reaffirm its faith in divine providence."[6]

"What better training for our youngsters could there be than to have them, each time they pledge allegiance to Old Glory, reassert their belief, like that of their fathers and their fathers before them, in the all-present, all-knowing, all-seeing, all-powerful Creator."[6]

"[I]n times like these when Godless communism is the greatest peril this Nation faces, it becomes more necessary than ever to avow our faith in God and to affirm the recognition that the core of our strength comes from Him."[7]

"Hence it is fitting that those two profoundly meaningful words "under God" should be included in the pledge of allegiance so that we and our children, who recite the pledge far more often than adults, may be reminded that spiritual strength derived from God is the source of all human liberty."[7]

"[The] principles of the worthwhileness of the individual human being are meaningless unless there exists a Supreme Being."[8]

"It is the Nation itself which was born and lives 'under God.'"[8]

"[T]he one fundamental issue which is the unbridgeable gap between America and Communist Russia is belief in Almighty God."[8]

"More importantly, the children of our land, in the daily recitation of the pledge in school, will be daily impressed with a true understanding of our way of life and its origins. … Fortify our youth in their allegiance to the flag by their dedication to 'one Nation, under God.'"[8]

"He is the God, undivided by creed, to whom we look, in the final analysis, for the well-being of our Nation. Therefore, when we make our pledge to the flag I believe it fitting that we recognize by words what our faith has always been."[9]

---

[5] 100 Cong. Rec. 4, 5069 (Apr. 13, 1954) (Statement of Rep. Peter W. Rodino, Jr. in support of the resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[6] 100 Cong. Rec. 5, 5915 (May 4, 1954) (Statement of Sen. Alexander Wiley in support of Sen. Ferguson's resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[7] 100 Cong. Rec. 5, 5915 (May 4, 1954) (Milwaukee Sentinel editorial printed in the Congressional Record – with the unanimous consent of the Senate – as requested by Sen. Alexander Wiley in support of Sen. Ferguson's resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[8] 100 Cong. Rec. 5, 6077-6078 (May 5, 1954) (Statement of Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[9] 100 Cong. Rec. 5, 6085 (May 5, 1954) (Statement of Rep. Francis E. Dorn, supporting passage of House Joint Resolution 502 which sought to insert the words "under God" into the previously secular Pledge of Allegiance)

It is a "fundamental truth … that a government deriving its powers from the consent of the governed must look to God for divine leadership."[10]

"We are asking that only two words be added to the Pledge of Allegiance, but they are very significant words."[11]

"[T]he Pledge of Allegiance to the Flag which stands for the United States of America should recognize the Creator who we really believe is in control of the destinies of this great Republic."[11]

"It is true that under the Constitution no power is lodged anywhere to establish a religion. This is not an attempt to establish a religion; it has nothing to do with anything of that kind. It relates to belief in God, in whom we sincerely repose our trust."[11]

"Appropriations and expenditures for defense will be of value only if the God under whom we live believes that we are in the right. We should at all times recognize God's province over the lives of our people and over this great Nation."[11]

"[The Pledge] is not only a pledge of words but also of belief."[11]

"[B]elief in God is part of our very lives."[11]

"The United States is one of the outstanding nations of the world standing foursquare on the principle that God governs the affairs of men."[12]

"Billy Graham [said,] 'We have dropped our pilot, the Lord Jesus Christ, and are sailing blindly on without divine chart or compass.'"[12]

"[I]t is well that when the pledge of allegiance to the flag is made by every loyal citizen and by the schoolchildren of America, there should be embodied in the pledge our allegiance and faith in Almighty God. The addition of the words 'under God' will accomplish this purpose."[12]

"[W]hen Francis Bellamy wrote this stirring pledge, the pall of atheism had not yet spread its hateful shadow over the world, and almost everyone acknowledged the dominion of Almighty God."[13]

---

[10] S. Rep. No. 1287, 83rd Cong., 2d Sess. 2, reprinted in 100 Cong. Rec. 5, 6231 (May 10, 1954) (Letter of Sen. Homer Ferguson, sponsor of the Senate resolution to insert the words "under God" into the previously secular Pledge of Allegiance, to Sen. William Langer, Chairman of the Senate Judiciary Committee, March 10, 1954)

[11] 100 Cong. Rec. 5, 6348 (May 11, 1954) (Sen. Homer Ferguson's explanation of the joint resolution to insert the words "under God" into the previously secular Pledge of Allegiance, to Sen. William Langer, Chairman of the Senate Judiciary Committee, March 10, 1954)

[12] 100 Cong. Rec. 5, 6919 (May 20, 1954) (Rep. Homer D. Angell's remarks on the joint resolution to insert the words "under God" into the previously secular Pledge of Allegiance)

[13] 100 Cong. Rec. 18 (Appendix), A3448 (May 11, 1954) (Letter entered into the record by Rep. George H. Fallon. This was "[p]assed without a single dissenting vote, and later adopted by the DAR,

"[N]ow that the militant atheistic Red menace is abroad in our land, it behooves us to remind the free people of these United States that they are utterly at the mercy of God."[13]

"Now that pagan philosophies have been introduced by the Soviet Union, there is a necessity for reaffirming belief in God."[14]

"I appear here today in support of any and all bills that would serve to recognize the power and universality of God in our pledge of allegiance."[15]

"The inclusion of God in our pledge would acknowledge the dependence of our people, and our Government upon the moral direction and the restraints of religion."[15]

"The significant import of our action today … is that we are officially recognizing once again this Nation's adherence to our belief in a divine spirit, and that henceforth millions of our citizens will be acknowledging this belief every time they pledge allegiance to our flag."[16]

"How fitting that we here today should take action to once more affirm our belief in … the guidance of a divine spirit."[16]

"Once again we are proclaiming to the world that … the flag which flies over our land is a symbol of a nation and of a people under God."[16]

"[T]his measure is more than one of passing importance. It goes to the very fundamentals of life and creation. It recognizes that all things which we have in the way of life, liberty, constitutional government, and rights of man are held by us under the divine benediction of the Almighty. There is a hope and a hereafter in these two words and they, of course, should be included in the pledge of allegiance to Old Glory."[17]

"One thing separates free peoples of the Western World from the rabid Communist, and this one thing is a belief in God. In adding this one phrase to our pledge of allegiance to our flag, we in effect declare openly that we denounce the pagan doctrine of communism and declare 'under God' in favor of free government and a free world."[17]

"Fortify our youth in their allegiance to the flag by their dedication to 'one nation under God.'"[18]

---

the Flag House Association, the VFW, the DAV, sections of the American Legion …, incorporated in the pledge at the 'I Am An American Day' … etc., etc.")
[14] 100 Cong. Rec. 18 (Appendix), A4066 (May 24, 1954) (Newspaper article from the Malden (Mass.) Press of May 13, 1954, entered into the record by Rep. Angier L. Goodwin.)
[15] 100 Cong. Rec. 6, 7590-7591 (June 2, 1954) (Rep. John R. Pillion's statement provided on May 5, 1954 to Subcommittee No. 5 of the House Committee on the Judiciary.)
[16] 100 Cong. Rec. 6, 7757 (June 7, 1954) (Statement of Rep. Oliver P. Bolton in support of the joint resolution to amend the previously secular Pledge.)
[17] 100 Cong. Rec. 6, 7758 (June 7, 1954) (Statement of Rep. Brooks in support of the joint resolution to amend the previously secular Pledge.)
[18] 100 Cong. Rec. 6, 7759 (June 7, 1954) (Statement of Rep. Louis C. Rabaut in support of the joint resolution to amend the previously secular Pledge.)

"Regaining our reverence for God we in America in this 20th century can rediscover our own value and the solid basis on which it rests."[19]

"The first sentence of section 7 of the joint resolution (36 U.S.C. sec. 172), as amended, 'one Nation indivisible under God,' is a realistic recognition of the theological and philosophical truth – the existence of a Supreme Being."[20]

"When the forces of anti-God and antireligion so persistently spread their dangerous and insidious propaganda, it is wholesome for us to have constantly brought to our minds the fact that, mighty and essential as armed strength may be, it is the strength of the spirit and the moral force generated by the righteousness of our cause and the purity of our motives to which we must ultimately look for salvation from destruction and for triumph over the evil forces that best us."[21]

"Faith in God … has never been misplaced. House Joint Resolution 243 is a proclamation to all the world and to ourselves, ever to keep us mindful and prayerful, that the United States of America is in truth and in the acknowledged fact, a 'Nation under God.'"[22]

"This [is a] victory for God and country."[22]

"[The joint resolution] seems to have struck a note of universal approval, indicating an underlying acknowledgement of our indebtedness to God and our dependence upon Him."[23]

"At this moment of our history the principles underlying our American Government and the American way of life are under attack by a system that does not believe in God. A system that denies the existence of God."[23]

"Thus, the inclusion of God in our pledge of allegiance rightly and most appropriately acknowledges the dependence of our people and our Government upon that divinity that rules over the destinies of nations as well as individuals."[23]

"The God of nations who helped in bringing to a successful conclusion the war of independence, has never ceased to control the destiny of this great Nations, and I trust He never will."[23]

---

[19] 100 Cong. Rec. 6, 7759 (June 7, 1954) (Statement of Rep. Charles G. Oakman in support of the joint resolution to amend the previously secular Pledge.)

[20] 100 Cong. Rec. 6, 7760 (June 7, 1954) (Letter written by the Chairman of the Department of Political Science at the University of Detroit, placed into the record by Rep. Brooks in support of the joint resolution to amend the previously secular Pledge.)

[21] 100 Cong. Rec. 6, 7760 (June 7, 1954) (Statement of Rep. Keating in support of the joint resolution to amend the previously secular Pledge.)

[22] 100 Cong. Rec. 6, 7761-7762 (June 7, 1954) (Statement of Rep. Barratt O'Hara in support of the joint resolution to amend the previously secular Pledge.)

[23] 100 Cong. Rec. 6, 7762-7763 (June 7, 1954) (Statement of Rep. Wolverton in support of the joint resolution to amend the previously secular Pledge.)

"[O]ne of the greatest differences between the free world and the Communists [is] a belief in God. The spiritual bankruptcy of the Communists is one of our strongest weapons in the struggle for men's minds and this resolution gives us a new means of using that weapon."[23]

"The use of the phrase 'under God' in the pledge of allegiance to the flag sets forth in a mere two words, but, very strong and meaningful words, the fundamental faith and belief of America in the overruling providence of God and our dependence at all times upon Him."[23]

"The recitation of this acknowledgement that God is the foundation of our Nation will be of incalculable value, all through the years, of ever keeping vividly before our people, including our children who from earliest childhood, pledge their allegiance to the flag, that the real source of our strength in the future, as in the past, is God."[23]

"[T]he Government and people of America have recognized the necessity of doing the will of God as we see it, and of relying for our strength and welfare on the protection of His divine providence."[24]

 "To insert these two words in the pledge … would be the most forceful possible defiance of the militant atheism and 'dialectical materialism' that are identified with Russian and international communism."[24]

"[W]e wish now, with no ambiguity or reservation, to place ourselves under the rule and care of God."[24]

"We Members of Congress … felt and acted on the popular urge to give expression to the conviction that our deliberations should be publicly and tangibly submitted to the guidance of God."[24]

"[W]e do well to once more publicly and officially affirm our faith."[25]

"[O]ur citizenship is of no real value to us unless our hearts speak in accord with our lips; and unless we can open our souls before God and before Him conscientiously say, 'I am an American.'"[26]

"God is the symbol of liberty to America."[26]

"The amendment to the pledge of allegiance to the flag, by inserting the words 'under God,' is a simple device by which we can verbally proclaim our intense desire to continue this land as 'one Nation, under God, indivisible.'"[26]

---

[24] 100 Cong. Rec. 6, 7763-7764 (June 7, 1954) (Statement of Rep. Peter W. Rodino, Jr. in support of the joint resolution to amend the previously secular Pledge. Amazingly, included in this statement were the words "I am firmly of the opinion that our Founding Fathers … meant to prevent … any provision of law that could raise one form of religion to a position of preference over others."  )

[25] 100 Cong. Rec. 6, 7764 (June 7, 1954) (Statement of Rep. Oliver P. Bolton in support of the joint resolution to amend the previously secular Pledge.)

[26] 100 Cong. Rec. 6, 7765-7766 (June 7, 1954) (Statement of Rep. Hugh J. Addonizio in support of the joint resolution to amend the previously secular Pledge.)

"[L]iberty, justice, and human equality … are man's own heritage from God."[26]

"Never before in our national history have so many diverse groups enjoyed such a complete measure of religious freedom as exists in the United States today. But it is even more inspiring to realize that these religious groups are all working 'under God' in their own ways, to help solve the problems which characterize our troubled era."[26]

"A child's belief in spiritual values is beautiful to behold."[26]

"I believe it to be of great importance that we as a Nation recognize a higher power than ourselves in the guidance of our existence. This joint resolution recognizes that we believe there is a Divine Power, and that we, our children, and our children's children should always recognize it."[27]

"I believe we should trust in God and we should recognize that God is guiding our destiny and the hopes and aspirations of this Nation."[27]

"It is so fitting that we declare to the world, in our position as leader among the sister nations of the earth, our dependence upon Almighty God."[28]

"In my experience as a public servant and as a Member of Congress I have never seen a bill which was so noncontroversial in nature or so inspiring in purpose."[29]

"I am proud to have been associated with this effort that produced this legislation which recognizes the importance of divine guidance in our national affairs."[29]

"We see the pledge, as it now stands, as a formal declaration of our duty to serve God and our firm reliance, now as in 1776, on the protection of divine providence."[30]

"To put the words 'under God' on millions of lips is like running up the believer's flag as the witness of a great nation's faith."[31]

---

[27] 100 Cong. Rec. 6, 7833-7834 (June 8, 1954) (Statement of Sen. Homer Ferguson in support of the joint resolution to amend the previously secular Pledge.)
[28] 100 Cong. Rec. 6, 7935 (June 9, 1954) (Letter from Rep. Louis C. Rabaut to President Eisenhower, informing him of the passage in Congress of the joint resolution to amend the previously secular Pledge.)
[29] 100 Cong. Rec. 6, 7989 (June 10, 1954) (Statement of Rep. Charles G. Oakman recounting the passage of the joint resolution to amend the previously secular Pledge.)
[30] 100 Cong. Rec. 7, 8563 (June 22, 1954) (Statement of Sen. Burke, submitting a resolution to provide for printing of the now sectarian Pledge as a Senate document. Sen. Burke also noted that the resolution adding "under God" to the previously secular Pledge "had been passed by House and Senate with no opposition.")
[31] 100 Cong. Rec. 7, 8617-8618 (June 22, 1954) (Statement of Sen. Homer Ferguson, reviewing the meaning of the new law that added "under God" to the previously secular Pledge, and recapping the events of that first Flag Day celebration with the new Pledge.)

"[A]s the flag was raised a bugle rang out with the familiar strains of 'Onward, Christian Soldiers!'"[31]

"From this day forward, the millions of our school children will daily proclaim in every city and town, every village and rural schoolhouse, the dedication of our Nation and our people to the Almighty."[32]

"It is my belief that an extensive circulation of these printed copies of the Pledge of Allegiance to the Flag will imprint, indelibly, upon the minds of those who read them, whether they be young or old, that their great Nation, these United States, exists and endures purposefully 'Under God.'"[33]

"Freedom in a world faced with this interminable conflict between communism and Christianity will survive only so long as freemen are willing to fight for that precious principle."[34]

"You have learned that you live in a free nation composed of free men and women who are willing to sacrifice all they possess, as did their forefathers, to preserve the Christian principles of a free nation under God."[34]

"Today we express … our national dependence upon almighty God by pledging, as a nation, our allegiance to the Stars and Stripes."[35]

"Wherever this banner is unfurled there is hope in the hearts of men who believe that God created man and destined him to be free."[35]

"[T]he need now is for the Christian ideas to neutralize the preponderance of material know-how. … We cannot afford to capitulate to the atheistic philosophies of godless men – we must strive to ever remind the world that this great Nation has been endowed by a creator."[35]

"The sordid records of the divorce courts, of the juvenile delinquency case histories, the tragedy of broken homes, wandering families, of the cheap price put on human life, the old heads on young children, the disrespect for authority, the contempt for law, the chiseling among those in authority, the lack of honor among the citizenry – all of this is the shame of America, the open sores of her secularist spirit."[36]

---

[32] 100 Cong. Rec. 7, 8618 (June 22, 1954) (Statement by President Dwight D. Eisenhower, as reported by Sen. Ferguson.)
[33] 100 Cong. Rec. 7, 8893 (June 24, 1954) (Statement of Rep. Louis C. Rabaut submitting a resolution to provide for printing of the now sectarian Pledge as a House document.)
[34] 101 Cong. Rec. 6, 8073 (June 13, 1955) (From text of address given by Rep. Martin at the joint commissioning ceremonies for Army, Navy and Air Force ROTC graduates at Dartmouth College, June 11, 1955.)
[35] 101 Cong. Rec. 6, 8156 (June 14, 1955) (Rep. Louis C. Rabaut's statement during the 1955 Flag Day ceremonies.)
[36] 101 Cong. Rec. 18 (Appendix), A5920-A5921 (Aug. 2, 1955) (Article submitted by Rep. Louis C. Rabaut, sponsor of the House resolution to insert the words "under God" into the previously secular Pledge.)

"If we have no rights under God, then America has no purpose of existence. For America is all that she is simply because she recognizes our rights under God."[36]

"The further men move from God and His principles, the worse it will be for America."[36]

"Our people without God would be a people reading the death warrant to real American freedom."[36]

"[The] right to profess God-given principles, to practice God-given commandments, and to live God-ordered lives … is America and will always be America. There is no other pattern of life that can bear this trademark."[36]

"It is time that we really be neighbors in the Christian sense, that we live as neighbors, and have trust one for the other. This is the American way; this is God's way."[36]

"Only God-fearing men can guarantee to America her greatness, her survival, and her continued blessings."[36]

"As these words are repeated, 'one Nation, under God, indivisible, with liberty and justice for all,' we are reminded not only of our dependence upon God but likewise the assurance of security that can be ours through reliance upon God."[37]

"These words, 'under God,' … can be taken as evidence of our faith in that divine source of strength that has meant and always will mean so much to us as a nation."[37]

"Let us never forget that recognition of God by this and the other nations of the free world will mean victory and security against the forces of evil that deny God. May we, as a nation under God, ever recognize Him as the source of our refuge and strength."[37]

"These principles of the worthwhileness of the individual human being are meaningless unless there exists a Supreme Being."[38]

"'Under God' in the pledge of allegiance to the flag expresses, aptly and forcefully, a grateful nation's attitude of dependence upon Almighty God."[38]

"For under God this Nation lives."[38]

"Our political institutions reflect the traditional American conviction of the worthwhileness of the individual human being. That conviction, in turn, is based on our belief that the human person is important because he has been created in the image and likeness of God and that he has been endowed by God with certain inalienable rights."[38]

---

[37] 100 Cong. Rec. 11, 14918-14919 (Aug. 17, 1954) (Remarks of Rep. Wolverton entitled "One Nation – Under God.")

[38] 100 Cong. Rec. 12, 15828-15829 (Aug. 20, 1954) (Remarks of Rep. Louis C. Rabaut, sponsor of the House resolution placing the words "under God" into the previously secular Pledge.)

**APPENDIX F**

**THE CURRENT SECTARIAN MOTTO CONTINUES TO FOSTER AND
ACCENTUATE THE GOVERNMENTAL ENDORSEMENT OF MONOTHEISM
AND DISAPPROVAL OF ATHEISM**

Since the passage of the Acts of 1955 and 1956, the official view that monotheism is superior to atheism (and that atheism is actually bad) has been perpetuated among the citizenry. This can be seen in myriad ways. For instance, there recently was a controversy in Cupertino, California regarding a teacher's emphasis on God-belief and Christianity in the public schools. In a *Los Angeles Times* story, "Web-fueled attacks labeling the school godless, unpatriotic and communist" were noted.[1] Additionally, the superintendent apparently never thought twice as he assembled together the three descriptors, "communists, stupid, nonbelieving."[2] Governmental claims that we, as a nation, trust in God most assuredly contribute to this mindset, and to the manifestly erroneous notion that "[r]ecognition of the Supreme Being is the first, most basic expression of Americanism."[3] Would our governmental officials simply accept that "the first, most basic expression of Americanism" is "recognition that Jesus Christ is Lord?" How about "recognition of white racial superiority,"[4] or "recognition that women belong at home?"[5] Those expressions, of course, are just as "historic" as the former, and would become just as "patriotic" were the citizenry to carry coins and adhere to a motto that claimed "In Jesus We Trust," "In White Supremacy We Trust," or "In Male Dominion We Trust."

---

[1] Pringle P. Fire, *Brimstone Over Faith*. December 26, 2004. LATimes.com. Accessed on December 27, 2004 at http://www.latimes.com/features/religion/la-me-teacher26dec26,0,7224317,print.story?coll=la-news-religion.
[2] Id.
[3] Wittner, Lawrence S., *Cold War America: From Hiroshima to Watergate* (New York: Praeger, 1974), p. 123.
[4] Judicial notice can be taken that three of the first four Presidents were slave-owners, and that the Constitution had its infamous "three-fifths" clause. United States Constitution, Article I, Section 2.
[5] "The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator." Bradwell v. State, 83 U.S. 130, 141 (1872) (Bradley, J., concurring). Judicial notice can also be taken that women could not vote or own property under the Framers' worldview.

The perpetuation of anti-atheistic bias is perhaps best seen in the political arena, since politicians generally take pains not to offend minority sensitivities. Yet, when it comes to atheists, they feel confident in making the most egregious and derogatory statements. For instance, when then Vice-President George H. W. Bush first announced his plans to become the Republican Party's nominee for President, he was asked how he intended to gather the support of patriotic atheistic citizens. His response was "I don't know that atheists should be regarded as citizens, nor should they be regarded as patriotic."[6] Similarly, when Miami Mayor Joe Carollo wished to express his displeasure over the Bureau of Immigration and Naturalization Service's raid to free Elian Gonzales – an incident that had nothing whatsoever to do with anything religious – his insult of choice was, "These are atheists. They don't believe in God."[7] And Congressman John J. LaFalce of New York issued a press release a month later, equating "secular atheism" with "greed, abject poverty [and] selfishness."[8]

As if to amplify the offensiveness of these insulting and imprudent remarks, no media protest is ever heard when they are uttered.[9] One can imagine the response were a politician to equate Catholicism with "greed, abject poverty [and] selfishness," to insult the INS by stating, "They're Jews. They don't believe in Jesus," or to comment at a press briefing that "I don't know that Muslims should be regarded as citizens, nor should they be regarded as patriotic." But make those statements about Atheists, and not a whimper is heard. Nor is it noticed when our leaders completely disregard the very existence of Atheists.[10] No wonder such an incredibly offensive statement as "An atheistic American

---

[6] As detailed at http://www.robsherman.com/information/liberalnews/2002/0303.htm, accessed on December 26, 2004.

[7] Salazar C and Garcia M. *Elian Seized Crying Boy Carried Off Amid Guns, Tear Gas*. The Miami Herald, April 23, 2000, page 1A.

[8] Press release of Congressman John J. LaFalce, 29th District, New York, May 22, 2000.

[9] This might be contrasted with the media uproar – and subsequent loss of his Senate Majority leader position – over Senator Trent Lott's somewhat diluted approval of Senator Strom Thurmond's racial segregationist political past. See, e.g., CNN.com, December 13, 2002, *Lott: Segregation and racism are immoral*, accessed at http://archives.cnn.com/2002/ALLPOLITICS/12/13/lott.transcript/ on December 27, 2004.

[10] See, e.g., President Bush's proclamation for Thanksgiving Day 2001 ("**Americans of every belief and heritage** give thanks to God") or for the National Day of Prayer 2003 ("America welcomes individuals of all backgrounds and religions, and our citizens hold diverse beliefs. In prayer, we share **the universal desire** to speak and listen to our Maker.")

… is a contradiction in terms" could be proudly placed into the Congressional Record by one of our elected representatives.[11]

That this anti-Atheism retains its consequential nature is readily appreciated by considering how political capital has been sought from its perpetuation, and how monotheistic religion, itself, has become a key issue in the nation's elections.[12] In fact, so significant has the issue of belief in God become that the term "the God gap" was frequently referenced during the last presidential election.[13] As one commentator summarized the topic, "[t]he wall between church and state is falling fast."[14]

The Republican Party of Texas – only last year – perpetuated in its platform the arrogant[15] claim "that the United States of America is a Christian nation,"[16] and now has "African Americans, Hispanics and Republicans All Believe: IN GOD" listed on its website.[17] It seems highly unlikely that the same acceptance would occur with "African Americans, Hispanics and Republicans All Believe: IN ALLAH," "African Americans, Hispanics and Republicans All Believe: IN JESUS," or "African Americans, Hispanics and Republicans All Believe: THERE IS NO GOD." Again, the political

---

Accessed at http://www.whitehouse.gov/news/proclamations/. (Emphases added). See, also,

[11] 100 Cong. Rec. 2, 1700 (Feb. 12, 1954) (Statement of Rep. Louis C. Rabaut).

[12] See, e.g., Kropf S. Senate GOP race has divine element. Post and Courier Charleston.net. May 7, 2004, accessed at http://www.charleston.net/stories/050704/sta_07pledge.shtml.

[13] See, e.g., Fortt J. "God gap" blocks understanding of "moral values" phenomenon. Mercury News, November 14, 2004, accessed at http://www.mercurynews.com/mld/mercurynews/news/editorial/10179393.htm; Polman D Kerry invoked God to appeal to the faithful. Philadelphia Inquirer, October 17, 2004, accessed at http://www.philly.com/mld/inquirer/news/nation/9937390.htm?1c.

[14] Gibson D. Confession Time: The wall between church and state is falling fast. November 7, 2004, accessed at http://nj.com/opinion/ledger/perspective/index.ssf?/base/news-0/109981008744860.xml.

[15] "[T]he Court takes a long step backwards to the days when Justice Brewer could arrogantly declare for the Court that 'this is a Christian nation.' Church of Holy Trinity v. United States, 143 U.S. 457, 471 (1892). Those days, I had thought, were forever put behind us." Lynch v. Donnelly, 465 U.S. 668, 717-718 (1984) (Brennan, J., dissenting).

[16] 2004 Republican Party of Texas Platform, accessed on December 26, 2004 at http://www.texasgop.org/library/platform.php.

[17] Accessed at http://www.texasgop.org/site/PageServer?pagename=library_sharedvalues on October 5, 2005.

disenfranchisement of Atheists – preserved by a national government that persistently proclaims that "In God We Trust" – is obvious.

Other present-day examples of manifest anti-Atheistic sentiment interspersed within government and politics abound. A Colorado town trustee "who refused to stand during the Pledge of Allegiance because he object[ed] to the words "under God"[18] was recalled.[19] In April, 2004, the Atheist Alliance International requested letters of welcome for their annual convention being held in Colorado Springs. Those letters were denied by both Colorado's governor and the local mayor, who acknowledged this was the only time he'd ever denied such a request.[20] That same month, Christian monotheists were granted access to the Alabama State Capitol building for a National Day of Prayer rally. When Atheists requested the very same access for the very same day, they were rebuffed.[21] When an Atheist was invited to give an invocation at the Charleston, South Carolina City Council meeting a few years ago, members of the council walked out before he uttered his first sentence. In the words of one, "He can worship a chicken if he wants to, but I'm not going to be around when he does it."[22] The same thing occurred a year later in Tampa, Florida.[23] There, not only was disrespect shown to the Atheist, but the City Council member who invited him "made a host of new enemies" because of that invitation.[24]  In Biscayne Park, the vice mayor showed little respect for the constitutional rights of Atheists when an attempt was made to introduce prayer at commission meetings.

---

[18] *Recall for Colorado Official Who Protests Pledge*. Reuters, December 16, 2004. Accessed on December 26, 2004, at
http://olympics.reuters.com/newsArticle.jhtml?type=domesticNews&storyID=7119645.
[19] *Voters recall Pledge objector*. Washington Times, March 24, 2005  Accessed on October 5, 2005 at http://www.washtimes.com/national/20050323-110303-1711r.htm.
[20] Atheist Conference Shunned by Colorado Governor, Mayor. April 9, 2004. Secular Coalition for America. Accessed on December 27, 2004, at  http://www.secular.org/silverman.html.
[21] *Alabama Atheists Allege Unfair Treatment*. FoxNews.com, April 23, 2004. Accessed on December 27, 2004 at http://www.foxnews.com/story/0,2933,118046,00.html.
[22] Harden J. *Some on city council snub atheist's invocation*. Charleston Post and Courier, March 27, 2003, accessed at http://www.charleston.net/stories/032703/loc_27atheist2.shtml on December 26, 2004.
[23] Carp D. *Council splits on atheist's invocation*. St. Petersburg Times Online. July 30, 2004, page 1.A.
[24] Karp D. *Council member, 2 unions on outs*. St. Petersburg Times Online. August 4, 2004. Accessed at

His statement was, "prayers don't offend anybody except the atheists, and I feel bad for the atheists, but we live in a country where the majority rules, and if you don't like it you can go to another country because our country is a religious country."[25] Also in Florida, the Department of Highway Safety and Motor Vehicles received a complaint signed by ten people who were offended by an "ATHEIST" vanity license plate. The Department responded by recalling the plate after deeming it "'obscene or objectionable.'"[26] After all, as one Florida mayor explained, "If you are a devout person and have a sincere belief in God, you are more likely to be … ethical and moral.''[27]

The constitutions of eight states still have clauses denying to Atheists the right to hold public office and/or testify in a court of law.[28] It seems not one of the combined 1328 state legislators has been willing to risk his or her career to eliminate those extraordinarily offensive constitutional provisions. Although these clauses are now legal nullities, the fact that they remain – unchanged for all the world to see – on the most vital

---

http://stpetetimes.com/2004/08/04/news_pf/Hillsborough/Council_member__2_uni.shtml on December 26, 2004.

[25] Nahed A. *Prayer Invokes Heated Discussion*. The Miami Herald, July 11, 2004, Page 8N.

[26] Wexler K. *'ATHEIST' plate raises a holy ruckus*. St. Petersburg Times Online. March 14, 2002, accessed at http://www.sptimes.com/2002/03/14/State/_ATHEIST__plate_raise.shtml.

[27] Statement of Tom Truex, mayor of Davie, Florida, as reported on Monday, March 22, 2004. Accessed at http://www.miami.com/mld/miamiherald/8245381.htm?1c on November 27, 2004.

[28] Arkansas State Constitution: Article 19, Section 1 ("No person who denies the being of a God shall hold any office in the civil departments of this State, nor be competent to testify as a witness in any court."); Maryland State Constitution: Article 37 ("That no religious test ought ever to be required as a qualification for any office of profit or trust in this State, other than a declaration of belief in the existence of God."); Mississippi State Constitution: Article 14, Section 265 ("No person who denies the existence of a Supreme Being shall hold any office in this state."); North Carolina State Constitution: Article 6, Section 8 ("The following persons shall be disqualified for office: First, any person who shall deny the being of Almighty God."); Pennsylvania State Constitution: Article 1, Section 4 ("No person who acknowledges the being of a God and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth."); South Carolina State Constitution: Article 17, Section 4 ("No person who denies the existence of a Supreme Being shall hold any office under this Constitution."); Tennessee State Constitution: Article 9, Section 2 ("No person who denies the being of God, or a future state of rewards and punishments, shall hold any office in the civil department of this state."); Texas State Constitution: Article 1, Section 4 ("No religious test shall ever be required as a qualification to any office, or public trust, in this State; nor shall any one be excluded from holding office on account of his religious sentiments, provided he acknowledge the existence of a Supreme Being.")

document in each of those states, powerfully demonstrates the extreme political disenfranchisement of Atheists.[29]

In 1958, a Gallup poll asking people if they would vote for various categories of candidates showed that 22% wouldn't vote for a Catholic, 28% wouldn't vote for a Jew, 41% wouldn't vote for a woman, 53% wouldn't vote for a black, and 77% wouldn't vote for an atheist. With the government no longer condoning (much less endorsing) discrimination against Catholics, Jews, women and blacks, those numbers fell dramatically to 4%, 6%, 7% and 4%, respectively, in 1999. With governmental endorsement of the idea that real Americans believe in God, however, the prejudice against Atheists has remained, so that still 48% won't vote for a member of this minority religious persuasion – an order of magnitude greater than that for those other groups.[30] In fact, "voters have a far more favorable impression of every religion tested than they do of Atheists. Just 32% hold a favorable opinion of atheists."[31] As one commentator wrote, "if one finds himself on what's perceived to be the wrong side of God, he loses."[32]

According to Laura Olson, Ph.D. – a professor of political science at Clemson University and author of *Religion and Politics in America* – "religion and morality are

---

[29] If this point needs to more strongly be made, one need only ponder how long phrases such as "No [Jew] shall hold any office under this Constitution" (South Carolina State Constitution, Article XVII, Section 4) or "No [African-American] shall hold any office in the civil department of this state" (Tennessee State Constitution, Article IX, Section 2) would persist in today's society.

[30] Polls given July 30 – August 4, 1958, and February 19-21, 1999, respectively. Copyright © 1958, 1999 The Gallup Organization, Princeton, NJ. See, www.gallup.com and www.gallupjournal.com. Phrased alternatively, At least 92% of respondents would vote for a candidate who is "Black," "Catholic," "Baptist," "a woman," or "Jewish." For atheists, the figure is 49%.

[31] *Religion and Politics: the Ambivalent Majority*, The Pew Research Center for the People and the Press in association with The Pew Forum on Religion and Public Life, September 20, 2000 (accessed at http://people-press.org/reports/print.php3?PageID=177). Additionally, that same number (32%) held "Very Unfavorable" opinions of Atheists. This can be contrasted with 3% for Evangelical Christians, 3% for Jews and 3% for Catholics and 8% for Muslim Americans.

[32] Smith J. *Democrats need an improved image*. The Battalion, November 17, 2004. Accessed on December 26, 2004, at http://www.thebatt.com/news/2004/11/17/Opinion/Democrats.Need.An.Improved.Image-807486.shtml.

definitely more salient in today's political discourse than they were 50 years ago or so."[33] Recognizing how incredibly salient they were 50 years ago or so,[34] along with how Atheists are negatively perceived in our current society (along with how the First Amendment's Establishment Clause demands governmental neutrality in matters of religion), the purely religious phrase under challenge in this litigation must be removed from the coins and currency, and must be replaced as our national motto. Until that occurs – and the "power, prestige and financial support of government" cease to further the erroneous notion that "In God We Trust" – it is virtually certain that this anti-Atheistic animus (and pro-(Christian) monotheistic favoritism) will prevail.

---

[33] Tammeus B. *Issues of Faith Envelop Roberts.*Kansas City Star, August 20, 2005. Accessed on August 24, 2005 at http://www.kansascity.com/mld/kansascity/12434132.htm.
[34] See APPENDICES B, C, D, and E.

## APPENDIX G

**THE WORDS, "IN GOD WE TRUST," ARE NOT MERELY "CEREMONIAL." NOR IS THEIR RELIGIOUS CONTENT OR EFFECT *"DE MINIMIS."* ON THE CONTRARY, THEY ARE UNQUESTIONABLY AND MEANINGFULLY RELIGIOUS**

It is expected that – rather than simply adhere to the clear principles underlying the Religion Clauses (and RFRA) and remove "In God We Trust" as requested – the Defendants in this case will engage in attempts to legitimatize that clearly unconstitutional phrase. One likely means will be to claim that motto is "ceremonial," with any religious content and/or effect being "*de minimis*." The history already provided in the body of the Complaint totally belies this bogus contention. The following – pertaining to the closely related "under God" in the Pledge of Allegiance[1] – does as well.

(1)   When the Ninth Circuit, on June 26, 2002, ruled that "under God" in the Pledge was unconstitutional, <u>Newdow v. United States Cong.</u>, 292 F.3d 597 (9th Cir. 2002),[2] there developed "a firestorm across most of the nation."[3] National firestorms (of controversy) are not created by the loss of merely "ceremonial" items with "*de minimis*" content or effects.

(2)   Both houses of Congress stopped their important work to spend significant amounts of time decrying the ruling in <u>Newdow v. U.S. Congress</u>.[4] Congress doesn't stop its work due to merely "ceremonial" items with "*de minimis*" content or effects.

(3)   The Senate almost immediately considered and unanimously passed a resolution condemning the decision in <u>Newdow v. U.S. Congress</u>.[5] Such Senate activity

---

[1] Numerous congressional bills and resolutions have considered and/or addressed the "under God" phrase in the Pledge along with the "In God We Trust" phrase in the motto and on the coins. <u>See</u>, <u>e.g.</u>, S. Res. 243, 109th Cong., 1st Sess. (September 15, 2005) ("Whereas the Senate believes that the Pledge of Allegiance, as revised in 1954, as recodified in 2002, and as recognized in a resolution in 2003, is a fully constitutional expression of patriotism; Whereas the National Motto, patriotic songs, United States legal tender, and engravings on Federal buildings also refer to `God' …").

[2] <u>Newdow v. U.S. Congress</u> was the initial Ninth Circuit case subsequently reversed by the Supreme Court in <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 159 L. Ed. 2d 98, 124 S. Ct. 2301 (2004).

[3] *Gov't to ask rehearing of Pledge ruling*, June 27, 2002. CNN.com. http://archives.cnn.com/2002/LAW/06/27/pledge.allegiance/

[4] 148 Cong. Rec. S6105-S6112 (daily ed. 6/27/02); 148 Cong. Rec. H4125-H4136 (daily ed. 6/28/02).

[5] S. Res. 292, 107th Cong., 148 Cong. Rec. S6105 (2002).

doesn't stem from merely "ceremonial" items with "*de minimis*" content or effects.

(4) By a vote of 416-3, the House of Representatives almost immediately considered and passed a resolution condemning the decision in <u>Newdow v. U.S. Congress</u>.[6] Such House activity doesn't stem from merely "ceremonial" items with "*de minimis*" content or effects.

(5) The Plaintiff in <u>Newdow v. U.S. Congress</u> was named *Time Magazine*'s "Person of the Week."[7] People aren't accorded such recognition over matters that are merely "ceremonial" items with "*de minimis*" content or effects.[8]

(6) President Bush's Press Secretary – on June 26, 2002 – stated that the reaction of the President of the United States "was that this ruling is ridiculous."[9] The President, himself, commented on the ruling. In fact, it was the first item addressed by him at his news conference on June 27, 2002 … following a meeting with Russian President Vladimir Putin, no less.[10] Presidents and their press secretaries don't address matters that are merely "ceremonial" and with "*de minimis*" content or effects.

(7) At that June 27, 2002 news conference, the President referred to <u>Newdow v. U.S. Congress</u> by noting this nation's "relationship with an Almighty," that the Pledge is "a confirmation of the fact that we received our rights from God, as proclaimed in our Declaration of Independence, and that "our rights were derived from God."[11] Such comments by the nation's Chief Executive – a deeply religious man – are not made over matters that are merely "ceremonial" and with "*de minimis*" content or effects.

(8) In response to the Ninth Circuit Court of Appeals' decision in <u>Newdow v. U.S. Congress</u>, Robert C. Byrd – a United States Senator – placed the following into the Congressional Record:

> Let that judge's name ever come before this Senate while I am a Member, and he will be blackballed … fast. ... I hope the Senate will waste no time in throwing this back in the face of this stupid judge.[12]

These are not the words a United States Senator – referencing an appellate-level Federal judge, no less – uses in response to matters that are merely "ceremonial" items with "*de minimis"* content or effects.

---

[6] H.R. Res. 459, 107th Cong., 148 Cong. Rec. H4135 (2002).
[7] H.R. Res. 459, 107th Cong., 148 Cong. Rec. H4135 (2002).
[8] http://www.time.com/time/pow/article/0,8599,266658,00.html.
[9] http://www.whitehouse.gov/news/releases/2002/06/20020626-8.html.
[10] http://www.whitehouse.gov/news/releases/2002/06/20020627-3.html.
[11] <u>Id</u>.
[12] 148 Cong. Rec. S6103 (daily ed. June 26, 2002).

(9)    After the Ninth Circuit's <u>Newdow v. U.S. Congress</u> decision was announced, its author – Judge Alfred Goodwin – had an "e-mail system [that] was literally jammed, frozen with public opinion. Ten boxes of mail piled up at his office, 'all scolding me for being un-American.'"[13] The litigation was "easily the most publicized and hotly debated case in Goodwin's fifty-three-year legal career."[14] This is not a reaction that stems from a decision affecting something merely "ceremonial" with "*de minimis*" content or effects.

(10)    As chosen by the Religion Newswriters Association, the story about the Pledge litigation was among the top 10 religion stories for 2002, 2003 and 2004.[15] Such a ranking – as a "religion story," three years in a row – is not consistent with something merely "ceremonial" with "*de minimis*" content or effects.

(11)    The Pew Research Center for the People & the Press reviewed the top news stories from 1986-2004 in terms of the maximum degree they were followed by the public.[16] Out of 1103 stories listed, the Pledge was #57 – ahead of, for instance, the O.J. Simpson trial (#89), the breakup of the Soviet Union (#91), and the Space Shuttle Columbia disaster (#111). Public interest to that extraordinary degree is not garnered by something merely "ceremonial" and with "*de minimis*" content or effects.

(12)    The United States – in its Writ Petition to the Supreme Court in <u>Newdow v. U.S. Congress</u> – claimed that "[t]he question presented is one of great importance."[17] It makes little sense to claim that something the United States itself believes to be "of great importance" is merely "ceremonial" and with "*de minimis*" content or effects.

(13)    <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 124 S. Ct. 2301, 2326 (2004) was referenced as "one of the most intensely watched church-state cases in recent memory."[18] Such a description hardly fits a case involving a merely "ceremonial" matter with "*de minimis*" content or effects.

(14)    Pages and pages of the Congressional Record are dedicated to debate about <u>Newdow v. U.S. Congress</u> and the subsequent Supreme Court litigation. Members of Congress don't spend extensive amounts of time posturing over an issue that is merely "ceremonial" and has "*de minimis*" content or effects.[19]

---

[13] Williams K. *Allegiance to the Law*. Oregon Quarterly. Autumn, 2004, page 22.

[14] <u>Id</u>.

[15] http://www.rna.org/

[16] http://people-press.org/nii/.

[17] *Petition for a Writ of Certiorari* for Petitioner United State of America, <u>United States of America v. Newdow</u>, April, 2003, at 25.

[18] Lane C. *Justices Keep 'Under God' in Pledge*. The Washington Post, Tuesday, June 15, 2004; A01.

[19] Plaintiffs do not rely too strongly upon this assertion.

(15) On September 23, 2004, the House of Representatives actually passed the "Pledge Protection Act of 2004," which would deny the federal judiciary any jurisdiction to hear any challenge to the constitutionality of the Pledge of Allegiance.[20] Such an unprecedented statute – so breathtaking in its nature – surely would not be created to deal with a merely "ceremonial" matter with "*de minimis*" content or effects.

(16) Fifty-five separate *amicus* briefs were filed in the Newdow case. Additionally, the case was covered in countless media reports, symposia, webchats, and commentaries. (Included among these were works by religious scholars and theologians,[21] Christian and Jewish clergy,[22] historians,[23] and respected commentators – legal[24] and otherwise[25] – who agreed with the Plaintiff in the Newdow case.) Such a level of participation by *amici* does not occur over matters that are merely "ceremonial" and that have "*de minimis*" content or effects.

(17) In the last presidential election, the danger of "political outsiders" based on religious belief was accentuated more than ever before. In fact, the Pledge

---

[20] 150 Cong. Rec. H7478 (daily ed. September 23, 2004).

[21] Nineteen Religious Scholars and Theologians wrote an *amicus* brief in support of the plaintiff in the Elk Grove case. See, *Brief amicus curiae of Religious Scholars and Theologians*, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).

[22] Thirty-two respected Christian and Jewish clergy members wrote an *amicus* brief in support of the plaintiff in the Elk Grove case. *Brief amicus curiae* of Rev. Dr. Betty Jane Bailey, et al., Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).

[23] In Newdow, the only *amicus* brief written by historians was in support of the Plaintiff's position. Twenty-two esteemed experts from academic institutions across the nation agreed that the school district policy in that case, "would have been opposed by the Framers of the Constitution." See, *Brief amici curiae of Historians and Law Scholars*, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004), at 1.

[24] See, e.g., Thompson JE. *What's the Big Deal? The Unconstitutionality of God in the Pledge of Allegiance.* 38 Harv. C.R.-C.L. L. Rev. 563, 586 (2003) ("From their cognitive birth Americans receive the message: 'You can be almost anything, but not an atheist.' We are prejudiced, biased from the outset. This anti-atheist sentiment is so pervasive that many fail to recognize its manifestations. … To reject God means overcoming … monumental social barriers sponsored by the government. Of course, the religious do not understand this message of disrespect for nontheism as a harm."); Hamilton M. *Why the Court Should Reject This Pledge, and Why the Department of Justice Is Wrong To Support It*, Findlaw.com, March 25, 2004, accessed at http://writ.news.findlaw.com/hamilton/20040325.html ("[I]t is not only the right thing for the Court to find in favor of Mr. Newdow and the principle of neutrality toward religion in the First Amendment's Free Exercise and Establishment Clauses. It is also in the national interest to do so.")

[25] See, e.g., William Safire, New York Times, March 24, 2004, *Of God and the Flag*, Section A , Page 21 , Column 1 ("The only thing this time-wasting pest Newdow has going for him is that he's right."); Ellen Goodman, Boston Globe, March 28, 2004, accessed at http://www.boston.com/news/globe/editorial_opinion/oped/articles/2004/03/28/why_make_such_ a_big_deal_of_two_little_words/ ("Here's the problem. … Newdow is right.")

litigation played a role. For instance, in Allentown, PA, a billboard stating "Bush Cheney 04 – One Nation Under God" was utilized.[26] People don't take out billboards to sway their fellow citizens votes in presidential election campaigns and plaster them with a matter that is merely "ceremonial" and has "*de minimis*" content or effects

(18) Rev. Brenda Bartella Peterson – appointed director of religious outreach for the Democratic Party – was forced to resign merely because she had joined thirty-one other clergy members to support the Plaintiff in Elk Grove Unified Sch. Dist. v. Newdow.[27] Political pressure sufficient to cause a key appointment to be reversed during an extremely close presidential election doesn't arise from merely joining more than thirty other esteemed individuals in signing a legal brief over a matter that is merely "ceremonial" and has "*de minimis*" content or effects.

(19) In the 2000 presidential election, potential candidates were interviewed by the Committee to Restore American Values. This arm of the so-called "religious right" specifically asked, "Would you support a removal of the words 'under God' from the Pledge of Allegiance?"[28] Joined by the executive director of the Christian Coalition, there can be no doubt as to the religious agenda the commission had in posing that question. This further demonstrates the illusory notion behind any "ceremonial deism" or "*de minimis*" claims.

(20) Recently, recitation of the Pledge in public schools was again ruled to violate the Establishment Clause. That occurred during the time when the confirmation hearings of Chief Justice Roberts were taking place. When the District Court decision was announced, Justice Roberts was asked for his opinions on this issue.[29] Candidates for the Chief Justice position of the United States Supreme Court are not asked by United States senators about matters that are "ceremonial" or "*de minimis*."

---

[26] Kirkpatrick D. *Battle Cry of Faithful Pits Believers Against the Rest*. New York Times, October 31, 2004. Section 1 , Page 24.

[27] Duin J. *Furor over Pledge stance prompts Democrat to quit*. The Washington Times, August 6, 2004, accessed at http://www.washingtontimes.com/functions/print.php?StoryID=20040805-113248-2858r.

[28] *Religious Right Queries GOP Rivals*,  Washington Post, Thursday, February 4, 1999; page A4.

[29] *Pledge again ruled unconstitutional*. San Francisco Chronicle, Thursday, September 15, 2005. Accessed at http://www.sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2005/09/15/PLEDGE.TMP on October 22, 2005.

**APPENDIX H**

**THE PHRASE, "IN GOD WE TRUST," IS NOT AN "ACKNOWLEDGEMENT" OF THE ROLE RELIGION HAS PLAYED IN OUR NATION'S HISTORY. IT ENDORSES THE PARTICULAR RELIGIOUS NOTIONS THAT (I) THERE EXISTS A GOD, AND (II) THAT THIS NATION TRUSTS IN THAT GOD**

Anticipating the Defendants will allege that the phrase, "In God We Trust," is merely an "acknowledgement" of the religious history of our country, Plaintiff will initially refer (again) to Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004). In the only *amicus* brief in that case wherein historians formally participated, it was stated unequivocally that "the policy … of having schoolchildren recite the [now-religious] Pledge of Allegiance … would have been opposed by the Framers of the Constitution."[1] For the use of "In God We Trust" to be an acknowledgement of the role religion played in our Nation's history would be rather paradoxical, since – as these noted scholars pointed out – our history was one where the alleged "acknowledgement," itself, was something to which the Framers were "firmly opposed." This was evidenced by the inclusion of the Religious Test Clause in Article VI of the Constitution, which "has become an enduring symbol of freedom of conscience and equality of belief in this nation."[2] Thus, the use of "In God We Trust" is not an acknowledgement of the role religion has played in our Nation's history. Just as, "[i]t cannot be gainsaid that the overriding purpose of the 1954 amendment was to incorporate a religious affirmation into the Pledge,"[3] it also cannot be gainsaid – especially in view of the history provided in the Complaint here – that "In God We Trust" was intended to indicate active, purely religious thought and belief.

That "In God We Trust" is religious – rather than historical – is also seen in the actions of the Republican National Committee in response to legal proceedings related to that phrase's cousin, "under God," in the Pledge. The RNC sent "mailings, which

---

[1] Brief *amicus curiae* of Historians and Law School Scholars in Support of Respondent, page 1, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004). Among the twenty-two esteemed academicians who signed onto this brief were five History professors.
[2] Id. at 15 (footnote omitted).

included images of a Bible labeled 'banned'" to the voters during the 2004 Presidential campaign. According to RNC spokesman Christine Iverson, the mailings were triggered at least in part by "activist judges [who] also want to remove the words 'under God' from the Pledge of Allegiance."[4] Such a mailing was clearly intended to play on the purely religious – and not historical – sentiments of the voters. In fact, as noted by nineteen religious scholars and theologians, "[I]t would be hard to imagine, outside the sanctuary of a Christian church, a more sectarian religious ceremony"[5] than that which occurred on June 14, 1954, when the newly amended Pledge was introduced to the American people. It was essentially the same Congress that turned "In God We Trust" into the official national motto. "In God We Trust" – like the revised Pledge – "not only favors religion over non-religion; it also favors some religions over others."[6] Additionally, "[t]hirty-two named Christian and Jewish clergy, together with the Unitarian Universalist Association" wrote that, "[t]o recite that the nation is "under God" is inherently and unavoidably a religious affirmation. Indeed, it is a succinct religious creed, less detailed and less specific than many creeds, but stating a surprising amount and implying more."[7] "In God We Trust" is nothing less, and the statement these esteemed ecclesiastics made in regard to "under God" in the Pledge is just as applicable here:

> If the religious language … is *not* intended to sincerely affirm the succinct creed entailed in its plain meaning … then it is a vain and ineffectual form of words. The numerically predominant religious faiths in the United States have a teaching about such vain references to God: "Thou shalt not take the name of the Lord thy God in vain." Exodus 20:7.[8]

Free Exercise and RFRA claims are also part of this litigation. As it pertains to those legal notions, it should be appreciated that taking the Lord's name in vain is obviously not a compelling interest.

---

[3] Id. at 21.

[4] Roff P. *GOP admits to mailers suggesting Bible ban*. New York, Sept. 24, 2004 (UPI) accessed at http://committeeforjustice.org/cgi-data/blog/files/22.shtml.

[5] Brief *amicus curiae* of Religious Scholars and Theologians in Support of Respondent, page 4, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).

[6] Id.

[7] Brief *amicus curiae* of Rev. Dr. Betty Jane Bailey, et al. in Support of Respondent, page 4, Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301 (2004).

[8] Id. at 8 (emphasis in original).

## APPENDIX I

## DECLARATION OF MICHAEL NEWDOW

I, Michael Newdow, declare as follows:

(1)   I am competent to testify to the matters stated herein.

(2)   I have been a numismatist since I was seven or eight years old. As a result, I often look carefully at the coins (and, at times, the currency) I carry.

(3)   I am virtually always confronted with the words, "In God We Trust" when I look at the coins and currency. I would estimate that this occurs on average at least five times a day.

(4)   In fact, my involvement in seeking to uphold the principle of equality upon which the Establishment Clause is founded was initiated during such an occasion. It was my inspection of the coins and currency in my hand, in November 1997, that initiated my efforts to end the religious inequality that has been unconstitutionally spatchcocked into our government.

(5)   I am a member, founder, and ordained minister of the First Amendmist Church of True Science (FACTS). This church is one that espouses Atheism. In other words, we specifically deny that there is a God.

(6)   We hold the belief that God is a fiction, and that belief or trust in such a fiction often leads to harms, which are not infrequently horrific.

(7)   Because of this – and because we feel that belief in supernatural entities is a repudiation of the scientific and skeptical thought processes which allow for the advancement of the human race – we in FACTS seek to specifically distance ourselves from any suggestion that there is exists a God.

(8)   Accordingly, we vehemently **DO NOT** trust in God, and are offended by any suggestion to the contrary.

(9)   I have – on numerous occasions – sought to raise money for FACTS. For instance, I have repeatedly attempted to sell FACTS pens. During these occasions, people have offered their money to me. However, in every case, that money has contained the words, "In God We Trust."

(10)   I have also sought to raise money for FACTS by holding giveaways of toys and games. During those giveaways, a basket for donations has been placed nearby. Again, I (and other FACTS members) have not been able to accept any of the

money offered. This is because of the "In God We Trust" verbiage engraved on the given monetary instrument.

(11)   FACTS has three "suggestions," which comprise the basis of our religion.[1] Those are (1) "Question," (2) "Be Honest," and (3) "Do What's Right." It is a violation of Suggestion (2) and (3) for FACTS members to accept money that has the words, "In God We Trust," while seeking to raise funds for our church (which specifically denies that claim).

(12)   We in FACTS believe that to accept such money would be highly hypocritical. Apparently, so do many who believe in God, inasmuch as I have repeatedly had thrown in my face such comments as, "Hey, I bet you don't mind getting paid with money that has 'In God We Trust' on it!" These comments have always been hurled against me in an unquestionably insulting manner.[2]

(13)   It should be noted that I own real estate in Elk Grove, California, that I purchased specifically for matters related to FACTS. I have worshipped on that property. Additionally, it has been on this property that I held one of the toy and game giveaways. I had plans for other fundraising at that site as well, in addition to conjoined worship and fund-raising. However, I have put those plans on hold, recognizing that it is futile to attempt to raise money when my religious tenets forbid me from accepting that money, which is the case due solely to the "In God We Trust" verbiage now required by law.

(14)    I was the plaintiff in <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 124 S. Ct. 2301 (2004), in which the words, "under God," in the Pledge of Allegiance were challenged.

(15)   As a result of that case, I repeatedly received letters, e-mails and phone calls where the individuals communicating with me would reference "In God We Trust," making it clear that they thought those words were unquestionably religious.

(16)   In fact, the vast majority of those persons expressed this view.

(17)   Many of those persons indicated that I would suffer in the afterlife due to my atheistic beliefs.

(18)   I was repeatedly told that I should leave the country because of the litigation. A typical statement was, "If you don't like it here, move."

---

[1] We are not so arrogant as to have "Commandments."
[2] In fact, during a radio interview with a Sacramento radio station just this morning, the host repeatedly referenced the fact that I would be accepting money with "In God We Trust" at an upcoming presentation  I will be giving on the Constitution. He did so clearly with the intention of impugning my integrity.

(19)  Often, "In God We Trust," was referenced by these individuals, used as (to them) proof that I am a "political outsider" who may be tolerated, but whose rights and religious freedoms are not equal to theirs.

(20)  I received a host of far more vitriolic messages as well.

(21)  Strangers left messages on my answering machine, calling me, among other things, an "atheist piece of shit," a "sick son of a bitch," "the idiest most stupidest man," an "imbicilic bastard," "a traitor," "an idiot," "a horrible person," "a stupid whore," "a sick man," a "fucking unpatriotic fuckface," and "one giant asshole."

(22)  Additionally, individuals suggested that I "should fucking go to hell," that "you have a wild hair up your ass," that "There is a hell, and you will be in it," that "you're disgusting and vile," that "you're just disgusting," and that "You better change your goddamn view."

(23)  Strangers also at times identified me in public. I was referred to as "the freak" in public, when I was with my child.

(24)  I was invited to speak at multiple venues. At one – on March 26, 2004, two days after the Supreme Court oral argument in the case – I gave a talk at the University of Toledo Law School. (Justice O'Connor gave a speech at that same locale less than two weeks later.) My presentation was delayed by a bomb threat.

(25)  I also received many communications from individuals who were supportive of my efforts, and who thanked me for bringing this case.

(26)  Many of the supporters stated that they were not atheists, but simply agreed with my work to uphold the principles underlying the Religious Clauses of the First Amendment

(27)  Other supporters – comprising the vast majority – were atheists and other "freethinkers" who had long felt discriminated against and/or suffered adverse consequences due to their inability to recite the pledge consistent with their religious ideals. A recurring theme from those individuals is that they wanted to do what I had done, but that they either thought it was futile, or they feared the consequences.

(28)  The Elk Grove case hinged on a family law matter. Myriad individuals believe that the family laws of this nation are egregiously abusive, and have for years been seeking ways to attract media attention in order to detail the destruction and waste caused by the family law system.

(29)  Accordingly, I contacted many of the groups these people have formed to ask if they would be interested in writing amicus briefs. Although those groups frequently complain that their voices are not heard, none of the major organizations would

agree to participate in the case.[3] The reason I was given – over and over – was that it would be too politically dangerous to be aligned with an Atheist.

(30)   I, personally, feel like a political outsider every time I see "In God We Trust" on our coins and currency, on government documents, and on other governmental locales.

(31)   As a result of the reactions to my involvement in the previous case – where I did nothing but attempt to uphold the Constitution – I am continually wondering if I'm being treated differently (especially negatively). For instance, I am involved in a family court proceeding where the judge has made no secret about his staunch Catholicism. Is it my Atheism that has caused his repeated adverse rulings?[4] I was recently treated inappropriately when I made an inquiry at a municipality office in Elk Grove. Was that because the workers there knew of my religious beliefs?

(32)   When the Elk Grove case was heading to the Supreme Court, I attempted to add parties to eliminate any standing concerns. The first family I contacted was comprised of friends who had been supportive since the case first broke. They were initially very willing to participate. Nonetheless, even though I told them I would attempt to add them anonymously, they subsequently declined to join the case. The reason given was that they feared the social consequences, especially loss of employment.

(33)   With my standing having been denied by the Supreme Court, numerous families have contacted me regarding their willingness to be plaintiffs in new challenges. Most have been atheists, and virtually all of them have expressed significant concerns as to their safety. Many have opted not to proceed due to the potential adverse ramifications of their being identified either as atheists, or as individuals supporting this cause.

(34)   I am a board-certified emergency physician with more than twenty-five years of experience. I recently applied for a number of positions in hospitals situated in nearby rural communities. The contracting company informed me that the hospitals will not hire me … solely because of my work in seeking to remove endorsements of God and (Christian) monotheism from government.

(35)   That work has as its goal the adherence to the principle of equality that underlies the Establishment Clause. I strongly doubt that I wouldn't have been hired had I been working to **add** God to the government – an activity that would be in violation of that constitutional ideal.

(36)   I believe strongly that this denial of employment is the result of the antipathy towards Atheists that has been perpetuated largely by such government acts as

---

[3] One small group – the United Fathers of America – did write an *amicus* brief. That organization, however, has a strong association with atheists.
[4] It certainly isn't my ability to care for, nurture and love my child.

declaring "In God We Trust" to be the national motto, and placing "In God We Trust" on all of the nation's coins and currency.

(37)  I have also long held a desire to run for public office. Unfortunately, the reality is that an atheist is virtually assured of defeat in this nation … largely, I believe, due to the anti-Atheistic messages constantly espoused by the government. Chief among these is the claim that "In God We Trust." This reality has directly affected my activity in this political regard.

(38)  I have paid federal taxes for each of the last (at least) twenty years, and expect that I will continue to pay federal taxes for at least another decade.

(39)  I have attended numerous meetings of atheist, humanist and other secular organizations. At those meetings, items directly related to my religious beliefs are often offered for sale, and I have, on more than one occasion, wished to make a purchase. When the sellers only take cash – or when I only have cash on my person – the only way I can make the given purchase is with money that bears the words, "In God We Trust." I cannot in good conscience, consistent with my religious principles, make purchases for religious materials with money that sends that message. Thus, I have forsaken making the given purchase(s).

(40)  I have traveled to numerous foreign lands, including Andorra, Aruba, Ascension Island, Australia, the Bahamas, Bali, Barbados, Belgium, Bimini, Canada, Chile, Cuba, Denmark, Dominican Republic, Ecuador, Egypt, England, France, Germany, Gibraltar, Greece, Haiti, Holland, Honduras, Hong Kong, Indonesia, Israel, Italy, Japan, Korea (South), Malaysia, Mexico, New Zealand, Norway, Palau, Panama, Puerto Rico, St. Thomas, Spain, Sri Lanka, Sweden, Switzerland, Taiwan, Thailand, Tobago, Trinidad, and likely others not presently recalled.

(41)  Although I often would take travelers' cheques on these trips, I frequently would need to exchange small quantities of American currency in order to avoid financial losses (due to exchanges of large denomination cheques).

(42)  I plan on continuing my foreign travels – including, possibly, as a minister of FACTS. I expect that I will continue to be forced to spend United States currency, thus further being placed in a situation where Defendants' acts have required me to evangelize for a religious view I explicitly deny.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2005 in El Paso, TX.


_____
      /s/ - Michael Newdow

            Michael Newdow

# APPENDIX J

# DATA ON RELIGION

## No. 67. Self-Described Religious Identification of Adult Population: 1990 and 2001

[In thousands (175,440 represents 175,440,000). The American Religious Identification Survey (ARIS) 2001 was based on a random digit-dialed telephone survey of 50,281 American residential households in the continental U.S.A (48 states). Respondents were asked to describe themselves in terms of religion with an open-ended question. Interviewers did not prompt or offer a suggested list of potential answers. Moreover, the self-description of respondents was not based on whether established religious bodies, institutions, churches, mosques or synagogues considered them to be members. Quite the contrary, the survey sought to determine whether the respondents themselves regarded themselves as adherents of a religious community. Subjective rather than objective standards of religious identification were tapped by the surveys]

| Religious group | 1990 | 2001 | Religious group | 1990 | 2001 |
|---|---|---|---|---|---|
| Adult population, total [1] . . . . . . . | 175,440 | 207,980 | Fundamentalist . . . . . . . . . . . . . . . . | 27 | 61 |
| | | | Salvation Army . . . . . . . . . . . . . . . . | 27 | 25 |
| Total Christian . . . . . . . . . . . . . . | 151,496 | 159,506 | Independent Christian Church . . . . . . . | 25 | 71 |
| Catholic . . . . . . . . . . . . . . . . . . . . | 46,004 | 50,873 | | | |
| Baptist . . . . . . . . . . . . . . . . . . . . . | 33,964 | 33,830 | Total other religions . . . . . . . . . . . | 5,853 | 7,740 |
| Protestant - no denomination supplied. . | 17,214 | 4,647 | Jewish . . . . . . . . . . . . . . . . . . . . . | 3,137 | 2,831 |
| Methodist/Wesleyan . . . . . . . . . . . . . | 14,174 | 14,150 | Muslim/Islamic. . . . . . . . . . . . . . . . . | 527 | 1,104 |
| Lutheran . . . . . . . . . . . . . . . . . . . . | 9,110 | 9,580 | Buddhist . . . . . . . . . . . . . . . . . . . . | 401 | 1,082 |
| Christian - no denomination supplied. . . | 8,073 | 14,150 | Unitarian/Universalist . . . . . . . . . . . . | 502 | 629 |
| Presbyterian . . . . . . . . . . . . . . . . . | 4,985 | 5,596 | Hindu . . . . . . . . . . . . . . . . . . . . . . | 227 | 766 |
| Pentecostal/Charismatic . . . . . . . . . . | 3,191 | 4,407 | Native American . . . . . . . . . . . . . . . | 47 | 103 |
| Episcopalian/Anglican . . . . . . . . . . . | 3,042 | 3,451 | Scientologist . . . . . . . . . . . . . . . . . | 45 | 55 |
| Mormon/Latter-Day Saints . . . . . . . . . | 2,487 | 2,787 | Baha'I . . . . . . . . . . . . . . . . . . . . . | 28 | 84 |
| Churches of Christ . . . . . . . . . . . . . . | 1,769 | 2,593 | Taoist . . . . . . . . . . . . . . . . . . . . . | 23 | 40 |
| Jehovah's Witness . . . . . . . . . . . . . . | 1,381 | 1,831 | New Age . . . . . . . . . . . . . . . . . . . . | 20 | 68 |
| Seventh-Day Adventist . . . . . . . . . . . | 668 | 724 | Eckankar . . . . . . . . . . . . . . . . . . . | 18 | 26 |
| Assemblies of God. . . . . . . . . . . . . . | 660 | 1,106 | Rastafarian. . . . . . . . . . . . . . . . . . . | 14 | 11 |
| Holiness/Holy . . . . . . . . . . . . . . . . . | 610 | 569 | Sikh . . . . . . . . . . . . . . . . . . . . . . | 13 | 57 |
| Congregational/United Church of Christ . | 599 | 1,378 | Wiccan . . . . . . . . . . . . . . . . . . . . . | 8 | 134 |
| Church of the Nazarene . . . . . . . . . . | 549 | 544 | Deity . . . . . . . . . . . . . . . . . . . . . . | 6 | 49 |
| Church of God . . . . . . . . . . . . . . . . | 531 | 944 | Druid . . . . . . . . . . . . . . . . . . . . . . | (NA) | 33 |
| Orthodox (Eastern) . . . . . . . . . . . . . | 502 | 645 | Santeria . . . . . . . . . . . . . . . . . . . . | (NA) | 22 |
| Evangelical [2] . . . . . . . . . . . . . . . . | 242 | 1,032 | Pagan . . . . . . . . . . . . . . . . . . . . . | (NA) | 140 |
| Mennonite . . . . . . . . . . . . . . . . . . . | 235 | 346 | Spiritualist . . . . . . . . . . . . . . . . . . . | (NA) | 116 |
| Christian Science . . . . . . . . . . . . . . | 214 | 194 | Ethical Culture. . . . . . . . . . . . . . . . . | (NA) | 4 |
| Church of the Brethren . . . . . . . . . . . | 206 | 358 | Other unclassified . . . . . . . . . . . . . . | 837 | 386 |
| Born Again [2] . . . . . . . . . . . . . . . . | 204 | 56 | | | |
| Nondenominational [2] . . . . . . . . . . . | 195 | 2,489 | No religion specified, total . . . . . . . . | 14,331 | 29,481 |
| Disciples of Christ . . . . . . . . . . . . . . | 144 | 492 | Atheist. . . . . . . . . . . . . . . . . . . . . | (NA) | 902 |
| Reformed/Dutch Reform . . . . . . . . . . | 161 | 289 | Agnostic. . . . . . . . . . . . . . . . . . . . | 1,186 | 991 |
| Apostolic/New Apostolic . . . . . . . . . . | 117 | 254 | Humanist . . . . . . . . . . . . . . . . . . . | 29 | 49 |
| Quaker . . . . . . . . . . . . . . . . . . . . . | 67 | 217 | Secular . . . . . . . . . . . . . . . . . . . . | (NA) | 53 |
| Full Gospel . . . . . . . . . . . . . . . . . . | 51 | 168 | No religion . . . . . . . . . . . . . . . . . . . | 13,116 | 27,486 |
| Christian Reform . . . . . . . . . . . . . . . | 40 | 79 | | | |
| Foursquare Gospel . . . . . . . . . . . . . | 28 | 70 | Refused to reply to question . . . . . . . | 4,031 | 11,246 |

NA Not available.   [1] Refers to the total number of adults in all fifty states. All other figures are based on projections from surveys conducted in the continental United States (48 states).   [2] Because of the subjective nature of replies to open-ended question, these categories are the most unstable as they do not refer to clearly identifiable denominations as much as underlying feelings about religion. Thus they may be the most subject to fluctuation over time.

Source: 1990 data, Barry A. Kosmin and Seymour P. Lachman, "One Nation Under God: Religion in Contemporary American Society", 1993; 2001 data, The Graduate Center of the City University of New York, New York, NY, Barry A. Kosmin, Egon Mayer and Ariela Keysar, American Religious Identification Survey, 2001 (copyright).

**U.S. Census Bureau, Statistical Abstract of the United States: 2004-2005, Page 55**

**BELIEF IN GOD AND CERTAINTY OF BELIEF**

**"Are you …?"**

| | Total | RELIGIOUS AFFILIATION | | | |
|---|---|---|---|---|---|
| | | Catholic | Protestant | Jewish | Atheist/ Agnostic |
| | % | % | % | % | % |
| **Believe in God (NET)** | **79** | **79** | **90** | **48** | **15** |
| Absolutely certain that there is a God | 66 | 63 | 81 | 24 | 4 |
| Somewhat certain that there is a God | 12 | 16 | 9 | 24 | 11 |
| **Believe there is no God (NET)** | **9** | **8** | **4** | **19** | **52** |
| Somewhat certain that there is no God | 5 | 4 | 2 | 13 | 28 |
| Absolutely certain that there is no God | 4 | 4 | 2 | 5 | 23 |
| **Not sure whether or not there is a God** | 12 | 13 | 6 | 33 | 33 |

**Base: All Adults.**

*The Harris Poll* #59, October 15, 2003

Survey by Harris Interactive® based on a nationwide sample of 2,306 adults
surveyed online between September 16 and 23, 2003.

(Accessed on August 23, 2005
at http://www.harrisinteractive.com/harris_poll/index.asp?PID=408)

## SUPPORT FOR CHANGES IN PUBLIC POLICY ACCORDING TO SEVEN KEY FAITH GROUPS

|  | All Adults | Evangelicals | Non-evangelical born again | Notional | Non-Christian faith | Atheist/ Agnostic | Protestant | Catholic |
|---|---|---|---|---|---|---|---|---|
| **Remove 10 Commandments** | 18% | < 0.5% | 6% | 16% | 32% | 55% | 6% | 18% |
| **Remove "In God We Trust"** | 13% | 1% | 4% | 12% | 28% | 37% | 4% | 15% |
| **Remove "One nation under God"** | 15% | 4% | 6% | 13% | 24% | 40% | 7% | 13% |
| **Teach creationism** | 59% | 86% | 70% | 60% | 42% | 29% | 69% | 59% |
| **Allow the "F-word" on broadcast TV** | 15% | 6% | 8% | 17% | 21% | 35% | 9% | 19% |
| **Make Christianity the official religion of the U.S.** | 32% | 66% | 44% | 25% | 21% | 8% | 43% | 24% |

Base: 1024 adults.

From poll reported on July 26, 2004 by The Barna Group, Ltd., 1957 Eastman Ave., Ste B, Ventura, CA 93003
(Accessed at http://www.barna.org/FlexPage.aspx?Page=BarnaUpdate&BarnaUpdateID=168 on December 21, 2004)

**APPENDIX K**

**CONSTITUTIONALLY, MONOTHEISM IS JUST AS SECTARIAN
AS IS ANY OTHER DENOMINATION**

# ALL BAPTISTS



**Citizens excluded (apr.):
246,000,000 (85%)**

**CONSTITUTIONALLY, MONOTHEISM IS JUST AS SECTARIAN
AS IS ANY OTHER DENOMINATION**

# ALL PROTESTANTS



## Citizens excluded:
## 142,000,000 (49%)

**CONSTITUTIONALLY, MONOTHEISM IS JUST AS SECTARIAN
AS IS ANY OTHER DENOMINATION**

# ALL CHRISTIANS



# Citizens excluded:
# 75,000,000 (26%)

**CONSTITUTIONALLY, MONOTHEISM IS JUST AS SECTARIAN
AS IS ANY OTHER DENOMINATION**

## ALL MONOTHEISTS



## Citizens excluded (apr.):
## 29,000,000 (10%)

**CONSTITUTIONALLY, MONOTHEISM IS JUST AS SECTARIAN
AS IS ANY OTHER DENOMINATION**

## ALL AMERICANS



## Citizens excluded:
## 0 (0%)

---

## APPENDIX L

**TWENTY-EIGHT OF THIRTY SUPREME COURT JUSTICES HAVE WRITTEN OPINIONS CONTAINING PRINCIPLED STATEMENTS INCONSISTENT WITH A MOTTO COMPRISED OF THE WORDS, "IN GOD WE TRUST"**

A Lexis search of United States Supreme Court cases has been performed. For every justice appointed since 1925, opinions in cases involving the Establishment Clause were sought. Of the forty justices, ten were excluded because they authored no such opinions. Twenty-eight of the remaining thirty – including seven of the eight justices currently sitting with more than two months tenure – provided principled dicta supporting Plaintiff's case. Taken together, these citations leave no doubt as to the manifest unconstitutionality of "In God We Trust."

**Justice Black:**

"[N]either a State nor the Federal Government … can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." Torcaso v. Watkins, 367 U.S. 488, 495 (1961)

**Justice Blackmun:**

"[T]he Constitution mandates that the government remain secular, rather than affiliate itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths." Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 610 (1989)

**Justice Brennan:**

"[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." Grand Rapids School District v. Ball, 473 U.S. 373, 390 (1985)

**Justice Breyer:**
"[The Religion Clauses] seek to 'assure the fullest possible scope of religious liberty and tolerance for all.' They seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike." <u>Van Orden v. Perry</u>, 125 S. Ct. 2854, 2868 (2005) (Breyer, J., concurring) (citations omitted).[1]

**Chief Justice Burger:**
"The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice" <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 625 (1971)

**Justice Clark:**
"[The Court] has consistently held that the [Establishment] clause withdrew all legislative power respecting religious belief or the expression thereof." <u>Abington School District v. Schempp</u>, 374 U.S. 203, 222 (1963)

**Justice Douglas:**
"Our individual preferences, however, are not the constitutional standard. The constitutional standard is the separation of Church and State." <u>Zorach v. Clausen</u>, 343 U.S. 306, 314 (1952)

**Justice Fortas:**
"Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice.  It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite.  The First Amendment mandates governmental neutrality between religion and religion and between religion and nonreligion." <u>Epperson v. Arkansas</u>, 393 U.S. 97, 103-104 (1968)

**Justice Frankfurter:**
"Certainly the affirmative pursuit of one's convictions about the ultimate mystery of the universe and man's relation to it is placed beyond the reach of law.  Government may not interfere with organized or individual expression of belief or disbelief." <u>Minersville School District v. Gobitis</u>, 310 U.S. 586, 593 (1940)

---

[1] That Justice Breyer then ruled against the plaintiff in <u>Van Orden</u> is certainly interesting, likely demonstrating how personal religious predilection can blind people to their own biases. Would Justice Breyer ever have said to Rosa Parks, for example, that having her sit in the back of the bus was okay because "40 years passed in which the presence of [racial segregation on buses], legally speaking, went unchallenged?" <u>Van Orden v. Perry</u>, 125 S. Ct. 2854, 2870 (2005). Would he ignore the manifest disenfranchisement of blacks as he did with the manifest disenfranchisement of Atheists? "I am not aware of any evidence suggesting that this was due to a climate of intimidation." <u>See</u> APPENDICES B, C, D and E.

**Justice Ginsberg:**

"A prime part of the history of our Constitution … is the story of the extension of constitutional rights and protections to people once ignored or excluded." United States v. Virginia, 518 U.S. 515, 557 (1996)

**Justice Goldberg:**

"The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief." Abington School District v. Schempp, 374 U.S. 203, 305 (1963) (concurring opinion)

**Justice Harlan:**

"[T]he State cannot 'constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can [it] aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.' … Neutrality and voluntarism stand as barriers against the most egregious and hence divisive kinds of state involvement in religious matters." Walz v. Tax Commission, 397 U.S. 664, 695 (1970) (separate opinion)

**Justice Jackson:**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion … If there are any circumstances which permit an exception, they do not now occur to us." West Virginia Board of Education v. Barnette, 319 U.S. 624, 642 (1943)

**Justice Kennedy:**

"The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." Lee v. Weisman, 505 U.S. 577, 589 (1992).

**Justice Marshall:**

"It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Hernandez v. Commissioner, 490 U.S. 680, 699 (1989)

**Justice Murphy:**

"[T]he protection of the Constitution must be extended to all, not only to those whose views accord with prevailing thought but also to dissident minorities who energetically spread their beliefs." Jones v. City of Opelika, 316 U.S. 584, 611-12 (1942) (dissenting opinion)

**Justice O'Connor:**

"[W]hen [government] acts it should do so without endorsing a particular religious belief or practice that all citizens do not share." <u>Wallace v. Jaffree</u>, 472 U.S. 38, 76 (1985)

**Justice Powell:**

"A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion." <u>Committee for Public Education & Religious Liberty v. Nyquist</u>, 413 U.S. 756, 792-93 (1973)

**Chief Justice Rehnquist:**

"The Establishment Clause of the First Amendment, applied to the States through the Fourteenth Amendment, prevents a State from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion." <u>Zelman v. Simmons-Harris</u>, 536 U.S. 639, 648-49 (2002)

**Justice O. Roberts:**

"In the realm of religious faith, ... sharp differences arise. [There] the tenets of one man may seem the rankest error to his neighbor." <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 310 (1940)

**Justice Rutledge:**

"The [First] Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion." <u>Everson v. Board of Education</u>, 330 U.S. 1, 31-32 (1947 (dissenting opinion)

**Justice Scalia:**

"The government may not compel affirmation of religious belief … or lend its power to one or the other side in controversies over religious authority or dogma." <u>Employment Div. v. Smith</u>, 494 U.S. 872, 877 (1990)

**Justice Souter:**

"The general principle that civil power must be exercised in a manner neutral to religion" <u>Board of Education of Kiryas Joel v. Grumet</u>, 512 U.S. 687, 704 (1994)

**Justice Stevens:**

"The importance of that principle does not permit us to treat this as an inconsequential case involving nothing more than a few words of symbolic speech on behalf of the political majority. For whenever the State itself speaks on a religious subject, one of the questions

that we must ask is 'whether the government intends to convey a message of endorsement or disapproval of religion.'" <u>Wallace v. Jaffree</u>, 472 U.S. 38, 60-61 (1985)


### Justice Stewart

"[P]olitical fragmentation and division along religious lines [is] one of the principal evils against which the Establishment Clause was intended to protect." <u>Meek v. Pittenger</u>,421 U.S. 349, 372 (1975)


### Justice Stone:

"[C]areful scrutiny of legislative efforts to secure conformity of belief and opinion by a compulsory affirmation of the desired belief, is especially needful if civil rights are to receive any protection." <u>Minersville School District v. Gobitis</u>, 310 U.S. 586, 606 (1940) (dissenting opinion)


### Chief Justice Warren:

"If the purpose or effect of a law is ... to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." <u>Braunfeld v. Brown</u>, 366 U.S. 599, 607 (1961)


### Justice White:

"<u>Lemon</u>'s 'purpose' requirement aims at preventing the relevant governmental decisionmaker - in this case, Congress - from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." <u>Corporation of Presiding Bishop v. Amos</u>, 483 U.S. 327, 335 (1986)

## APPENDIX M

## THE SUPREME COURT HAS ISSUED AN OVERWHELMING NUMBER OF PRINCIPLED STATEMENTS DEMONSTRATING THAT "IN GOD WE TRUST" AS OUR MOTTO AND ON OUR MONEY IS UNCONSTITUTIONAL

The following is a sampling of approximately 200 instances of dicta, which – when applied to "In God We Trust" – support Plaintiff's contention that the challenged governmental use of this phrase  was and is unconstitutional. They should be kept in mind when considering the rare, unprincipled dictum suggesting that the phrase might comport with the Constitution's mandates. It also should be noted that there are many, many more instances – Plaintiff hopes that this listing suffices to make his point here.

In order to keep the focus on the words, the authors and the cases are not included. Plaintiff can provide these missing items if deemed necessary by the Court.

---

"[A]s the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private. It cannot be made a public one by legislative act. This was the very heart of Madison's Remonstrance, as it is of the Amendment itself."

"[A]s with the freedom of thought and speech of which Mr. Justice Cordozo spoke in <u>Palko v. Connecticut</u>, 302 U.S. 319 - it is accurate to say concerning the principle that a government must neither establish nor suppress religious belief."

 "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought - not free thought for those who agree with us but freedom for the thought that we hate."

"[I]t is only by wholly isolating the state from the religious sphere and compelling it to be completely neutral, that the freedom of each and every denomination and of all nonbelievers can be maintained."

"[N]o American should at any point feel alienated from his government because that government has declared or acted upon some 'official' or 'authorized' point of view on a matter of religion."

"[N]o particular religious sect or society ought to be favored or established, by law, in preference to others" (quoting Rhode Island's State Constitution)

"[N]o preference shall ever be given by law to any religious establishments or modes of worship." (quoting Pennsylvania's State Constitution)

"[O]rdering an instrumentality of the State to support religious evangelism with direct funding … is a flat violation of the Establishment Clause."

"[O]ur cases have prohibited government endorsement of religion, its sponsorship, and active involvement in religion, whether or not citizens were coerced to conform."

"[O]ur judicial opinions have refrained from drawing invidious distinctions between those who believe in no religion and those who do believe.  The First Amendment has lost much if the religious follower and the atheist are no longer to be judicially regarded as entitled to equal justice under law."

"[R]eligions supported by government are compromised just as surely as the religious freedom of dissenters is burdened when the government supports religion."

"[R]eligious exercises are not constitutionally invalid if they simply reflect differences which exist in the society from which the school draws its pupils.  They become constitutionally invalid only if their administration places the sanction of secular authority behind one or more particular religious or irreligious beliefs."

"[T]he attitude of government toward religion must be one of neutrality."

"[T]he central meaning of the Religion Clauses of the First Amendment … is that all creeds must be tolerated, and none favored. The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted."

"[T]he concept of neutrality … does not permit a State to require a religious exercise even with the consent of the majority of those affected."

"[T]he Constitution … demands that the State not take action that has the primary effect of advancing religion."

"[T]he Constitution mandates that the government remain secular, rather than affiliate itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths."

"[T]he Constitution's authors sought to protect religious worship from the pervasive power of government. The history of many countries attests to the hazards of religion's intruding into the political arena or of political power intruding into the legitimate and free exercise of religious belief."

"[T]he core rationale underlying the Establishment Clause is preventing 'a fusion of governmental and religious functions.'"

"[T]he dogma, creed, scruples or practices of no religious group or sect are to be preferred over those of any others."

"[T]he Establishment Clause ... forbids the State to employ its facilities or funds in a way that gives any church, or all churches, greater strength in our society than it would have by relying on its members alone.  Thus, the present regimes must fall under that clause for the

additional reason that public funds, though small in amount, are being used to promote a religious exercise.  Through the mechanism of the State, all of the people are being required to finance a religious exercise that only some of the people want and that violates the sensibilities of others."

"[T]he Establishment Clause … is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce non-observing individuals or not."

"[T]he First Amendment's purpose of requiring on the part of all organs of government a strict neutrality toward theological questions"

"[T]he government's use of religious symbols is unconstitutional if it effectively endorses sectarian religious belief."

"[T]he great purposes of the Constitution do not depend on the approval or convenience of those they restrain."

"[T]he individual's freedom of conscience [is] the central liberty that unifies the various Clauses in the First Amendment."

"[T]he mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred."

"[T]he State may not espouse a religious message."

"[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect."

"[T]his Court  … has found that the First and Fourteenth Amendments afford protection against religious establishments far more extensive than merely to forbid a national or state church."

"[T]hough the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself."

"[The Court] has consistently held that the [Establishment] clause withdrew all legislative power respecting religious belief or the expression thereof."

"[The] essence [of the constitutional protections of religious freedom] is freedom from conformity to religious dogma."

"[V]iewpoint discrimination occurs when government allows one message while prohibiting the messages of those who can reasonably be expected to respond."

"[W]e have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion."

"[W]e must not confuse the issue of governmental power to regulate or prohibit conduct motivated by religious beliefs with the quite different problem of governmental authority to compel behavior offensive to religious principles."

"A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion."

"absolute equality before the law, of all religious opinions and sects … The government is neutral, and, while protecting all, it prefers none, and it disparages none."

"Any spark of love for country which may be generated in a child or his associates by forcing him to make what is to him an empty gesture and recite words from him contrary to his religious beliefs is overshadowed by the desirability of preserving freedom of conscience to the full.  It is in that freedom and the example of persuasion, not in force and compulsion, that the real unity of America lies."

"Any use of such coercive power by the state to help or hinder some religious sects or to prefer all religious sects over nonbelievers or vice versa is just what I think the First Amendment forbids.  In considering whether a state has entered this forbidden field the question is not whether it has entered too far but whether it has entered at all."

"As a result, the public school system of Champaign actively furthers inculcation in the religious tenets of some faiths, and in the process sharpens the consciousness of religious differences at least among some of the children committed to its care. These are consequences not amenable to statistics."

"As we have repeatedly recognized, government inculcation of religious beliefs has the impermissible effect of advancing religion."

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs"

"Certainly the affirmative pursuit of one's convictions about the ultimate mystery of the universe and man's relation to it is placed beyond the reach of law.  Government may not interfere with organized or individual expression of belief or disbelief."

"Courts above all must be neutral, for '[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.'"

 "evenhanded treatment to all who believe, doubt, or disbelieve"

"For just as religion throughout history has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance.  The solution to this problem adopted by the Framers and

consistently recognized by this Court is jealously to guard the right of every individual to worship according to the dictates of conscience while requiring the government to maintain a course of neutrality among religions, and between religion and non-religion."

"Government [may not] foster the creation of political constituencies defined along religious lines."

"Governmental approval of religion tends to reinforce the religious message … and, by the same token, to carry a message of exclusion to those of less favored views."

"Here we have such a small minority entertaining in good faith a religious belief, which is such a departure from the usual course of human conduct, that most persons are disposed to regard it with little toleration or concern.  In such circumstances careful scrutiny of legislative efforts to secure conformity of belief and opinion by a compulsory affirmation of the desired belief, is especially needful if civil rights are to receive any protection."

"History teaches us that there have been but few infringements of personal liberty by the state which have not been justified … in the name of righteousness and the public good, and few which have not been directed … at politically helpless minorities."

"I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion or prohibiting the free exercise thereof,' thus building a wall of separation between church and State."

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.  If there are any circumstances which permit an exception, they do not now occur to us."

"In sum, the history which our prior decisions have summoned to aid interpretation of the Establishment Clause permits little doubt that its prohibition was designed comprehensively to prevent those official involvements of religion which would tend to foster or discourage religious worship or belief."

"In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'"

"It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"

"It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends [of compulsory unification of opinion] by avoiding these beginnings."

"Madison and his coworkers made no exceptions or abridgements to the complete separation they created.  Their objection was not to small tithes.  It was to any tithes whatsoever."

"Neither the National Government nor, under the Due Process Clause of the Fourteenth Amendment, a State may, by any device, support belief or the expression of belief for its own sake, whether from conviction of the truth of that belief, or from conviction that by the propagation of that belief the civil welfare of the State is served, or because a majority of its citizens, holding that belief, are offended when all do not hold it."

"No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."

"Not simply an established church, but any law respecting an establishment of religion is forbidden."

"Of course, giving sectarian religious speech preferential access to a forum close to the seat of government (or anywhere else for that matter) would violate the Establishment Clause …"

"Official compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship …"

"One of our basic rights is to be free of taxation to support a transgression of the constitutional command that the authorities 'shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

"Our country has become strikingly multireligious as well as multiracial and multiethnic. This fact, perhaps more than anything one could write, demonstrates the wisdom of including the Establishment Clause in the First Amendment."

"'Primary among those evils' against which the Establishment Clause guards 'have been sponsorship, financial support, and active involvement of the sovereign in religious activity"

"Public funds may not be used to endorse the religious message."

"reflects nothing more than the governmental obligation of neutrality in the face of religious differences"

"Should government choose to incorporate some arguably religious element into its public ceremonies, that acknowledgment must be impartial; it must not tend to promote one faith or handicap another; and it should not sponsor religion generally over nonreligion. Thus, in a series of decisions concerned with such acknowledgments, we have repeatedly held that any active form of public acknowledgment of religion indicating sponsorship or endorsement is forbidden."

"Th[e First] Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers …"

"The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope for attainment of that end."

"The cause of the conflict is the State's apparent approval of a religious or anti-religious message.  Our Constitution wisely seeks to minimize such strife by forbidding state-endorsed religious activity."

"the command of the First Amendment that the Government maintain strict neutrality, neither aiding nor opposing religion."

"The constitutional inhibition of legislation on the subject of religion has a double aspect.  On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.  Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law.  On the other hand, it safeguards the free exercise of the chosen form of religion."

"The Court today does only what courts must do in many Establishment Clause cases - focus on specific features of a particular government action to ensure that it does not violate the Constitution."

"The day that this country ceases to be free for irreligion it will cease to be free for religion - except for the sect that can win political power."

"The design of the Constitution is that preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission."

"The essence of the religious freedom guaranteed by our Constitution is therefore this: no religion shall either receive the state's support or incur its hostility.  Religion is outside the sphere of political government."

"The essential inquiry in each case, as expressed in our prior decisions, is whether the challenged state aid has the primary purpose or effect of advancing religion or religious education or whether it leads to excessive entanglement by the State in the affairs of the religious institution."

"The Establishment Clause withdrew from the sphere of legislative concern and competence a specific, but comprehensive, area of human conduct: man's belief or disbelief in the verity of some transcendental idea and man's expression in action of that belief or disbelief. Congress may not make these matters, as such, the subject of legislation, nor, now, may any legislature in this country."

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government … can pass laws which aid one religion, aid all religions, or prefer one religion over another.  Neither can …force him to profess a belief or disbelief in any religion."

"The First Amendment ... was one of twelve proposed on September 25, 1789, to the States by the First Congress after the adoption of our Constitution.  Ten were ratified.  They were intended to be and have become our Bill of Rights.  By their terms our people have a

guarantee that so long as law as we know it shall prevail, they shall live protected from the tyranny of the despot or the mob.  None of the provision of our Constitution is more venerated by the people or respected by legislatures and the courts than those which proclaim for our country the freedom of religion and expression."

"The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State."

"The Free Exercise Clause protects against governmental hostility which is masked as well as overt."

"The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief."

"The government must be neutral when it comes to competition between sects.  It may not thrust any sect on any person.  It may not make a religious observance compulsory."

"The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state.  For when it comes to rest upon that secular foundation it vanishes with the resting."

"The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs"

"The idea, as I understand it, was to limit the power of government to act in religious matters, not to limit the freedom of religious men to act religiously nor to restrict the freedom of atheists or agnostics."

"The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect."

"the protection of the Constitution must be extended to all, not only to those whose views accord with prevailing thought but also to dissident minorities who energetically spread their beliefs."

"The Religion Clauses prohibit the government from favoring religion"

"The spiritual mind of man has thus been free to believe, disbelieve, or doubt, without repression, great or small, by the heavy hand of government."

"the State is constitutionally compelled to assure that the state-sponsored activity is not being used for religious indoctrination."

"The test may be stated as follows: what are the purpose and the primary effect of the enactment?  If either is the advancement or inhibition of religion then the enactment

exceeds the scope of legislative power as circumscribed by the Constitution.  That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

"There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated.  And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal.  The First Amendment within the scope of its coverage permits no exception: the prohibition is absolute."

"There is an 'establishment' of religion in the constitutional sense if any practice of any religious group has the sanction of law behind it."

"These same precedents caution us to measure the idea of a civic religion against the central meaning of the Religion Clauses of the First Amendment, which is that all creeds must be tolerated, and none favored.  The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of religion with more specific creeds strikes us as a contradiction that cannot be accepted."

"This case, rather, involves the noncontroversial principle, repeated in Smith, that formal neutrality and general applicability are necessary conditions for free exercise constitutionality."

"to bar not only prohibitions of religious exercise fueled by the hostility of the majority, but prohibitions flowing from the indifference or ignorance of the majority as well."

"We are here concerned with a vital question involving the very foundation of our civilization.  Centuries ago our forefathers fought and died for the principles now contained in the Bill of Rights of the Federal and New Jersey Constitutions.  It is our solemn duty to preserve these rights and to prohibit any encroachment upon them."

"we have repeatedly held that any active form of public acknowledgment of religion indicating sponsorship or endorsement is forbidden."

"We have time and again held that the government generally may not treat people differently based on the God or gods they worship, or don't worship."

"We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma."

"We think that by using its public school system to encourage recitation of the Regents' prayer, the State of New York has adopted a practice wholly inconsistent with the Establishment Clause."

"What our Constitution indispensably protects is the freedom of each of us, be he Jew or Agnostic, Christian or Atheist, Buddhist or Freethinker, to believe or disbelieve, to worship or not worship, to pray or keep silent, according to his own conscience, uncoerced and unrestrained by government."

"When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.  But the purposes underlying the Establishment Clause go much further than that.  Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and degrade religion."

"Where the government's operation of a public forum has the effect of endorsing religion, even if the governmental actor neither intends nor actively encourages that result, … the Establishment Clause is violated."

"Where we have tested for endorsement of religion, the subject of the test was either expression by the government itself, ... or else government action alleged to discriminate in favor of private religious expression or activity."

"While our institutions reflect a firm conviction that we are a religious people, those institutions by solemn constitutional injunction may not officially involve religion in such a way as to prefer, discriminate against, or oppress, a particular sect or religion."

"While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs."

"[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices. The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years."

"[D]isplays of this kind inevitably have a greater tendency to emphasize sincere and deeply felt differences among individuals than to achieve an ecumenical goal. The Establishment Clause does not allow public bodies to foment such disagreement."

"[I]f government is to remain scrupulously neutral in matters of religious conscience, as our Constitution requires, then it must avoid those overly broad acknowledgments of religious practices that may imply governmental favoritism toward one set of religious beliefs."

"[T]he effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. That is a difference which the Constitution sets up between religion and almost every other subject matter of legislation, a difference which goes to the very root of religious freedom."

"[T]he endorsement test captures the essential command of the Establishment Clause, namely, that government must not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message "that religion or a particular religious belief is favored or preferred."

"[T]he government's sponsorship of prayer at the graduation ceremony is most reasonably understood as an official endorsement of religion and, in this instance, of theistic religion."

"[T]he judgment of the Establishment Clause is that neutrality by the organs of government on questions of religion is both possible and imperative."

"[T]he longstanding constitutional principle [is] that government may not engage in a practice that has the effect of promoting or endorsing religious beliefs."

"[T]he religious liberty so precious to the citizens who make up our diverse country is protected, not impeded, when government avoids endorsing religion or favoring particular beliefs over others."

"[T]he State cannot 'constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can (it) aid those religions based on a belief in the existence of God as against those religions founded on different beliefs.' In the vast majority of cases the inquiry, albeit an elusive one, can end at this point. Neutrality and voluntarism stand as barriers against the most egregious and hence divisive kinds of state involvement in religious matters."

"[U]nder the Religion Clauses government is generally prohibited from seeking to advance or inhibit religion."

"[W]hen [government] acts it should do so without endorsing a particular religious belief or practice that all citizens do not share."

"a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion."

"[W]hen … officials participate in or appear to endorse the distinctively religious elements of this otherwise secular event, they encroach upon First Amendment freedoms. For it is at that point that the government brings to the forefront the theological content of the holiday, and places the prestige, power, and financial support of a civil authority in the service of a particular faith."

"A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither atheism nor religion as its official creed."

"Allegheny County … has conveyed a message of governmental endorsement of Christian beliefs. This the Establishment Clause does not permit."

"Although a distinct jurisprudence has enveloped each of these Clauses, their common purpose is to secure religious liberty. See Engel v. Vitale, 370 U.S. 421, 430 (1962). On these principles the Court has been and remains unanimous."

"Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith."

"But it is not enough that the government restrain from compelling religious practices: It must not engage in them either."

"An Establishment Clause standard that prohibits only "coercive" practices or overt efforts at government proselytization, but fails to take account of the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others, would not, in my view, adequately protect the religious liberty or respect the religious diversity of the members of our pluralistic political community. Thus, this Court has never relied on coercion alone as the touchstone of Establishment Clause analysis."

"But, the First Amendment, in its final form, did not simply bar a congressional enactment establishing a church; it forbade all laws respecting an establishment of religion. Thus, this Court has given the Amendment a 'broad interpretation . . . in the light of its history and the evils it was designed forever to suppress. . . .' Everson v. Board of Education, supra, at pp. 14-15. It has found that the First and Fourteenth Amendments afford protection against religious establishment far more extensive than merely to forbid a national or state church."

"candor requires us to admit that this Alabama statute was intended to convey a message of state encouragement and endorsement of religion."

"Clearly freedom of belief protected by the Free Exercise Clause embraces freedom to profess or practice that belief"

"Compulsory attendance upon religious exercises went out early in the process of separating church and state, together with forced observance of religious forms and ceremonies."

"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so."

"First and foremost, [Justice O'Connor's Lynch] concurrence squarely rejects any notion that this Court will tolerate some government endorsement of religion. Rather, the concurrence recognizes any endorsement of religion as "invalid," id., at 690, because it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community,"

"I know of no principle under the Establishment Clause, however, that permits us to conclude that governmental promotion of religion is acceptable so long as one religion is not favored. We have, on the contrary, interpreted that Clause to require neutrality, not just among religions, but between religion and nonreligion."

"If government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community."

"If the primary end achieved by a form of regulation is the affirmation or promotion of religious doctrine - primary, in the sense that all secular ends which it purportedly serves are derivative from, not wholly independent of, the advancement of religion - the regulation is beyond the power of the state."

"In barring the State from sponsoring generically theistic prayers where it could not sponsor sectarian ones, we hold true to a line of precedent from which there is no adequate historical case to depart."
"In my opinion the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property.7 There is always a risk that such symbols will offend nonmembers of the faith being advertised as well as adherents who consider the particular advertisement disrespectful."

"In New York the teacher who leads in prayer is on the public payroll; and the time she takes seems minuscule as compared with the salaries appropriated by state legislatures and Congress for chaplains to conduct prayers in the legislative halls. Only a bare fraction of the teacher's time is given to reciting this short 22-word prayer, about the same amount of time that our Crier spends announcing the opening of our sessions and offering a prayer for this Court. Yet for me the principle is the same, no matter how briefly the prayer is said, for in each of the instances given the person praying is a public official on the public payroll, performing a religious exercise in a governmental institution."

"It is not a question of religion, or of creed, or of party; it is a question of declaring and maintaining the great American principle of eternal separation between Church and State." (quoting Elihu Root, Addresses  on Government and Citizenship, 137, 140)

"It is indeed true that there are certain tensions inherent in the First Amendment itself, or inherent in the role of religion and religious belief in any free society, that have shaped the doctrine of the Establishment Clause, and required us to deviate from an absolute adherence to separation and neutrality. Nevertheless, these considerations, although very important, are also quite specific, and where none of them is present, the Establishment Clause gives us no warrant simply to look the other way and treat an unconstitutional practice as if it were constitutional."

"it seems dangerous to validate what appears to me a clear religious preference."

"Nearly half a century of review and refinement of Establishment Clause jurisprudence has distilled one clear understanding: Government may neither promote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution. The application of these principles to the present case mandates the decision reached today by the Court."

"Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact "establishes a [state] religion or religious faith, or tends to do so."

"our cases do not require a plaintiff to demonstrate that a government action necessarily promotes religion, but simply that it creates such a substantial risk."

"Our decisions under the Establishment Clause prevent government from supporting or involving itself in religion."

"Our task is, as always, to decide only whether the challenged provisions of a law comport with the United States Constitution."

"People who share a common religious belief or lifestyle may live together without sacrificing the basic rights of self-governance that all American citizens enjoy, so long as they do not use those rights to establish their religious faith. Religion flourishes in community, and the Establishment Clause must not be construed as some sort of homogenizing solvent that forces unconventional religious groups to choose between assimilating to mainstream American culture or losing their political rights."

"Resolve that neither the state nor the nation, nor both combined, shall support institutions of learning other than those sufficient to afford every child growing up in the land the opportunity of a good common school education, unmixed with sectarian, pagan, or atheistical dogmas. Leave the matter of religion to the family altar, the church, and the private school, supported entirely by private contributions. Keep the church and state forever separated." (quoting President Grant's 'The President's Speech at Des Moines,' 22 Catholic World 433, 434-35 (1876))

"secular and religious authorities must not interfere with each other's respective spheres of choice and influence."

"Separation is a requirement to abstain from fusing functions of Government and of religious sects, not merely to treat them all equally."

"Separation means separation, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a 'wall of separation,' not of a fine line easily overstepped. The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools, to avoid confusing, not to say fusing, what the Constitution sought to keep strictly apart. 'The great American principle of eternal separation' – Elihu Root's phrase bears repetition-is one of the vital reliances of our Constitutional

system for assuring unities among our people stronger than our diversities. It is the Court's duty to enforce this principle in its full integrity. We renew our conviction that 'we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion."

"Should government choose to incorporate some arguably religious element into its public ceremonies, that acknowledgment must be impartial; it must not tend to promote one faith or handicap another; and it should not sponsor religion generally over nonreligion. Thus, in a series of decisions concerned with such acknowledgments, we have repeatedly held that any active form of public acknowledgment of religion indicating sponsorship or endorsement is forbidden."

"State governments, like the Federal Government, have been required to refrain from favoring the tenets or adherents of any religion or of religion over nonreligion, … and from establishing programs which unnecessarily or excessively entangle government with religion."

"The [First] Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion."

"the bedrock Establishment Clause principle that, regardless of history, government may not demonstrate a preference for a particular faith"

"the challenged public school programs operating in the religious schools may impermissibly advance religion in three different ways. First, the teachers participating in the programs may become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs. Second, the programs may provide a crucial symbolic link between government and religion, thereby enlisting - at least in the eyes of impressionable youngsters - the powers of government to the support of the religious denomination operating the school."

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."

"The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice"

"The Court must take care to speak and act in ways that allow people to accept its decisions on the terms the Court claims for them, as grounded truly in principle, not as compromises with social and political pressures having, as such, no bearing on the principled choices that the Court is obliged to make. Thus, the Court's legitimacy depends on making legally principled decisions under circumstances in which their principled character is sufficiently plausible to be accepted by the Nation."

"The endorsement test does not preclude government from acknowledging religion or from taking religion into account in making law and policy. It does preclude government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred. Such an endorsement infringes the religious liberty of the nonadherent, for "[w]hen the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion in plain."

"the established principle that the government must pursue a course of complete neutrality toward religion."

"The First Amendment put an end to placing any one church in a preferred position. It ended support of any church or all churches by taxation. It went further and prevented secular sanction to any religious ceremony, dogma, or rite."

"The First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion."

"Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices. The laws here in question were enacted contrary to these constitutional principles, and they are void."

"The freedom to worship as one pleases without government interference or oppression is the great object of both the Establishment and the Free Exercise Clauses."

"The fundamental source of constitutional concern here is that the legislature itself may fail to exercise governmental authority in a religiously neutral way."

"The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion."

"The general principle that civil power must be exercised in a manner neutral to religion"

"The Government's argument gives insufficient recognition to the real conflict of conscience faced by the young student. The essence of the Government's position is that, with regard to a civic, social occasion of this importance, it is the objector, not the majority, who must take unilateral and private action to avoid compromising religious scruples, hereby electing to miss the graduation exercise. This turns conventional First Amendment analysis on its head. It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice."

"The imperatives of separation and neutrality are not limited to the relationship of government to religious institutions or denominations, but extend as well to the relationship of government to religious beliefs and practices."

"The importance of that principle does not permit us to treat this as an inconsequential case involving nothing more than a few words of symbolic speech on behalf of the political majority. For whenever the State itself speaks on a religious subject, one of the questions that we must ask is "whether the government intends to convey a message of endorsement or disapproval of religion."

"The lessons of the First Amendment are as urgent in the modern world as in the 18th century, when it was written. One timeless lesson is that, if citizens are subjected to state-sponsored religious exercises, the State disavows its own duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people. To compromise that principle today would be to deny our own tradition and forfeit our standing to urge others to secure the protections of that tradition for themselves."

"the potential for conflict 'inheres in the situation,' and because of that the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination."

"The matter is not one of quantity, to be measured by the amount of money expended. Now as in Madison's day it is one of principle, to keep separate the separate spheres as the First Amendment drew them; to prevent the first experiment upon our liberties; and to keep the question from becoming entangled in corrosive precedents. We should not be less strict to keep strong and untarnished the one side of the shield of religious freedom than we have been of the other."

"the principles of separation and neutrality help assure that essentially religious issues, precisely because of their importance and sensitivity, not become the occasion for battle in the political arena."

"the respect for religious diversity that the Constitution requires."

"The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone."

"There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct. To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context."

"This principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence, ensuring that religious belief is irrelevant to every citizen's standing in the political community."

"We do not hold that Sunday legislation may not be a violation of the 'Establishment' Clause if it can be demonstrated that its purpose - evidenced either on the face of the legislation, in conjunction with its legislative history, or in its operative effect - is to use the State's coercive power to aid religion."

"We repeat and again affirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."

"When a statute is challenged as impinging on freedom of speech, freedom of the press, or freedom of worship, those historic privileges which are so essential to our political welfare and spiritual progress, it is the duty of this Court to subject such legislation to examination, in the light of the evidence adduced, to determine whether it is so drawn as not to impair the substance of those cherished freedoms in reaching its objective."

"When public school officials, armed with the State's authority, convey an endorsement of religion to their students, they strike near the core of the Establishment Clause. However "ceremonial" their messages may be, they are flatly unconstitutional."

"When the government arrogates to itself a role in religious affairs, it abandons its obligation as guarantor of democracy."

"When the government puts its imprimatur on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs."

"While in small communities of comparatively homogeneous religious beliefs, the need for absolute separation presented no urgencies, elsewhere the growth of the secular school encountered the resistance of feeling strongly engaged against it. But the inevitability of such attempts is the very reason for Constitutional provisions primarily concerned with the protection of minority groups."

"[T]he State may not favor or endorse either religion generally over nonreligion or one religion over others."

"What distinguishes the rule of law from the dictatorship of a shifting Supreme Court majority is the absolutely indispensable requirement that judicial opinions be grounded in consistently applied principle."

"When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."

"[S]crutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts."

"[T]he government may not favor one religion over another, or religion over irreligion."

"[T]he goal of the Clauses is clear: to carry out the Founders' plan of preserving religious liberty to the fullest extent possible in a pluralistic society."

## APPENDIX N

## 1994 SURVEY ON AMERICAN VIEWS OF THE MOTTO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 94-S-1345

ANNE N. GAYLOR; ANNIE LAURIE GAYLOR; DANIEL E.
BARKER; GLENN V. SMITH; JEFF BAYSINGER; LORA
ATTWOOD;   THE   FREEDOM   FROM   RELIGION
FOUNDATION, INC.; and THE COLORADO CHAPTER OF
THE FREEDOM FROM RELIGION FOUNDATION, INC.,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA; THE DEPARTMENT OF
THE TREASURY; LLOYD W. BENTSEN, SECRETARY OF
THE   TREASURY;   and   MARY   ELLEN   WINTHROW,
TREASURER OF THE UNITED STATES;

Defendants.

_____

### AFFIDAVIT OF SHARON R. CHAMBERLAIN

_____

I, Sharon R. Chamberlain, being duly sworn, do hereby make
the following affidavit:

1.   I am the President and sole owner of Chamberlain
Research Consultants. I have been in the polling business since 1988.

2.   Chamberlain Research Consultants (CRC) is an
independent, full-service market research firm. We are located at
4801 Forest Run Road in Madison, Wisconsin and have been in

business since 1988. The firm has been solely owned by me since June of 1990; prior to that, it was a branch of Matousek and Associates, where I was a partner.

3.      Wisconsin Interviewing Services (WIS) is the field service owned by CRC. The field service includes a phone bank and focus group facility. WIS is responsible for the actual collection of data. CRC is responsible for research design and analysis. CRC/WIS employs approximately six full-time and 25 to 50 part-time people at any given time.

4.      CRC/WIS clients include: school districts, utility companies, political candidates, lobbyists, restaurants and food manufacturers, trade associations, ad agencies and design firms, marketing firms, insurance companies, government agencies, law firms, new product developers, newspapers, and radio stations.

5.      CRC was contracted by the Freedom From Religion Foundation, Inc. to conduct a poll on the use of the phrase "In God We Trust" as seen on U.S. currency. The poll was conducted with 900 adults across the nation. The number of surveys was chosen to provide a sufficient margin of error, in other words, approximately ±3%.

6.      CRC purchased a random sample telephone list from Scientific Telephone Samples (STS) in California for use in this study. STS was instructed by CRC to draw the numbers proportionately to population across all 50 states. The sample was generated so that unlisted phone numbers were not excluded from the sample.

7.      Quotas were set for gender based on the most recent U.S. Census data available (1990: 52% female, 48% male). The gender constraints were placed on the sample because past experience has shown us that the proportion of women who answer

the telephone is higher than the actual proportion of women in the population.

8. The poll was in the field May 18-23, 1994. All surveys were conducted from a supervised phone bank. Over 10% of the interviews were monitored by a supervisor through our special phone system, and/or called back for transcription verification. Over 10% of the keying-in data entry was also verified.

9. Among the employees of CRC and WIS who assisted with this survey, in addition to me, were: Janeen Potts, Interim Field Service Director; Rob Padley, Supervisor; Ryan Randall, Supervisor; and Nicole Wyrembeck, Senior Analyst.

10. Attached as Exhibit A is the survey form with raw data, exact questions and their responses.

11. This poll establishes that the majority of those surveyed believe that the phrase "In God We Trust" is religious, as opposed to non-religious, and endorses a belief in God. As for endorsing religion over atheism, almost 11% of the respondents did not choose yes or no. Of those who did give an opinion, the majority agreed that the phrase does endorse religion over atheism.

12. The margin of error for this poll was ±3.22% at the 95% confidence level.

13. This poll was conducted in accordance with generally accepted standards in the industry.

Further, the affiant sayeth not.

Sharon R. Chamberlain

STATE OF WISCONSIN          )
                            ) ss.
COUNTY OF DANE              )

Subscribed and sworn to before me this 14th day of September,
1994.

Jacklyn M. Sande
Notary Public

My commission expires: 2-19-97

MOTTO TEST: Raw Data

Job # 132
May 18-23, 1994                         Sex: Male    Female
Sample Size = 900                              48%     52%
Margin of Error = ±3.22%

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Hello, this is _____ from Chamberlain
Research. Tonight we're doing a one minute survey with people
across the nation. Am I speaking with someone who is over the age
of 18?   (If not, ask to speak with someone who is, terminate if
none)

The United States is currently working on redesigning US currency.
The topic of my three questions is the motto "In God We Trust," as
seen on US currency.

1.     Is "In God We Trust" religious or non-religious?

         Religious..........................................550
                                         61.1%

         Non-religious.................................271
                                         30.1%

         DK...................................................79
                                         8.8%

2.     Does "In God We Trust" endorse a belief in God?

         Yes...................................................641
                                         71.2%

                                                    EXHIBIT A

No...................................................217
24.1%

DK...................................................42
4.7%

3.    Does "In God We Trust" endorse religion over atheism?

Yes..................................................480
53.3%

No...................................................322
35.8%

DK...................................................98
10.9%